### CITIZENS COMMITTEE AGAINST INTERSTATE ROUTE 675, et al., Plaintiffs,

v.

### Drew LEWIS, Secretary, U.S. Department of Transportation, et al., Defendants.

### No. C–3–82–017.

United States District Court, S. D. Ohio, W. D.

June 10, 1982.

Thomas L. Crowl, Dayton, Ohio, Philip W. Moore, Steven Root, Washington, D. C., for plaintiffs.

Robert J. Fogarty, James A. Wilson, Asst. U. S. Attys., Dayton, Ohio, Robert B. Schaefer, Land & Natural Resources Division, Washington, D. C., for defendant Drew Lewis.

John Tanoury, Deputy Chief Asst. Atty. Gen., Columbus, Ohio, Robert E. Hickey, Jr., Dayton, Ohio, for defendant Ohio Dept. of Transp.

Charles H. Horn, Dayton, Ohio, for intervening party defendants, Dayton Area Chamber of Commerce, Montgomery-Greene County Transportation & Development Planning Program (TCC).

Thomas Randolph, Deputy Director of Law, Dayton, Ohio, for amicus City of Dayton.

James D. Ruppert, Les Landen, Franklin, Ohio, for amicus Wright State University and Dr. Robert J. Keggereis, President of Wright State University.

Richard A. Frye, Knepper, White, Arter & Hadden, Columbus, Ohio, for amicus Ohio Contractors Ass'n.

RICE, District Judge.

#### Table of Contents

| | | |
|---|---|---|
| I. | Findings of Fact | 506–521 |
| II. | Scope of Review | 521–522 |
| III. | Standing | 522–526 |
| IV. | Laches | 526–538 |

V. Socio-Economic Impacts _____ 528–538

VI. Reasonable Alternatives to I–675 __ 538–550

VII. Other Alleged Inadequacies in the
 FEIS _____ 550–572

 A) FEIS Assessment of Need for
 I–675 _____ 550–566

 B) Adequacy of Discussion of
 Noise Impacts _____ 566–571

 C) Response to Agency Com-
 ments _____ 571–572

VIII. The 1981 Lewis Decision _____ 572–583

IX. Bad Faith—Count IV _____ 583

X. Alleged Violation of 23 U.S.C.
 § 134—Count III _____ 583–585

XI. Footnotes _____ 506–584

OPINION; EXPANDED OPINION WITH DETAILED FINDINGS OF FACT AND CONCLUSIONS OF LAW; JUDGMENT TO BE ENTERED IN FAVOR OF DEFENDANTS ON ALL ASPECTS OF PLAINTIFFS' COMPLAINT; PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF DENIED; TERMINATION ENTRY

The captioned cause came on to be heard upon the Plaintiffs' request for preliminary and permanent injunctive relief, enjoining construction of a 13.5 mile segment of Interstate 675, in Greene and Montgomery Counties, from U.S. 35, south to Interstate 75.

According to prior agreement between Court and counsel, the oral hearing upon the Plaintiffs' request for a preliminary injunction was combined with trial upon the merits, pursuant to Fed.R.Civ.P. 65(a)(2).

The trial upon the merits was held on April 1st and 2nd, 1982, and the captioned cause submitted for decision upon the testimony adduced at trial, the pretrial and post-trial memoranda of counsel and of the amicus curiae, the voluminous administrative record and the exhibits admitted into evidence.

Based upon the reasoning, Findings of Fact and Conclusions of Law set forth in detail below, this Court finds for the Defendants and against the Plaintiffs, on the entirety of the Plaintiffs' complaint. The Plaintiffs' request for injunctive relief is, therefore, denied.

Before addressing the specific substantive issues which have been raised herein, the Court will first set forth its Findings of Fact, and the general principles of law which are applicable to review of administrative actions and to claims arising under the National Environmental Policy Act.[1] Following these matters, the Court will then discuss certain standing issues which have been raised herein, the laches argument presented by Defendants, and the substantive allegations of the Complaint. It should also be noted that the jurisdiction of the Court has not been contested.

## I. FINDINGS OF FACT

The following items constitute the Court's Findings of Fact, based upon the administrative record, testimony, exhibits, and depositions received in connection with the trial of the within case. In addition, all other factual conclusions made throughout the text of this Opinion are incorporated into the Court's Findings of Fact.

1. The following is a list of abbreviations utilized herein:

ODOT—Ohio Department of Transportation

NEPA—National Environmental Policy Act

TCC—Transportation Coordinating Committee

MVRPC—Miami Valley Regional Planning Council

USDOT—United States Department of Transportation

FHWA—Federal Highway Administration

DEIS—The draft environmental impact statement filed herein

FEIS—The final environmental impact statement filed herein

USEPA—United States Environmental Protection Agency

RCC—Regional Transportation Committee, the predecessor of TCC

BPR—Bureau of Public Roads, the predecessor of FHWA

ODR—Ohio Department of Roads, the predecessor of ODOT

EIS—Environmental Impact Statement

CEQ—Council on Environmental Quality

WPAFB—Wright Patterson Air Force Base

MPO—Metropolitan Planning Organization

UMTA—Urban Mass Transit Administration

TSM—Transportation System Management

RAPCA—Regional Air Pollution Control Agency

SMSA—Standard Metropolitan Statistical Area

*A. Chronology*

1. In 1957, the United States Bureau of Public Roads (BPR) (predecessor of the Federal Highway Administration) authorized a belt route as part of the interstate system for the Dayton area, which was eventually designated as I–675. A consulting engineering firm was hired to determine whether the beltway should be located on the east or west side of Dayton. (Gov. Ex. F, § 1.01, p. 1/1.)

2. Late in the Fall of 1959, the State negotiated an agreement with a Consulting Engineering firm for the preparation of a Preliminary Engineering Report which was to investigate the question of location on the east or west side of Dayton, and develop a proposed route for I–675. This agreement was approved by the BPR on March 29, 1960. (Gov. Ex. F, § 1.02, p. 1/1.)

3. In April, 1960, the Ohio Department of Highways (ODH) (predecessor of the Ohio Department of Transportation) and the BPR met with officials from the Montgomery-Greene County Regional Transportation Committee (RTC) (predecessor of the Transportation Coordinating Committee) and local communities to discuss possible route corridor locations of the beltway. (Gov. Ex. F, § 1.03, p. 1/1.)

4. The Consultant prepared and submitted to the State an informal report (dated 31 May 1960) which discussed a number of different physically feasible route corridors west of Dayton and east of Dayton. This report was summarized in a Preliminary Engineering Report. Control factors considered in the Studies were: concentrated residential, commercial or industrial development; public lands such as schools, parks, and military bases; semi-public properties such as churches, cemeteries, and golf courses. Proposed future land uses were not necessarily considered as controlling features, but known major planned developments within the various corridors were considered in the selection of a recommended corridor. This report recommended that the belt route be located on the east side of Dayton. (Gov. Ex. F, § 1.04, p. 1/1; Gov. Ex. S.)

5. In July 1960, the BPR approved the general location of the recommended east corridor location for further engineering studies. (Gov. Ex. F, § 1.05, p. 1/2.)

6. In December 1961, the consulting engineering firm completed and submitted a preliminary engineering report which included a recommended location within the eastern corridor and some minor (non-relevant) alternatives. (Gov. Ex. F, § 1.06, p. 1/2; Gov. Ex. T.)

7. Copies of the consultant's report were reviewed by the State, the BPR and local officials. (Gov. Ex. F, § 1.07, p. 1/2.)

8. In 1962, local officials took exception to the route location recommended in the 1961 preliminary engineering report. The RTC developed a "close-in" route through Kettering and the eastern section of Dayton, called the Southern Expressway. This recommendation was concurred in by the State. The BPR did not approve the "close-in" route, since it judged that it did not meet the criteria for an interstate belt route. Subsequently, after further studies by the RTC and others, agreement was reached in 1963 on a location which essentially follows the one presently established for I–675. This location was approved by the BPR in January 1965, subject to additional studies and evaluation of the merits of possible alternate alignments and a public hearing on January 22, 1965. (Gov. Ex. F, §§ 1.08–1.10, pp. 1/2–1/4; Gov. Ex. U.)

9. On March 9, 1965, a public hearing was held on the proposed alignment for I–675. Many comments and suggestions were presented for consideration by local and state officials. The general alignment of I–675 was approved by the Director of Highways on April 19, 1965. On July 13, 1965, the BPR approved the routing for I–675 on the general alignment east of Fairborn, Ohio. (Gov. Ex. F, §§ 1.11–1.12, p. 1/4; Gov. Ex. V.)

10. Concurrently with the development of the proposed I–675 alignment, the RTC was developing a Regional Transportation Plan. "The Regional Transportation Plan, Volume II," (Gov. Ex. I) was completed in

September 1965. This plan included I–675, in its present corridor, as part of the planned system of highways for Greene and Montgomery Counties. (Gov. Ex. F, § 1.13, p. 1/4; Gov. Ex. I.)

11. Two consulting engineering firms were hired by ODOT in 1966 to develop construction contract plans for I–675. As a result of public comments received at the public hearing and the communications received by the State concerning the alignment, the consultants prepared studies of alternates to the proposed alignment south of U.S. 35, identified at the March 9, 1965 public hearing. A report which took into consideration regional and community growth, public facilities and services, displacement of residents and businesses, fast, safe and efficient transportation and highway costs and user benefits was issued on July 12, 1966. After reviewing this report, the State conducted a second public hearing which was required due to certain minor and nonrelevant alignment changes recommended in the report. On February 10, 1967, the second public hearing was held where the alignment and adjustments were presented. Subsequently, construction plans were prepared for the corridor defined at this hearing, which is essentially the existing alignment of I–675. (Gov. Ex. F, §§ 1.14–1.17, pp. 1/4–1/5; Gov. Ex. V.)

12. For right of way acquisition and construction purposes, I–675 was divided into individual Construction Sections. These seven sections are identified on Gov. Ex. N. Construction Sections Nos. 1–3 are south of U. S. 35 and Construction Sections Nos. 4–7 are north of U. S. 35.

13. On May 23, 1966, the BPR authorized the ODH to proceed with "right of way incidentals" for Construction Sections Nos. 1–6. This authorization enabled the ODH to prepare parcel descriptions and appraisals for the parcels to be acquired, but did not authorize acquisition of the right of way. (Gov. Ex. G, pp. 3, 5.)

14. The Federal Highway Administration (FHWA) authorized the Ohio Department of Transportation (ODOT) to begin full right of way acquisition for the Construction Sections as follows:

| Date | Construction Section No. | Description |
|------|------|------|
| 3–12–71 | 6 | North Fairfield Road to S.R. 235 |
| 6–18–71 | 3 | Wilmington Pike to U.S. 35 |
| 12–27–71 | 7 | S.R. 235 to I–70 |
| 8–25–72 | 5 | Kemp Road to North Fairfield Road |
| 11–3–72 | 4 | U.S. 35 to Kemp Road |
| 8–14–73 | 1 | I–75 to Normandy Lane |

(Gov. Ex. G, pp. 51, 79, 80, 90, 114.)

15. By August 14, 1973, the FHWA had authorized the ODOT to begin full right of way acquisitions for all of I–675 with the exception of Construction Section No. 2, from Normandy Lane to Wilmington Pike. With respect to this construction section, a number of advance right of way acquisitions were authorized for hardship and protective buying reasons on a parcel by parcel basis. The first parcel was authorized on October 13, 1969 and the last parcel was authorized on May 6, 1976. A total of 11 parcels were authorized during this period. Of these parcels, only six were authorized subsequent to August 15, 1973. (See paragraph 21, below, for significance of this date) (Gov. Ex. G, pp. 37, 93, 96, 99, 105, 109.)

16. On January 29, 1970, the FHWA authorized the ODOT to advertise for receipt of bids for a bridge project carrying Loop Road over I–675. This project was within the limits of Construction Project No. 2. The bridge project was completed on October 23, 1970 at a cost of $214,521. (Gov. Ex. F, §§ 1.19, 2.2.13, pp. 1/6, 2.2/4.)

17. On May 17, 1972, the FHWA authorized the ODOT to advertise for receipt of bids for Construction Section No. 6. This 5.83 mile construction section from North Fairfield Road to State Route 235 was opened to traffic on October 30, 1974 at a total cost of $10,856,427. (Gov. Ex. F, § 1.19, p. 1/6.)

18. On April 25, 1973, FHWA authorized ODOT to advertise for receipt of bids for

Construction Section No. 7. This 3.55 mile construction section from State Route 235 to I–70 was opened to traffic on October 29, 1975 at a total cost of $13,428,389. (Gov. Ex. F, § 1.19, p. 1/6.)

19. These three construction projects discussed in paragraphs 16, 17 and 18, totalling $24,499,337, did not require the preparation of an Environmental Impact Statement (EIS). Therefore, the EPA requirements did not apply to these projects.

20. Concurrently with the preparation of the construction plans, properties along the proposed I–675 corridor were being purchased and developed by private interests. In many cases these private developments were coordinated with the proposed highway. Ohio Department of Transportation records reveal that at least 56 separate developments were coordinated with the highway plan. The boundary lines of many of the developments are coincident with the right-of-way lines for the proposed freeway. See Exhibit XIV and Exhibit XV. (Gov. Ex. F, § 1.18, p. 1/6.)

21. On June 23, 1973, the FHWA and the National Wildlife Federation entered into a consent agreement whereby FHWA agreed that it would not grant any "proposed FHWA authorization" after August 15, 1973 for major projects without completing an environmental reassessment to determine if an EIS was required. The consent agreement provided that the FHWA could authorize right of way acquisitions in hardship cases or for protective buying in extraordinary circumstances. The consent agreement did not rescind nor restrict prior approvals or authorizations given by the FHWA on active projects. (Gov. Ex. A, pp. 1–3.) Prior to this time, although the NEPA had become effective on January 1, 1970, there was no requirement to file an EIS in a situation in which the FHWA authorization was sought for the building of a highway. Subsequent to this date, the FHWA was required to comply with the requirements of the NEPA, which included the preparation, circulation and approval of an EIS. Pursuant to the consent agreement, the FHWA made an environmental reassessment on October 24, 1973, concluding that an EIS should be prepared for all of I–675 which was not then under construction; namely, the Construction Sections 1–5, from I–75 to North Fairfield Road. (Gov. Ex. A, pp. 4–9; Gov. Ex. F, § 1.20, p. 1/6.)

22. As of October 24, 1973, approximately 80% of the right of way parcels for project No. I–675–8(13) had been acquired. On the remaining projects, total right of way acquisition was around 24%.

23. From 1974 through 1976, a Draft Environmental Impact Statement (DEIS) (Gov. Ex. B) was prepared by a consultant under the ODOT's direction and with considerable input from the FHWA. The DEIS was made available to the public on December 22, 1976 and to the Council on Environmental Equality (CEQ) on December 23, 1976. The notice of submission to CEQ and of public availability was published in newspapers of general circulation in the Montgomery-Greene County area on January 7, 1977. The final deadline for public and agency comments was set for February 10, 1977. (Gov. Ex. A, pp. 11–12, 24–26.)

24. Many comments, both favorable and unfavorable, were received from the public and agencies concerning the DEIS. By memorandum dated February 28, 1977, the Office of the Secretary of Transportation advised the FHWA that it had received the DEIS but had no comments. (Gov. Ex. A, pp. 16–19; Gov. Ex. F, p. 9.2/29.)

25. As a result of comments received from agency and public review of the DEIS, various changes were incorporated into the Final Environmental Impact Statement (FEIS). Those changes included the following:

(A) *Updated population and traffic projections consistent with those used for other programs in the Dayton area planning process*—traffic assignments updated in connection with the development of the year 2000 long range transportation plan by the Transportation Committee (TCC). This plan considered three alternate transportation systems for the year

2000: high highway-low transit (HH-LT), medium highway-medium transit (MH-MT), and low highway-high transit (LH-HT). Following extensive public input, the MH-MT alternate was supported by all local jurisdictions and selected by the Transportation Coordinating Committee. Although the design year traffic assignments resulting from the year 2000 transportation plan study were seen to be somewhat lower than the design year traffic assignments used in the DEIS, the study concluded that I-675 was still warranted from a traffic demand standpoint.

(B) *Noise impact*—as the result of the updated traffic volumes referred to above, the number of areas where design noise levels would be exceeded was reduced from 29 to 22. Noise abatement measures had been studied and the construction of nine barriers was recommended as part of the highway improvement.

(C) *I-675 redesigned in order that no land from Grant Park would be used for construction purposes.*

(D) *Air quality—updated air quality analysis using the latest emission factors.* The previous analysis was updated using emission factors set forth in EPA's Supplement 8. The results were coordinated with and reviewed by the Ohio EPA and were found to be consistent with the State of Ohio implementation plan as to the attainment and maintenance of desirable air quality conditions.

(E) *Restoration of traffic circulation within the "Concept Four" subdivision by means of a grade separation*—certain design changes made, the major one being provisions for a grade separation structure carrying I-675 over Vineland Trail in order to restore community cohesion.

(F) *Flood hazard evaluation*—a 100 year frequency storm evaluation concluded that increased width of the Holes Creek Channel relocation was required, thus resulting in redesign of all bridges over Holes Creek to provide greater waterway openings. (Gov. Ex. A, pp. 29–33, and references to EIS, Gov. Ex. F, contained therein.)

(G) *Ecology*—eight separate coordination activities with the United States Fish and Wildlife Service, including two joint field reviews, resulted in agreement on construction of aerators, low flow channels and pools, planting of trees along stream banks and extent of channel work. The relationship between the proposed highway improvement and the pond in Pondview Park was clarified. The section dealing with run-off from deicing chemicals was rewritten.

(H) *Alternatives*—the various references to alternatives were strengthened and updated, mainly by inclusion of the results of the year 2000 long range transportation plan update.

(I) *Public participation and planning process*—reference was made to the discussions on the continuing nature of the transportation plan update and the opportunity for public participation in the planning process.

26. The FEIS was adequate in that:

(A) There was adequate consideration of the need for the highway, including specifically traffic patterns and population growth;

(B) there was adequate consideration of noise abatement programs;

(C) there was adequate consideration of the relationship between I-675 and development resulting from the construction of the highway;

(D) there was adequate consideration of alternatives to the proposed I-675; and

(E) there was no necessity for consideration in the FEIS of urban-socioeconomic impacts upon the City of Dayton from the proposed highway. Assuming *arguendo* that socio-economic impacts should have been considered, they were adequately discussed in the FEIS.

27. On October 31, 1978, ODOT formally submitted the FEIS to the FHWA Ohio Division Office. After review by the Division Office, the FEIS was submitted with a recommendation for approval to the FHWA Regional Office on November 9, 1978. (Gov. Ex. A, pp. 27–28). On December 20,

1978, the FHWA Regional Office transmitted the FEIS to FHWA's Washington Office with a recommendation that the Washington Office concur in the Regional Office's proposed approval of the FEIS. The Washington Office of the FHWA found the FEIS adequate and on January 16, 1979, submitted the FEIS to the Office of the Secretary of the Department of Transportation for concurrence. (Gov. Ex. A, pp. 34–36.) DOT Order 5610.1B, ¶ 9(c)(1), (5) provides that for highway projects such as I–675, prior concurrence of the Regional Office's approval of an FEIS must be obtained from both the Washington Office of FHWA and the Office of the Secretary. (Gov. Ex. O.)

28. On March 23, 1979, United States Transportation Secretary Brock Adams advised the ODOT of President Carter's urban policy, stating that the Federal Government must support the continued vitality of the nation's urban centers. In light of that urban policy, Secretary Adams requested that the ODOT solicit the views of the Miami Valley Regional Planning Commission (MVRPC) concerning the impact of I–675 on the City of Dayton, by supplying answers to the following five questions:

(A) What are the expected benefits and adverse impacts to the City of Dayton of the construction of I–675? In particular, what are the anticipated effects on current business and employment in the city, especially the central business district, and on opportunities for future business and employment growth? In addressing these questions, consideration should be given to possible plans of businesses currently located in Dayton to build in the I–675 corridor if the road is constructed, as possibly reflected in land ownership in this corridor;

(B) What will be the likely impacts of the proposed project on lower income residents of Dayton, other socially disadvantaged segments of the population, and minority businesses?

(C) What is the relationship of I–675 to the Dayton City Plan and to future development plans of the city?

(D) What benefits and possible adverse impacts would the completion of I–675 have on the metropolitan area in general that may reflect directly on the economic and social vitality of Dayton?

(E) In light of all relevant information, including particularly the answers to the above questions, what conclusions does the MVRPC reach regarding the desirability of constructing I–675 as planned or with modification?

(Gov. Ex. A, pp. 37–38.)

29. On May 24, 1979, MVRPC responded to the request of Secretary Adams by submitting a report entitled *"Analysis of Impacts of I–675 East upon the City of Dayton, Minorities, Low and Moderate Income Persons and Urban Sprawl."* (Gov. Ex. C.) The report concluded that "there is no impact methodology for assessing" the question of how completion of I–675 will affect the retail environment of the Central Business District. (Gov. Ex. C, p. 5.) The report goes on to state that "[m]easuring the price impact of I–675 East on the City of Dayton housing market is difficult." (*Id.*, p. 12.) Neither is there a reliable methodology that "permits the prediction of a number of jobs *which will be drawn from the City of Dayton* or identifies the jobs that *would go to the City of Dayton* if I–675 were not built" ... (*Id.* at 15, emphasis in original.) The report also states that "[i]t is impossible to determine what I–675 will do to the competitiveness of minority business firms vs. non-minority firms which locate along I–675." (*Id.*, p. 24.) The MVRPC Chairman, in a memorandum transmitting the report, frankly conceded that the "technology for undertaking such an urban analysis report is scant." (*Id.*, May 16, 1979 Memorandum of Nora Lake, p. 4.) The report and accompanying resolution endorsed full completion of I–675 as proposed and directed that negotiations concerning nine mitigating actions be encouraged between the affected local governments and the applicable state and federal agencies. (Gov. Ex. A, pp. 50–52, *see also*, pp. 43–48, staff reports behind letter.) Plaintiff Dean Lovelace submitted comments concerning this report. (Gov. Ex. C, App. A; Lovelace Ans. to Interrog. 22.)

The nine mitigating factors were as follows:

(A) Encourage the prime contractor on the I–675 project to subcontract at least 10% of the direct labor to a minority business enterprise (or combinations thereof) in the Dayton area;

(B) Have the U. S. Department of Housing and Urban Development give high priority to earmarking Section 8 new unit funds for planning units in the I–675 corridor;

(C) Encourage local units of government along the I–675 east corridor to adopt MVRPC's areawide housing opportunity plan by resolution prior to approval of any remaining segment of the interstate, if they have not done so already;

(D) Encourage all local units of government having development control along the I–675 corridor to adopt the regional plan, framework for change, by resolution to assure that intensive land development within their jurisdictions will be limited to urban service areas as shown in the plan;

(E) Encourage all local units of government to submit all developments within a mile radius of I–675 freeway interchanges to MVRPC and TCC for review and comment;

(F) Encourage all local units of government along the I–675 corridor to sign MVRPC's affirmative fair and equal housing plan;

(G) Encourage an expanded regional transit authority (RTA) for Montgomery County;

(H) Encourage local units of government to negotiate agreements or establish mechanisms to share additional tax revenues due to development associated with construction of interstates;

(I) Encourage the City of Dayton to commit itself to developing a transit and pedestrian emphasis on Main Street in the Dayton Central Business District and USDOT to commit urban initiative study funds to this effect.

These nine mitigating factors have been addressed between local, state and federal governmental agencies and entities, with the result that some success has been achieved as of the date of the trial. These nine mitigating objectives have at least been begun or, in the case of the transit expansion objective, implemented. In terms of the other objectives and mitigating factors, there is progress in varying degrees in each of the objectives, even though the objectives were never accepted at the federal level. (*See* testimony of Jack Jenson, Executive Director of the TCC.)

30. The urban impact studies were not made part of the FEIS nor circulated for comment.

31. On June 21, 1979, the City of Dayton submitted to Secretary Adams its statement on the mitigating conditions that it thought necessary to minimize what it believed to be the adverse fiscal and economic impacts of I–675 on the City of Dayton. The City of Dayton advocated building I–675 only north of U. S. 35. (Gov. Ex. A, pp. 64, 67–85.)

32. On October 11, 1979, the FHWA Deputy Administrator, John Hassell, wrote a letter to Ohio Governor Rhodes outlining the three options available to Ohio concerning I–675. Hassell advised that the State could: (1) proceed with completion of I–675; (2) withdraw the uncompleted portion of I–675 in accordance with 23 U.S.C. § 103(e)(4), and transfer funds to support other area transportation needs; or (3) proceed with completion of I–675 to U. S. 35 and withdraw the remainder. (Gov. Ex. A, pp. 86–90.)

33. On November 29, 1979, Secretary Neil Goldschmidt issued a Decision Memorandum which approved I–675 only with respect to that segment of the highway south from its present terminus at North Fairfield Road to an intersection with U. S. 35. He disapproved the proposed project south of U. S. 35 to I–75. Secretary Goldschmidt also requested that state, local and regional officials develop alternative approaches to the transportation needs in the I–675 corridor south of U. S. 35. He concluded that the FHWA should indicate to Governor Rhodes that it would entertain

a request from the Governor to initiate withdrawal and substitution proceedings for that portion of I–675 south of U. S. 35. (Gov. Ex. A, pp. 95–100.)

Secretary Goldschmidt made no determination concerning the adequacy of the final EIS, in terms of its compliance with either NEPA, the regulations enacted thereunder or prevailing case law.

34. On December 11, 1979, Charles Swinburn, Acting Assistant Secretary for Policy and International Affairs, concurred in the FEIS consistent with Secretary Goldschmidt's November 29, 1979 Decision Memorandum (approving the construction of I–675, south to U. S. 35) and directed that the Decision Memorandum be made part of the FEIS. (Gov. Ex. A, pp. 101–102.) On December 28, 1979, the FHWA Regional Administrator, through his designee, signed the title sheet of the FEIS and filed the FEIS with the United States Environmental Protection Agency (USEPA). The FEIS which was then filed is the same FEIS which was found acceptable on July 6, 1981 by FHWA Administrator Barnhart, with the concurrence of Assistant Secretary for Policy and International Affairs, Judith Connor. The Plaintiffs did not file any objections to adequacy of the FEIS in 1979. (Gov. Ex. A, pp. 110–111; Pl.Interrog.)

35. On January 7, 1980, the FHWA Ohio Division formally notified the ODOT of the FEIS limited approval and Secretary Goldschmidt's Decision Memorandum. On February 8, 1980, ODOT wrote the USEPA and stated its position on what it considered as the impropriety of Secretary Goldschmidt's decision. (Gov. Ex. A, pp. 112, 114–116.)

36. The FEIS was published in the *Federal Register* on January 11, 1980, with the review period ending February 11, 1980.

37. On February 22, 1980, the ODOT formally distributed the FEIS to agencies and to the public. In its distribution memorandum, the ODOT stated that the Secretary's Decision Memorandum and the ODOT's disclaimer were considered part of the FEIS. (Gov. Ex. A, pp. 117–119.)

38. On March 14, 1980, the FHWA Ohio Division notified the ODOT to stop all preliminary engineering work on construction contract plans for that portion of I–675 South of U. S. 35. (Construction Sections Nos. 1 through 3.) On May 13, 1980, the FHWA Ohio Division notified the ODOT not to initiate any new right of way negotiations for that portion of I–675 south of U. S. 35. (Gov. Ex. A, p. 120; Gov. Ex. G, p. 118.)

39. On March 25, 1980, the Transportation Coordinating Committee (TCC) requested the FHWA's concurrence in its decision to use the previously determined year 2000 socio-economic and land use forecasts for its study of alternatives to construction of I–675, south of U. S. 35. The TCC's request was based upon a report (*Analysis of Projected and Proposed Growth in I–675 Corridor*) which showed that a redistribution of previously forecasted population growth was unnecessary. The TCC's position was based on observed growth trends in the region to that date and the regional consensus that alternative transportation improvements were needed in the corridor as a first priority. On April 7, 1980, after reviewing the TCC analysis, the FHWA Ohio Division concurred. (Gov. Ex. A, pp. 124–131.)

40. On July 7, 1980, the TCC transmitted to the ODOT a report entitled "*Supplemental Analysis for Interstate Route 675, GRE–675–5.37/675–7.43.*" (Gov. Ex. D; Gov. Ex. A, p. 132.) This report dealt with Construction Section Nos. 4 and 5, from North Fairfield Road to U. S. 35. The report was written in response to Secretary Goldschmidt's November 29, 1979, decision wherein he requested additional information on improved transit service including high occupancy vehicle lanes (HOV) on U. S. 35 and on the north portion of I–675 in order to serve Wright-Patterson Air Force Base (WPAFB) and Wright State University (WSU). Major findings of the report included: (a) HOV lanes on U. S. 35 and I–675 were not justified and (b) transit needs in the I–675 corridor would be adequately met. The report was forwarded to the Ohio Division FHWA on July 25, 1980

and to Region 5, FHWA on August 8, 1980. (Gov. Ex. A, pp. 132–134, Gov. Ex. D.)

41. On August 12, 1980, the ODOT submitted to the Ohio Division FHWA a summary of comments received as the result of the circulation of the FEIS. The preponderance of comments were in favor of constructing I–675 as proposed. The ODOT also requested that Secretary Goldschmidt's November 29, 1979 decision be set aside and that the FEIS be approved as submitted. (Gov. Ex. A, pp. 135–149.)

42. On August 6, 1980, the TCC sent a report entitled *"An Analysis of the Year 2000 Demographic Forecasts in Relation to Current Trends"* (Gov. Ex. E, App. C) to the Washington Office of the FHWA. This report concluded that no significant change in traffic volumes would occur within the I–675 corridor if TCC's year 2000 forecasts were reprocessed in light of the 1980 preliminary census count. (*Id.*) Specifically, the report stated:

In spite of the decrease in population from 1970 to 1980 in the two-county area, the number of dwelling units increased significantly, the number of registered passenger cars increased, labor force increased and both vehicular miles of travel and traffic counts increased. When one reviews our year 2000 projections vs. currently available data, one can see that the travel variables are growing at a trend similar to those projected. The two specific items which are significantly lower than projected are total population and population per dwelling unit. If one compares the rates established by dividing today's variables by today's population with the projected variables divided by a population projection adjusted downward to reflect the recent trends, one will find that those rates remain basically constant. The suggestion is that the probable per capita rates with respect to labor force and registered vehicles will remain rather constant for the next twenty years. Since these variables are the controlling factors in trip production, it is our conclusion that the existing year 2000 forecasted trips would not change significantly.

It has been suggested that recent publicity concerning potential job losses in the area are reflective of the need to lower our expectations of travel needs in the year 2000. In the past decade this region has experienced significant loses of industrial employment, yet the total employment picture has remained relatively stable over the past decade. This experience suggests to us that we can expect to recover in the next several years from those job losses presently anticipated. The report shows that our employment has changed from basic industry to service industry, but that the jobs and therefore the trips remain.

The Urban Planning Division of FHWA also analyzed these figures and concluded that the figures on traffic volumes within the I–675 corridor which were being used to evaluate other alternatives were reasonable. (Gov. Ex. E, p. II–2.)

43. On September 10, 1980, the ODOT forwarded to the Ohio Division of the FHWA, a report entitled *"An Analysis of Transportation Alternatives In the I–675 Corridor (US 35 South to I–75)."* (Gov. Ex. E.) This report was forwarded to Region 5, FHWA on September 10, 1980. (Gov. Ex. A, pp. 150–153.) The report was prepared by the TCC in response to Secretary Goldschmidt's Decision Memorandum wherein he requested alternative approaches to the transportation needs in the I–675 corridor south of U. S. 35.

The report considered 15 alternatives, of which 7 were given detailed review. The opportunity for broad citizen participation concerning alternatives to I–675 was made available by the TCC. The report contained a discussion encompassing five major elements—urban impact, energy, minority neighborhood effects, alternatives and improvements to existing systems. Such salient topics as demographic patterns, transit service, local input, public participation and criteria for evaluating alternatives were contained therein. A TCC analysis of the developmental growth patterns for the Dayton area indicated no significant effect

on traffic forecasts whether or not I–675 was included in the regional transportation plan. The report indicated that, in July of 1980, the TCC had performed another analysis of forecast perimeters based on preliminary 1980 census relation data and concluded no significant changes in traffic volumes would occur in the I–675 corridor should the 1980 census data be used for forecasting input. In a September 10, 1980, cover letter from the Division Administrator to the Regional Administrator of the FHWA, the following language is contained,

> We recognize there are differences between the population forecast for the region and the preliminary 1980 census data. However, all planning for the region including transportation has been based on consistent socio-economic forecasts. In the normal course of the planning process, forecasts are updated as more current information becomes available. The analysis included in the report of the year 2000 demographic forecast shows that the 1980 population within the I–675 corridor has been growing and is reasonably close to the 1980 forecast for that area. In addition, other facts affecting trip generation, such as vehicle registration, dwelling units and employment after 1975, have been increasing, as has travel. Since the affected corridor has been experiencing growth, we believe the traffic forecasts are within an acceptable range and further analysis at this time would not be productive. Therefore, we recommend that the population and traffic forecast contained in the report be accepted.

Plaintiffs Mione and Righter attended several of these meetings. (Mione Ans.Interrog. 22; Righter Ans.Interrog. 22.) Based upon this report, the TCC's first priority solution was a request for the Secretary to reverse his decision not to build I–675 south of U. S. 35. (Gov. Ex. E; Gov. Ex. A, p. 175–6.)

44. On September 26, 1980, Secretary Goldschmidt wrote to Fred F. Frecker, Chairman of TCC, regarding the alternatives report. (Gov. Ex. E.) Secretary Goldschmidt informed the TCC that he be-lieved no evidence had been developed that would justify reconsideration of his November 29, 1979 decision to disapprove the FEIS for I–675 south of U. S. 35. He advised the TCC that a decision to formally withdraw I–675 was the responsibility of the TCC and the Governor of Ohio and he encouraged the TCC to begin this withdrawal/substitution process. (Gov. Ex. A, pp. 154–156.) This letter was not received by the ODOT at that time.

45. Pursuant to the directions contained in Secretary Goldschmidt's letter of September 26, 1980, the TCC immediately began consideration of withdrawal/substitution options. (Weir Dep. Ex. 4) but never responded formally to the letter from Goldschmidt. (Larson Dep., pp. 15–16.) The TCC drafted a letter for the signature of Governor Rhodes, requesting withdrawal/substitution on October 14, 1980. (Weir Dep. Ex. 4.)

46. The ODOT did not receive a copy of the October 14, 1980 letter until later in October and on October 23, 1980, Defendant Weir mailed a letter to Jack Jenson of the TCC expressing his displeasure at the October 14th letter, and specifically with the implication that it was prepared by the Governor. In his letter, Weir clarified the withdrawal procedure and provided examples of how to accomplish same. (Weir Dep. Ex. 4.)

47. On November 4, 1980, Ronald Reagan was elected President. He was inaugurated on January 20, 1981.

48. On November 6, 1980, during a regularly scheduled meeting of the TCC, the TCC voted to proceed with attempts to secure approval of its original objective and first priority, i.e., the construction of I–675 as initially proposed. The resolution was made because of comments in the press by the new vice-president that the new administration would reconsider the I–675 project.

49. Leon N. Larson has been Director, Office of Environmental Policy, Washington Office of the FHWA since August of 1980 (Larson dep., p. 4). He is responsible for advancing the FHWA projects through

the EIS state and assuring compliance with NEPA. (*Id.* at 5.) On or about March 13, 1981, Larson drafted a letter to the ODOT for Federal Highway Administrator Barnhart's signature. The letter indicated that it would be appropriate to re-examine the I–675 proposal, and invited the ODOT to resubmit the FEIS, along with a request for a decision. (Gov. Ex. A, p. 165.) Larson wrote this letter since it was his job to make sure that a decision was made on highway construction projects which were pending. Since no formal project concerning I–675 south of U. S. 35 had been proposed by the ODOT to the FHWA, Larson wanted the ODOT to advise the FHWA concerning its position on withdrawal/substitution or some other proposal. Neither the TCC nor the ODOT had formally replied to Secretary Goldschmidt's September 26, 1980 letter and Larson wanted to resolve the issue of I–675 south of U. S. 35. (Larson dep., pp. 15–16, 18, 24, 26.) In this letter, the ODOT was requested to address the issues raised in the previous decisions of Secretary Goldschmidt.

50. On April 16, 1981, the ODOT submitted the same FEIS which had been filed in 1979 for reconsideration along with supporting information from the TCC. The supporting information from TCC included the study entitled *An Analysis of Transportation Alternatives in the I–675 Corridor (U. S. 35 south to I–75)* (Gov. Ex. E), responses received from circulation of the final EIS originally submitted on August 12, 1980 and an April 1, 1981, summary position of the Transportation and Coordinating Committee of the Montgomery-Greene County Transportation and Development Planning Program which addresses pertinent issues raised in the Secretary's November, 1979 and September, 1980 communications. Gov. Ex. A, pp. 168–184. The ODOT requested approval of the I–675 project south of U. S. 35. (Gov. Ex. A, pp. 168–179.) The ODOT's submission was reviewed by the Ohio Division FHWA and forwarded to Region 5, FHWA with a recommendation that it be approved, upon the ground that the planning process had continued to demonstrate a need for the complete I–675 facility. (Gov. Ex. A, pp. 180–184.)

51. On April 16, 1981, Dayton Mayor James McGee met with FHWA Administrator Barnhart and Secretary Drew Lewis and expressed his views concerning the impacts of constructing I–675 south of U. S. 35, on the City of Dayton. He reiterated those views in a letter to Secretary Lewis on May 18, 1981. (Gov. Ex. A, pp. 185–187.)

52. On approximately June 1, 1981, Leon Larson and Richard B. Robertson came to Dayton and inspected the I–675 project on the ground. (Larson dep., pp. 10–11.) Larson began drafting the decision statement, which was to approve I–675, in its entirety (south of U. S. 35) on the plane returning to Washington. On June 8, 1981, Richard B. Robertson, FHWA Associate Administrator for Planning and Policy Development asked his staff to analyze whether I–675 was still justified on the basis of traffic demand. Mr. Robertson noted that "it appears that the City of Dayton and OST (under President Carter) have analyzed the project based on President Carter's Urban Policy." He further stated that ". . . OST seems to have utilized some inconclusive material to defend its position under President Carter." Mr. Robinson went on to ask his staff, in view of the fact that everyone seems to agree that based on a comparison of the 1970 and 1980 census, the long range population forecast by the MPO (TCC) is somewhat optimistic, what appears to be a reasonable assumption for the population in a low-high range? He indicated that he had noted that population in the vicinity of the proposed I–675 location has been experiencing new commercial, industrial and residential growth of good quality. He pointed out that whether or not I–675 is built, the area surrounding the I–675 corridor would continue to develop. He asked his staff to determine whether there was sufficient traffic volume to warrant a bypass freeway. He further indicated that the Dayton Central Business District seemed to be strong and holding its own even if the total city was not. He went on to conclude that he was not convinced, as apparently Secre-

tary Goldschmidt was, that I–675 was nonessential. (Gov. Ex. P.) His staff responded with an analysis showing that I–675 to the south of U. S. 35 could be supported even at reduced levels of population growth. (Gov. Ex. Q.)

53. On or about June 9, 1981, Leon Larson drafted a Decision Statement for FHWA Administrator Barnhart's signature. The Decision Statement was subsequently signed by FHWA Barnhart without any changes being made. (Larson dep., pp. 13–14). The decision statement recommended approval of the resubmitted FEIS and the building of I–675 in its entirety, "because the State's request has been fully supported by a viable transportation planning process and has demonstrated a viable transportation need." On June 9, 1981, the Decision Statement was forwarded to Judith T. Connor, the primary policy adviser to the Secretary of Transportation, for her prior concurrence. (Gov. Ex. A, pp. 189–194; Connor dep., p. 6.)

54. On or about June 9, 1981, Mr. R. A. Barnhart of the FHWA called Judith Conner and informed her that he wished review of the EIS to be expedited. Ms. Conner informed Mr. Barnhart that she would expedite the EIS process. There is no indication that Mr. Barnhart indicated that he wished Ms. Conner to render a decision either favoring or disapproving the FEIS. His request was merely that the decision process be expedited.

55. Conner reviewed the material submitted by FHWA which found the EIS acceptable and which approved the section of I–675 south of U.S. 35. She also reviewed the recommendations of her Staff Office of Environment and Safety. (Conner dep., pp. 20–21, Gov. Ex. R.) Conner viewed her decision as a choice between the FHWA's justification of the highway in terms of the traffic needs of the area versus using highways as a tool to implement urban policy. (Conner dep., pp. 30–31.) She also believed that it was the policy of the Reagan administration to pay more attention to the actual transportation benefits of a highway as opposed to the urban policy

benefits. (*Id.* at 23, 26.) Further, in light of her experience, she felt it important to consider the recommendations which had evolved from the local planning process. (*Id.* at 25.) Conner accepted the FHWA's decision about the need for the project since they were the experts in transportation and the FHWA believed the traffic forecasts supported the highway. (*Id.* at 37–38.) Conner did not follow the recommendations of her staff for the reason that, *inter alia*, she concluded that her staff was tainted by a vested interest in view of the fact that Marvin Convisser and other staff personnel in the Office of Environment and Policy had previously participated in the Goldschmidt decisions.

56. In recommending approval of the final EIS to the Secretary of Transportation, Ms. Conner relied upon the proposed decision statement prepared by the FHWA and on President Reagan's policy which advocated the building of highways to meet existing and/or proposed transportation needs as opposed to President Carter's policy which looked upon highway construction approval as a means of implementing the President's urban policy.

57. The new population and employment data resulting from the preliminary census report were not significant new information which should have been included in a new or supplemental EIS.

58. Since the issue did present an important policy question, Conner met with Secretary Lewis on July 6, 1981, to get his opinion. (*Id.* at 33.) She advised the Secretary that the highway should be approved because the local planning organization had elected to go ahead with the highway, the justification was adequate and the only argument against the highway was based on urban policy. Secretary Lewis agreed and the five-minute meeting ended. (*Id.* 36, 39.) On July 6, 1981, Conner concurred in the Decision Statement approved by the FHWA after changing the signature block. Conner made no other changes. (*Id.* at 20.) Partisan political considerations did not enter into Conner's decision. (*Id.* at 12, 39–41.)

59. By July 9, 1981, each of the Plaintiffs had been informed of the July 6, 1981 decision approving the construction of I–675 south of U.S. 35. (Righter I Ans. Interrog. 24; Lovelace Ans. Interrog. 24.)

60. On July 7, 1981, the FHWA Washington Office notified the FHWA Region 5 Office of the new decision and requested that notice of the decision be announced by the EPA in the Federal Register. On July 21, 1981, FHWA Ohio Division transmitted the July 6, 1981 decision to the ODOT and requested that immediate distribution be made to agencies and the public. Distribution was made by the ODOT on July 23, 1981. (Gov. Ex. A, pp. 197–206.)

61. By memorandum dated July 29, 1981, USEPA notified USDOT that the Notice of Availability of the FEIS would appear in the Federal Register on July 31, 1981 and that the public review period would terminate on August 31, 1981. On August 31, 1981, FHWA Ohio Division confirmed with the ODOT that no significant comments had been received as a result of the 30 day comment period and that detailed design could proceed on I–675 south of U.S. 35. (Gov. Ex. A, pp. 207–208.)

62. In a letter to the ODOT, dated August 28, 1981, USEPA submitted comments on the FEIS, indicating that its concerns about air and water quality had been resolved, but still questioned the extent of noise mitigation measures and the consideration given to modal alternatives. The ODOT reviewed the comments and concluded that discussion of those items in the FEIS was adequate. (Gov. Ex. A, pp. 219–221.)

63. On August 31, 1981, Plaintiffs' attorney, on their behalf, wrote to Secretary Lewis and asked him to reconsider the approval of the FEIS. On September 18, 1981, Secretary Lewis responded that other than Plaintiffs' difference of opinion as to the wisdom of constructing I–675 south of U.S. 35, they presented no factual basis upon which to base a revised decision. (Gov. Ex. A, pp. 210–218.)

64. On November 13, 1981, the FHWA authorized the ODOT to advertise for receipt of bids for Construction Section No. 5, from Kemp Road to North Fairfield Road. On January 20, 1982, a contract was executed between the ODOT and the contractor. Construction work began on March 8, 1982. The estimated construction cost is $12,588,960.

On December 30, 1981, the FHWA authorized the ODOT to advertise for receipt of bids for Construction Section No. 1 from I–75 to Normandy Lane. The estimated reconstruction cost is $33,896,110. Bids were opened on February 2, 1982.

65. On January 26, 1982, Plaintiffs filed the instant complaint.

B. *The Planning Process*

66. In 1960, local officials agreed to proceed with a cooperative transportation planning process by forming the Regional Transportation Committee (RTC), the predecessor of the TCC. This was prior to any Federal requirements for an urban planning process. (Gov. Ex. M, p. 9; Gov. Ex. I, p. V.)

67. The 1962 Federal Aid Highway Act required establishment of a comprehensive, cooperative and continuing (3C) transportation planning process in urban areas over 50,000 population (23 U.S.C. 134). The Dayton urban area fell into this category. Such a process was already underway in Dayton. With adoption in 1963 of the Regional Transportation Plan, Volume I, and in 1965 of the Regional Transportation Plan, Volume II, transportation improvements in the Dayton urban area were based on a planning process. I–675 was an element of this plan. (Gov. Ex. I; Gov. Ex. F, § 1.13, p. 1/4.)

68. In 1967, the Dayton urban area moved into the continuing phase of transportation planning by reorganizing the Regional Transportation Committee (RTC) into the Transportation Coordinating Committee (TCC) of the Montgomery-Greene County Transportation Planning and Development Program. (Gov. Ex. M, p. 9.)

69. In 1968, the TCC began a major re-evaluation of the transportation plan for

the Dayton urban area, consisting of extensive reappraisal and re-examination of goals, objectives, assumptions and proposals of the then existing plan in view of changing conditions and public interest in this two-county region. (Gov. Ex. M, p. 10.)

Since that time, the TCC has periodically reevaluated its long range transportation plan for the two-county area. Its monitoring program provides current population, land use, mobility, safety and other data which is used to evaluate current trends thereby leading to priority revisions, if necessary. Many transportation modes—automobile, high occupancy vehicles, transit, pedestrian, bicycle, as well as transportation for the elderly and handicapped—are considered in the reevaluation process. (Gov. Ex. F, § 1.21, p. 1/6.)

70. As part of the FHWA's review and monitoring of the transportation planning process in urban areas, the FHWA periodically reviewed and certified the adequacy of the process for the Dayton urban area. The Administrative Record identifies some of these actions, covering the period from November 12, 1973 through January 14, 1982. For part of this period, starting with Fiscal Year 1975, a condition was contained in the certification to the effect that no major transportation projects on new locations should be undertaken until the long range transportation plan had been updated and accepted. However, I–675 was exempted from this condition. Upon adoption of the Year 2000 Plan by TCC in January 1978, the FHWA, on January 18, 1978, lifted the condition relative to the advancement of major new projects. It should also be noted that the joint FHWA/UMTA (Urban Mass Transit Administration) certification actions on May 2, 1980 and April 13, 1981, in recognition of the alternative analysis underway with respect to the Secretary's November 29, 1979 request, limited advancement of projects affected by the I–675 corridor on a case-by-case basis. This limitation was removed on August 24, 1981, after FHWA's acceptance of the FEIS for the entire section of I–675. (Gov. Ex. H, pp. 1, 3, 4, 7, 8, 12, 15, 34, 54, 55, 71, 72, 80.)

71. On September 17, 1975, the Federal Highway Administration and Urban Mass Transportation Administration published in the Federal Register joint regulations governing urban transportation planning. The Transportation System Management (TSM) element was incorporated as a requirement in the transportation planning process. In compliance with this requirement, the Dayton urban area transportation planners (TCC) issued annual TSM reports for the Fiscal Years 1976 through 1980. Three of these, for the Fiscal Years 1970, 1979 and 1981 have been included in the Administrative Record as samples. (Gov. Ex. J; Gov. Ex. K; Gov. Ex. L.)

72. By letter dated October 24, 1975, the ODOT requested the TCC to revise the Year 2000 population forecast to be consistent with that used in other Dayton urban planning studies, and by memorandum dated January 9, 1976, the ODOT advised the TCC that a two-county (Montgomery and Greene) population control total of 973,000 for Year 2000 had been found acceptable. (Gov. Ex. H, pp. 9–11.)

73. In 1977, the TCC presented its *Year 2000 Transportation Plan*, which called for the completion of I–675 in addition to the construction of other highways. This plan has been adopted by all the local political jurisdictions.

74. By letter dated July 6, 1979, to the Ohio EPA, the TCC submitted a report which addressed the consistency determination between the regional transportation plan, of which I–675 is a part, and air quality. In this letter, the TCC indicated that the report was developed with the active participation of the Regional Air Pollution Control Agency (RAPCA) and its staff. On July 11, 1979, the Ohio EPA informed the TCC that the report essentially supported the 109(j)/176(c) consistency determination. (Gov. Ex. H, pp. 41–55.)

75. On March 2, 1981, the ODOT submitted a copy of comments on the draft report for the Regional Transportation Plan adopted in 1978. The Ohio Division, FHWA approved these comments on March 3, 1981 (stamped "Approved" and signed). The fi-

nal report was issued in June 1981. (Gov. Ex. M; Gov. Ex. H, pp. 68–69.)

### C. Estimates of Relevant Costs

76. As of March 29, 1982, the sum of $52,859,026 had been expended or committed on I–675, south from U.S. 35 to I–75, whereas $61,193,556 remained to be expended. (Def. ODOT Ex. AAA; Def. ODOT Ex. Y.)

77. As of March 29, 1982, the sum of $42,499,976 had been expended or committed on that portion of I–675 running from U.S. 35 north to I–70, whereas the sum of $26,558,000 remained to be expended. (Def. ODOT Ex. AAA; Def. ODOT Ex. Y).

In summary, as of March 29, 1982, $95,673,983 had been expended or committed on the entirety of I–675, with $87,751,556 yet to be expended. (Def. ODOT Ex. AAA; Def. ODOT Ex. Y.)

78. The following estimated costs of delay to the State of Ohio, on an annual basis, for that portion of I–675 from I–75 to Normandy Lane, is or are uncontroverted—$15 million loss per year upon an $8 million increase in contractor's bid, a $3 million claim of loss by original contractor, a $3,700,000 increase in construction costs due to inflation (computed at 9.8%) and excess cost to inconvenience travelers due to inefficient use of fuel and time, $300,000.

### D. Standing

79. The Plaintiffs in this case are the Citizens Committee Against Interstate Route 675 (Committee), Frank Mione, Dean Lovelace, the Dayton Black Political Assembly (Political Assembly) and Richard L. Righter (See, caption of Complaint, Doc. # 1).

80. The Committee is based in the metropolitan area of Dayton, Ohio, and has formed because of concerns about the proposed construction of Interstate 675. (Complaint, para. 6).

81. The Political Assembly is a coalition of black organizations in the City of Dayton, and has, as one of its concerns, the goal of economic development for the black community in Dayton. The Black Political Assembly is one of the constituent members of the Committee.

82. Dean Lovelace is a co-chairperson of the Political Assembly and of the Committee. Mr. Lovelace is a black resident of the City of Dayton.

83. Frank Mione is co-chairman of the Committee. He resides in Kettering, Ohio, one of the towns within the jurisdiction covered by the programs of the TCC.

84. Richard L. Righter is a member of the Committee. He resides in Dayton, Ohio. (Complaint, para. 10.) His property is "about five miles" from I–675. (Righter Int. # 1.)

85. A portion of I–675 passes directly behind and next to the Plaintiff Frank Mione's property.

86. Neither Lovelace nor Righter allege that they will be among those members of the Plaintiff organizations who use portions of the area to be traversed for I–675 for recreation and will, therefore, be adversely effected by curtailment of their recreational opportunities. (Lovelace Ints. and Righter Ints.)

87. Neither Lovelace nor Righter claim any reduction of enjoyment of property due to noise, air, water and visual pollution produced by highway construction and the use and development induced. (Lovelace Ints. and Righter Ints.)

88. Plaintiffs Lovelace and Righter, both City of Dayton residents, and Political Assembly allege only that the construction of I–675 will cause a loss of population and jobs in the City of Dayton and will diminish its tax base. Lovelace has asserted that "the construction of the highway will take jobs away from the City of Dayton and move them to the I–675 corridor. This will reduce the tax base of Dayton and could affect my future employment with the City." (Lovelace Int. # 17.) Righter's response to the same interrogatory was "the injury to which I refer would be the reduction of population and jobs caused by the construction of I–675 and the resultant loss to the tax base of the City of Dayton." (Righter Int. # 17).

89. The Political Assembly makes no claim of injury to itself apart from the asserted injury to its members. (Political Assembly Int. # 7.) The only individual Plaintiff who is a member of the Political Assembly is Dean Lovelace. (See Lovelace Int. # 16; Mione Int. # 16; Righter Int. # 16). Political Assembly expressly disclaims as not applicable to it any claim of adverse effect upon its members by curtailment of recreational activities (Political Assembly Int. # 4), by reduction of enjoyment of its members' property due to alleged noise, air, water and visual pollution produced by the construction of I–675. (Political Assembly Int. # 5.)

90. Frank Mione is neither a member of the Political Assembly nor has he alleged any claim of injury arising out of potential socio-economic impacts of I–675 on the City of Dayton.

91. Plaintiff Mione is not a resident of Dayton and confines his claim of injury to an alleged loss in value of his property (which abuts I–675) due to increased dirt, noise and pollution caused by construction and operation of the highway (Mione Int. # 17), and to an alleged curtailment of recreational opportunities due a threatened destruction of a woodland area abutting his residence. (Mione Int. # 18.)

92. The Committee concedes that it has no members whose claims it might raise (Committee Int. # 1). It has neither alleged nor suffered any distinct injury to itself. The Committee is not a membership organization, claims no members and has no constitution or qualifications for membership. (Committee Int. # 1). Its management structure is "informal, representation from each group, and its leadership, consists solely of the three individual plaintiffs." (Committee Int. # 8). It claims no organizational participation in the administrative process leading to the challenged actions. (Committee Int. # 13, # 14, # 15).

## II. SCOPE OF THIS COURT'S REVIEW

■ In a case of this wide ranging public interest, it is imperative that this Court point out, most emphatically, that its role in deciding this lawsuit is *not* to determine the legislative, administrative or political wisdom behind the Government's decision to approve the building of the segment of I–675 under discussion, or, for that matter, to determine if I–675 is *really* needed in the greater Dayton community and what its short and long range impacts upon that community might be. Rather, the *sole* task of the Court, in litigation wherein the Plaintiffs seek review of an administrative decision, is to determine if the administrative action was either "arbitrary, capricious and an abuse of discretion, or otherwise not in accordance with law," *or* if the action failed to meet statutory, procedural or constitutional requirements. 5 U.S.C. 706(2)(A)–(D). If these findings are not made, after a review of the entire administrative record compiled by the agency, and any supplementation allowed by the Court, the agency action must be upheld. *Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 414–420, 91 S.Ct. 814, 822–25, 28 L.Ed.2d 136 (1971) (*Overton Park*). De novo review, which would allow this Court to examine the wisdom of the merits of the administrative agency's decision, is not appropriate under the situation as exists in the case at bar. 411 U.S. at 141–142, 93 S.Ct. at 1243–1244; 401 U.S. at 415, 91 S.Ct. at 823. *See also*, 5 U.S.C. § 706(2)(F).

■ The focus of judicial review of agency action is not on the correctness or wisdom of the agency's decision, but on whether the process employed by the agency to reach its decision took into consideration all of the relevant factors. The Court is not to substitute its judgment for that of the agency. 401 U.S. at 416, 91 S.Ct. at 823; *Asarco, Inc. v. U. S. E. P. A.*, 616 F.2d 1153 (9th Cir. 1980) at 1159. The final agency decision carries with it a "presumption of regularity." 401 U.S. at 415, 91 S.Ct. at 823 (citation omitted). In order to overturn this decision, the Plaintiffs must show that the agency decision was "a clear error of judgment." *Id.* at 416, 91 S.Ct. at 823 (citation omitted); *Gables by the Sea,*

*Inc. v. Lee*, 365 F.Supp. 826, 831 (S.D.Fla. 1973), aff'd, 498 F.2d 1340 (5th Cir. 1974), cert. denied, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975).

In this case, the gist of the Plaintiffs' claim is that the Final Environmental Impact Statement (FEIS) was, and remains, inadequate under the National Environmental Policy Act (NEPA).

◼ NEPA imposes upon agencies duties which are essentially procedural. *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978) (*Vermont Yankee*). Once an agency has satisfied NEPA's procedural requirements, the only role for a Court is to ensure that the agency has considered the environmental consequences. The reviewing court cannot interject itself within the area of discretion of the executive as to the choice of the actions to be taken. *Kleppe v. Sierra Club*, 427 U.S. 390, 410, n.21, 96 S.Ct. 2718, 2730, n.21, 49 L.Ed.2d 576 (1976), *Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1980).

◼ Judicial deference to agency discretion in substantive decision making, however, is counterbalanced by a duty to "engage in substantial inquiry" to determine that the procedural requirements of law have been met. *Overton Park, supra*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). In conducting this review, the court's "inquiry into the facts is to be searching and careful." *Id.* at 416, 91 S.Ct. at 823. This inquiry, however, is bounded by the "rule of reason," which requires the reviewing court to engage in sufficient fact-finding to determine whether the EIS:

> [H]as been compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed actions, as well as to make a reasoned choice between alternatives.

*County of Suffolk v. Secretary of Interior*, 562 F.2d 1368, 1375 (2d Cir. 1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978) (citations omitted).

◼ To prevail on the merits, Plaintiffs are required to establish that an Environmental Impact Statement is inadequate and that alternatives they propose are reasonable and feasible; more than a prima facie showing of deficiencies is necessary. Plaintiffs must prove the essential allegations in their complaint by a preponderance of the evidence. *See, Sierra Club v. Callaway*, 499 F.2d 982, 992 (5th Cir. 1974); *Environmental Defense Fund, Inc. v. Corp of Engineers*, 492 F.2d 1123, 1131 (5th Cir. 1974); *Crosby v. Young*, 512 F.Supp. 1363, 1379 (E.D.Mich. S.D., 1981).

Finally, with regard to alternatives, it has been held that:

> [They] must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes of concern. The comment cannot merely state that a particular mistake was made . . .; it must show why the mistake was of possible significance in the results.

512 F.Supp. at 1374, quoting from *Vermont Yankee, supra*, 435 U.S. 519, 553, 98 S.Ct. 1197, 1216, 55 L.Ed.2d 460 (parenthetical material added).

### III. STANDING

◼ To obtain judicial review of federal agency action, Plaintiffs must show, first, that a case or controversy within the meaning of Article III of the United States Constitution exists by showing *injury in fact* as a result of agency action. The Plaintiffs must "allege such a personal stake in the outcome of the controversy" as to warrant their invocation of Federal Court jurisdiction and to justify the exercise of the Court's remedial powers on their behalf. *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1967). Second, the interest the Plaintiffs seek to protect must be arguably within the zone of interests to be protected by the statute giving rise to their cause of action. *Association of Data*

*Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153–156, 90 S.Ct. 827, 829–831, 25 L.Ed.2d 184 (1970).

Simply stated, the standing issue in this case becomes whether the Plaintiffs have alleged an "injury in fact" to an interest within the zone of interests to be protected by the National Environmental Policy Act (NEPA).

██ The Defendants concede that the Plaintiff Frank Mione, a Kettering resident who alleges specific injury as a result of the environmental impact of I–675 abutting his property line and a loss of recreational opportunities due to the taking of a nearby woods for highway use, has standing to challenge the FEIS, at least insofar as those impacts are concerned. The Defendants contend, however, that Mione has no standing to sue on the basis of the alleged deficiency of the FEIS in failing to consider socio-economic impacts upon the City of Dayton, because he has claimed no inquiry which arises from that act. In addition, the Defendants contend that the Plaintiffs, Lovelace, Righter, the Citizens Committee Against I–675 and the Dayton Black Political Assembly, lack standing to raise any environmental impact injury allegations as a result of I–675, since they allege none in either their complaint or their answers to interrogatories. Defendants also maintain that these Plaintiffs do not have standing to raise any issue regarding the failure of the FEIS to consider socio-economic impacts on the City of Dayton, because socio-economic impacts are not included within the zone of interests protected by NEPA.

The standing issue in this case is resolved by application of *Sierra Club v. Adams, supra,* 578 F.2d 389 (D.C.Cir.1978). That case dealt with the standing problem in a situation wherein the Plaintiffs did not allege any specific harm they would suffer as the result of inadequate discussion and consideration of the proposed highway on certain Indian tribes by the Federal decision-makers. In concluding that the Plaintiffs did have standing, the Court agreed with the following claim which had been made by Plaintiff.

Having established standing to challenge the adequacy of the FEIS [Final Environmental Impact Statement] on at least one ground, they are entitled to raise other inadequacies in the FEIS based upon the "public interest" in requiring government officials to discharge faithfully their statutory duties under NEPA.

*Id.* at 392 (parenthetical material added).

The Court referred to Supreme Court authority on standing, as follows:

[T]he fact of ... injury is what gives a person standing to seek judicial review under the statute [in question], but once review is properly invoked, that person may argue the public interest in support of his claim that the agency has failed to comply with its statutory mandate .... [A]ccord, *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975) ("so long as this requirement [of alleging a distinct and palpable injury] is satisfied, persons to whom Congress has granted a right of action, either expressly or by clear implication, ... may invoke the general public interest in support of their claim").

578 F.2d at 392, quoting from *Sierra Club v. Morton*, 405 U.S. 727, 737, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (citation omitted) (parenthetical material in original). This public interest concept is seen by the District of Columbia Court of Appeals as particularly applicable to cases brought under NEPA and the Administrative Procedure Act. The District of Columbia Circuit Court of Appeal's interpretation and discussion of standing is summed up in the following language:

NEPA is an "action-forcing" statute; it places the "primary and non-delegable" responsibility for compliance with its requirements on the agency, not the public.... Section 102(2)(C) of the statute, ... which requires a "detailed statement" of the environmental impacts of, and alternatives to, various federal actions, has been aptly described as "the heart of NEPA," combining, as it does, "the legislative objectives of full disclosure, consultation, and reasoned decision-

making prescribed as the cutting edge of administrative reform." W. Rodgers, Environmental Law § 7.4, at 725 (1977). *An interpretation that unnecessarily restricts the ability of plaintiffs properly before the court to challenge additional inadequacies in an environmental impact statement would be patently inconsistent with the unequivocal legislative intent embodied in NEPA that agencies comply with its requirements "to the fullest extent possible."* 42 U.S.C. § 4332 (1970).... *Furthermore, because of the statutory and regulatory requirements that the FEIS reflect an "inter-disciplinary" and "integrated" approach, the issues discussed in the statement will be necessarily interrelated and interdependent.* A reviewing court will rarely view one issue in isolation, and its task will be aided by adversarial illumination of all critical portions of the statement. *We hold, therefore, that, because appellees have established an independent basis for standing to challenge the FEIS, they also have standing to argue the public interest in support of their claim that there is inadequate discussion and consideration of the effect of the construction on the Cuna and Choco Indians.*

578 F.2d 389 at 392–393 (citations omitted) (emphasis added).

█ Therefore, since it has been conceded that Mione has standing to advance his environmental injury in fact, it is clear, by application of *Sierra Club v. Adams*, that Mione has standing, based upon the public interest, to raise other alleged inadequacies of the FEIS, including, *assuming* same to be relevant criteria under NEPA, and thus within its zone of protected interests, the socio-economic impacts of I–675 upon the City of Dayton.

█ There is every reason to believe that the Sixth Circuit, if confronted with a situation similar to that existing in the case at bar and in *Sierra Club v. Adams*, would follow the rule established in that case. In *Environmental Defense Fund v. Tennessee Valley Authority*, 468 F.2d 1164 (6th Cir. 1972), the Sixth Circuit ruled that certain

plaintiffs, having alleged the requisite "injury in fact" and that the injuries they asserted were arguably within the zone of interests to be protected by NEPA, might also advance the interests of the general public in support of their claims for equitable relief. *See, id.* at 1171–1172. The Court further held that the two organizational plaintiffs could sue in their own names to vindicate the interests of those other members who were injured. *See, id.* at 1172. This tacit approval, some six years prior to the announcement from the District of Columbia Circuit Court of Appeals in *Sierra Club v. Adams*, of the concept that standing upon any one ground under NEPA gives a plaintiff the right to advocate other grounds upon a public interest basis, clearly portends Sixth Circuit approval of the *Sierra Club v. Adams* case and its theory of standing. *See also, Neighborhood Development Corp. v. Advisory Council on Historic Preservation*, 632 F.2d 21, 23–24 (6th Cir. 1980) (applying a liberal rule of standing in an action brought under NEPA). Therefore, based on the fact that Mione has standing, and on the fact that he is a member of the Citizens Committee Against I–675 (The Committee), the Court also concludes that the Committee has standing in the present action.

█ As is set forth in the Findings of Fact, *infra*, at 79–92, none of the other three Plaintiffs, Dean Lovelace, the Dayton Black Political Assembly and Richard L. Righter, claim any injury from any traditional environmental impacts (air, water, recreation, noise, esthetics) due to the proposed construction of I–675. Rather, these Plaintiffs, as individuals and, as an organization speaking for its members, allege only that the construction of I–675 will cause a loss of population and jobs in the City of Dayton and will diminish its tax base. Lovelace asserts that "the construction of the highway will take jobs away from the City of Dayton and move them to the I–675 corridor. This will reduce the tax base of Dayton and could affect my future employment with the City." (Lovelace Int. # 17). Righter's response to the same interrogato-

ry was "the injury to which I refer would be the reduction of population and jobs caused by the construction of I–675 and the resultant loss to the tax base of the City of Dayton." (Righter Int. # 17). Even assuming, arguendo, that these interests are such as to be within the zone of interests to be protected by NEPA, it is clear that, as a matter of law, said statement of interests do not constitute the requisite "injury in fact" sufficient to constitute a case or controversy within the meaning of Article III of the United States Constitution. The Plaintiffs, Lovelace and Righter, therefore, lack the requisite standing in this action to urge the socio-economic impact upon the City of Dayton which will allegedly be caused by I–675.

The allegations of the Plaintiffs, with the exception of Mione, are not allegations of injury in fact to these Plaintiffs personally, but speculations (even conceding, arguendo, that same may have a basis in various reports prepared by the City of Dayton and the Miami Valley Regional Planning Commission) of possible consequences to the City of Dayton. In order to have standing, these Plaintiffs must not only allege but must also show injury or threatened injury to them personally, not merely that the injury is or may be suffered by other, unidentified members of the class to which they belong. *Warth v. Seldin, supra,* 422 U.S. at 498, 95 S.Ct. at 2204. The Plaintiffs' statement of remote possibilities, buttressed by speculation, that their situation might be better in the future, had Defendants determined to act otherwise, and might even improve were the Court to afford relief, is not such a statement that alleges such a personal stake in the outcome of the controversy as to warrant their invocation of Federal Court jurisdiction and, therefore, to justify exercise of the Federal Court's remedial powers on their behalf. *Baker v. Carr, supra,* 369 U.S. at 204, 82 S.Ct. at 703. A Federal Court's jurisdiction can be invoked only when the Plaintiff himself has suffered "some threatened or actual injury resulting from the putatively illegal action . . ." *Warth v. Seldin, supra,* 422 U.S. at 499, 95 S.Ct. at 2205; *Linda. R. S. v.*

*Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973); *Data Processing Service v. Camp, supra,* 397 U.S. 150, 151–154, 90 S.Ct. 827, 829–830, 25 L.Ed.2d 184 (1970). As was noted by the Supreme Court in *Schlesinger v. Reservist's Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974):

> [S]tanding to sue may not be predicated upon an interest . . . which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share. Concrete injury, whether actual or threatened, is that indispensable element of a dispute which serves in part to cast it in a form traditionally capable of judicial resolution.

*Id.* at 220, 94 S.Ct. at 2931. *Accord, United States v. Richardson,* 418 U.S. 166, 176–177, 94 S.Ct. 2940, 2946, 41 L.Ed.2d 678 (1974); *Ex parte Levitt,* 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937).

Since the individual Plaintiffs, Lovelace and Righter, have alleged no injury in fact with regard to the socio-economic impact upon the City of Dayton, occasioned by the threatened construction of I–675, it is clear that the Plaintiff organization, the Dayton Black Political Assembly, having asserted only the interests of its members, in language similar to that utilized by Lovelace and Righter, can claim no injury in fact to itself, either in its organizational capacity or as an organization set forth to protect identifiable, articulable injuries of the individual organization's members. This organization, therefore, likewise lacks standing to urge upon this Court the alleged deficiencies of the FEIS due to its failure to adequately consider socio-economic impacts upon the City of Dayton.

The above is of no more than academic interest, however. As has been discussed, Frank Mione, whose standing has been conceded by the Defendants, has the requisite standing, by virtue of the *Sierra Club v. Adams* line of decisions, which this Court deems applicable within the Sixth Circuit, to urge all other inadequacies in the FEIS based upon the public interest in requiring

government officials to discharge faithfully their statutory duties under NEPA. Likewise, because Mione has standing, the Committee also may sue on Mione's behalf. Even though Dean Lovelace, Richard L. Righter, and the Black Political Assembly must be and, hereby are dismissed as parties Plaintiff to this litigation, the issues they sought to raise (socio-economic impact of the threatened construction of I–675 upon the City of Dayton), can be adequately protected by Frank Mione, and the Committee, the remaining Plaintiffs, *assuming, arguendo*, that such interests are within the zone of interests to be protected by NEPA.

## IV. LACHES

The defense of laches has been raised in the Amended Answer of the State Defendant, in the Answer of the Federal Defendants, and in the Answer of the Intervening Defendants, the TCC and the Dayton Area Chamber of Commerce. *See,* Doc. # 15, ¶ 73, Doc. # 32, ¶ 45, and Doc. # 35, ¶ 42. The State Defendant has requested that the Complaint be dismissed because no challenge was brought against the FEIS between the time of the 1979 decision of Secretary Goldschmidt and the initiation of the present lawsuit in 1982. *See,* Doc. # 38, p. 29. Since the FEIS involved in the 1979 decision is the same document which is involved herein, and if inadequate now, would have been inadequate then, the State Defendant has contended that the delay of almost three years in initiating suit is impermissible. The other Defendants have not addressed this issue in their memoranda, and the Plaintiffs have not responded to the arguments made by the State Defendant.

■ While laches is permitted as a defense in actions brought under NEPA, *see, Ecology Center of Louisiana, Inc. v. Coleman*, 515 F.2d 860, 867 (5th Cir. 1975) (*Ecology Center*; *accord, Michigan v. City of Allen Park*, 501 F.Supp. 1007, 1016 (E.D. Mich.1980), its use is "restricted to avoid defeat of Congress' environmental policy." *Coalition for Canyon Preservation v. Bowers*, 632 F.2d 774, 779 (9th Cir. 1980) (*Can-*

*yon Preservation* ) (citations omitted). The general standard which has been applied to resolution of laches claims is that "[t]he defendant must show a delay in asserting a right or claim, that the delay was not excusable, and that there was undue prejudice to the party against whom the claim was asserted." *Ecology Center,* 515 F.2d at 867 (citation omitted). *See also, Canyon Preservation,* 632 F.2d at 779 (requiring "lack of diligence . . . and . . . prejudice to the party asserting the defense.") (citation omitted).

■ Absent the public interest in environmental concerns, the Court would have no difficulty in concluding that the present action is barred by laches. Indeed, even in the face of such concerns, the Court is tempted to rule that laches does constitute a bar, particularly with respect to claims made in conjunction with the allegedly inadequate discussion in the FEIS of alternatives, traffic projections, urban impacts, induced development, air and noise pollution, water quality, and the views of other agencies. *See,* Doc. # 1, ¶ 64(a)–(j). While all of these alleged imperfections were, or should have been known at the time of the first publication of the FEIS in 1979, neither Plaintiffs nor any other commenting parties mentioned any deficiencies pertinent therein, with the exception of air pollution. *See,* Gov. Ex. A, pp. 143, 149. However, given the fact none of the Plaintiffs had reason to protest the alleged inadequacies of the FEIS in 1979, since they were not directly affected by that decision, it would be difficult to conclude that the delay was inexcusable. For example, Plaintiff Mione would have had no personal stake in asserting inadequacies in 1979 since the portion of the highway project approved at that time did not affect his property.

Putting this matter aside, however, there is also the question of prejudice caused by the delay. Defendants have claimed that substantial public funds have been committed or expended upon the present project. *See,* Findings of Fact, 76–78. Obviously, funds expended on the portion of I–675

north of U.S. 35 could not be taken into consideration in determining prejudice, since those funds would have been spent in any event. Likewise, funds not yet expended on I–675 south of U.S. 35 could not be taken into consideration. The relevant matters would seem to be funds spent between September, 1981, after the Lewis rejection of Plaintiffs' request for reconsideration, and the time of the filing of the within lawsuit, and possible losses which would be caused by the delay in the construction of the project. With regard to the first item, the Court finds that Defendants have failed to segregate the claimed losses, and instead have merely referred to "funds expended or committed." *See*, Plaintiffs' Ex. Y. Thus, it is impossible to determine the precise amount of funds already spent on the project. With respect to the second item, i.e., construction losses caused by delay, there is some evidence of damage to the State of Ohio. The testimony of Howard E. Knollen, the ODOT Deputy Director for Planning and Design, indicated that the prime contract for the highway project would have to be rebid, and that the State's estimate, which was exposed, was $8,000,000.00 less than the low bid which was accepted for the project. Knollen further indicated that historically, when the State's estimate has been exposed, the subsequent low bid will be close to the State's prior exposed estimate. Thus, it can be surmised, with some degree of safety, that the failure of Plaintiffs to alert the agency to perceived inadequacies at an earlier time, has caused or will cause some prejudice to the State.

An additional factor which has been taken into consideration in determining prejudice is environmental harm. For example, in *Canyon Preservation, supra*, 632 F.2d 774 (9th Cir. 1980), the Court was troubled by "the fact that a bare right-of-way will remain while the project is delayed for further NEPA compliance." *Id.* at 780–781. Despite this factor, and despite the fact that almost four years had elapsed between the apparent approval of the FEIS and the initiation of the lawsuit contesting its approval, the Court of Appeals rejected the claim of laches.[2] *Id.* at 779–781. In the present case, while the right-of-way was substantially acquired prior to the necessity for compilation of an environmental impact statement, *see*, Findings of Fact 12–15 and 22, the possibility of a barren right-of-way has not been specifically caused by Plaintiffs' delay, but would have probably occurred anyway if the Goldschmidt decision had remained without amendment.[3]

The preceding discussion has indicated that while there may have been a delay in asserting claims based on the alleged inadequacies of the FEIS, any delay was not inexcusable, since none of the Plaintiffs would have had reason to protest the approval of the FEIS at a time when they were not directly affected. Even if the delay had been inexcusable, the Court concludes that the delay has not caused sufficient harm either to Defendants or to the environment to outweigh the public interest in assuring that environmental concerns should be protected. Accordingly, the Court rejects the defense of laches, and will consider the merits of the claims which have been advanced by Plaintiffs.

**2.** The appellate opinion in the cited case does not reflect the date of approval of the FEIS. The opinion of the district court, however, indicates that submission and publication of the FEIS occurred in 1975, approximately four years before initiation of the lawsuit. *See, Coalition for Canyon Preservation v. Bowers*, 479 F.Supp. 815, 816–817 (D.Mont.1979), *rev'd*, 632 F.2d 774 (9th Cir. 1980).

**3.** Ironically, however, Network G, for which proposal Goldschmidt expressed tentative approval in September, 1980, utilized the same right-of-way as I–675. *See*, Gov. Ex. E, p. IV–

63. Should this litigation be protracted beyond September, 1983, or even to a period in such close proximity that appropriate substitution projects could not be submitted in time to receive funding under 23 U.S.C. § 103(e)(4), it is quite possible that the I–675 corridor could become a barren right-of-way. Thus, the argument could be made that the failure to raise inadequacies in the FEIS in 1979 did cause environmental harm or prejudice, since Network G, at least, would have used the same right-of-way.

## V. SOCIO–ECONOMIC IMPACTS

In Count I of the Complaint, Plaintiffs have alleged that the Defendants violated the National Environmental Policy Act, 42 U.S.C. §§ 4321, et seq., and 23 C.F.R., Part 771 (1981), by failing to include in the FEIS an adequate assessment of various impacts of I–675, including, *inter alia*, the economic and social impacts of the proposed highway upon minorities and the City of Dayton. Conversely, Defendants have contended that they have complied with the requirements of the NEPA and the regulations promulgated thereunder.

An examination of the DEIS, which was sent to the FHWA Division Administrator on December 22, 1976 (Gov. Ex. A, p. 11), indicates that the sole discussion of socio-economic conditions and impacts occurred on pages 35, 36 and 77 of that document. *See*, Gov. Ex. B. Therein, the report first referred to the location of the proposed route, and then noted that this area was predominantly white, i.e., contained a minority population of 53, as opposed to a total population of 57,309. (*Id.* at 35). Based on the fact that the residents of the corridor area possessed higher educational attainment and income than the average, the DEIS concluded that persons who must be relocated would be able to obtain replacement housing without a great degree of economic hardship. (*Id.* at pp. 36, 75.)

In the FEIS, which was submitted to the FHWA Division Administrator on October 31, 1978 (Gov. Ex. A, p. 27), the discussion of socio-economic conditions and impacts was expanded somewhat. While consideration was still restricted to these jurisdictions through which the highway would pass, socio-economic data was provided separately for various census tracts in the I–675 corridor area. *See generally*, Gov. Ex. F, pp. 2.8/1–2.8/9. Again, the report concluded that the "primary social impact of the proposed highway," i.e., the relocation of families within the corridor, should pose no problem in light of the relative affluence of the area residents (Gov. Ex. F, p. 3.8/1). In addition, the FEIS predicted a tremendous increase in employment potential in townships lying within the corridor, and forecast an increase in employment of approximately 18,580 persons in the I–75/I–675 interchange area by 1980. (Gov. Ex. F, pp. 2.8/10, 3.8/1). The FEIS further noted that "[t]here is no known long range decrease in employment that would result from the construction of the freeway." (Gov. Ex. F, p. 3.8/1).

Chapter 9, Section 9.3 of the FEIS summarized comments from the general public, which had been received during public meetings, through letters, and from citizen petitions (Gov. Ex. F, p. 9.3/1), and responded to the comments, either by referring to a specific portion of the FEIS, or by providing a general statement intended to answer the points raised in the comment. Comments 140, 141, and 142 requested an analysis or discussion of the impacts of I–675 upon the social and commercial growth of the City of Dayton. *See*, Gov. Ex. F, p. 9.3/66. In response to these comments, it was indicated that:

A review of current development and known plans for development show that there will be little area remaining for development immediately adjacent to the corridor. There is a possibility of some movement from the Dayton CBD [Central Business District] to outlying areas, however it is recognized such migrations will depend upon the vitality of the Dayton CBD & rate of development along the corridor.

Gov. Ex. F, p. 9.3/66. The FEIS further stated that the corridor would improve accessibility "to and from the center city, which is important in a social and economic sense." *Id.*

The FEIS was reviewed and approved by the FHWA Division Administrator on November 9, 1978, and by the FHWA Regional Administrator on December 20, 1978. (Gov. Ex. A, pp. 28, 34–35.) In the memorandum issued by the Regional Administrator, it was noted that certain issues, which had been raised by the Department of Housing and Urban Development, had not been addressed in the FEIS. (Gov. Ex. A, p. 34.) The Administrator did indicate that the

questions had been generally covered by several documents attached to the memorandum, among which was a letter from the Executive Director of the Metropolitan Planning Organization for the City of Dayton, addressing "the issue of the negative economic health of the City of Dayton core area." *Id.* The Administrator then concluded that the issues raised by HUD were planning issues to be studied in conjunction with the planning process, and were "not appropriate for addressing in this particular final environmental impact statement." *Id.* On January 19, 1979, the Environmental Programs Division found that the urban impacts questions posed by HUD had been given adequate consideration, and requested the concurrence of the Assistant Secretary for Policy and International Affairs. (Gov. Ex. H, p. 36).

On March 23, 1979, however, Secretary of Transportation Brock Adams sent a letter to David Weir, the Director of ODOT, requesting that the Miami Valley Regional Planning Commission (MVRPA) answer several questions regarding the impact of I–675 upon Dayton as "the core of the Dayton metropolitan area." (Gov. Ex. A, p. 37). Secretary Adams noted that the policy of the Carter Administration was to support the continued vitality of the nation's urban centers, and stated that "[b]efore we make a decision on this proposed highway, we want to assure ourselves that the economic effects of I–675 have been fully considered." *Id.* Following this letter, an urban impact analysis was conducted, and a response to the questions posed by Adams was submitted on May 24, 1979, by Nora Lake, chairperson of the MVRPA. (Gov. Ex. A, 39–41.) In that document, Lake stated that the MVRPA had met and re-affirmed its support for construction of I–675, but had also noted that there would be certain negative impacts upon "older urban areas, newly urbanizing areas as well as certain identifiable groups of citizens." *Id.* at 39. Lake also noted that I–675 had been granted a favorable A–95 review, which carried with it "the directive that negotiations of nine objectives be carried on between affected local governments and the

applicable state and federal agencies." *Id.* The objectives included, *inter alia* : encouragement of adoption by local government units of the MVRPC's affirmative fair and equal housing plan; encouragement of an expanded regional transit plan for Montgomery County; encouragement of tax sharing by local governments; and encouragement of 10% minority contracting by the I–675 prime contractor.

Attached to the Lake letter is a response by the City of Dayton to the questions raised by Secretary Adams. *See generally,* Gov. Ex. A, pp. 42–49.) In that document, the City concluded, after consideration of all the information pertinent to the matters posed by Adams, that the distribution of benefits resulting from the investment of public funds in I–675 would be inequitable, and that the mitigating actions approved by the MVRPC "did not address the economic and fiscal impacts caused by the highway." *Id.* at 49. Therefore, the report stated that:

> [T]he City cannot recommend favorable review until such time as meaningful mitigating actions can be agreed upon by officials of the appropriate federal, state, regional and private institutions. Such agreed upon actions should insure that within the region there will be equitable distribution of the benefits accruing from the highway and further, those agreed upon actions should offset the negative impacts upon the City and its residents.

*Id.* The City of Dayton, through Mayor James McGee, submitted a further statement to Secretary Adams on June 21, 1979, outlining mitigating actions, such as, *inter alia*, annexation of Wright Patterson Air Force Base to the City of Dayton, and completion of U.S. 35, which were deemed necessary to offset the adverse effect of I–675. *See generally,* Gov. Ex. A, pp. 67–85.

On November 29, 1979, Secretary of Transportation Neil Goldschmidt, who had replaced Secretary Adams, issued a Decision Memorandum, disapproving the proposed construction project with respect to the portion of I–675 south of U.S. 35. *See,* Gov. Ex. A, pp. 95–99. In that decision, the Secretary noted that "the major issue in-

volved is the potential impact of I–675 on the City of Dayton and the development likely to result if I–675 were to be built as proposed." *Id.* at 95. The Secretary observed that the City and MVRPC reports had concluded that construction of I–675 would worsen conditions in the center city which threatened its viability, and further stated that a series of proposed compensatory measures had not been agreed to at the local level. *See, id.* at 96. The Secretary finally concluded that "in the absence of agreement on an appropriate series of compensatory steps, it is my conclusion that the adverse impacts of I–675 on the City are essentially unaddressed." *Id.*

On March 13, 1981, the Department of Transportation sent a letter to Director Weir, of ODOT, indicating that re-examination of the I–675 project would be appropriate. The USDOT requested that ODOT resubmit the FEIS for I–675, together with ODOT's response to the four issues presented in the November, 1979 Goldschmidt decision. *See,* Gov. Ex. A, p. 165. On April 15, 1981, the FEIS was resubmitted, together with certain additional documents, including, *inter alia,* a supplemental study entitled "An Analysis of Transportation Alternatives in the I–675 Corridor." *See,* Gov. Ex. A, pp. 168, 189; *see also,* Gov. Ex. E. Following this submission, the Division Administrator, on April 28, 1981, recommended that the 1979 Secretarial decision be rescinded. Gov. Ex. A, p. 181. On June 9, 1981, R. A. Barnhart, the Federal Highway Administrator, approved the proposal and requested the concurrence of the Secretary of Transportation. Gov. Ex. A, p. 190. In a decision statement issued on July 6, 1981, the Assistant Secretary for Policy and International affairs approved the I–675 project south of U.S. 35,[4] finding, in relevant part: (1) that the 1979 Urban Impacts

Study indicated in general that "impacts on the city of Dayton would be offset by the overall benefits to the region, which includes Dayton," Gov. Ex. A, p. 192; and (2) that "[a]vailable information does not indicate that the adverse economic impact on the city of Dayton is significant enough to deny the approval of the EIS for the portion of I–675 south of U.S. 35." *Id.* In addition, it should be noted that while Mayor McGee objected to construction of the southern portion of I–675 in 1981, the City of Dayton currently supports the project. *See,* Doc. # 49, Amicus Curiae Brief of the City of Dayton, and Exhibit A attached thereto.

As was previously noted, Plaintiffs have contended that the failure of the FEIS to consider the adverse impacts upon the City of Dayton rendered the FEIS inadequate, and constituted a violation of the requirements of NEPA. Defendants, however, have claimed that the sole reason for any discussion of matters related to urban impacts evolved from the politically-based Urban Policy of President Carter, rather than from the dictates of NEPA.[5]

In *Overton Park, supra,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Supreme Court indicated that the proper standard of review of agency actions is whether "the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' ... or failed to meet statutory, procedural or constitutional requirements." *Id.* at 414, 91 S.Ct. at 822 (citation omitted). Court review of NEPA actions, in particular, has been held to encompass two inquiries. In *Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068 (1st Cir. 1980), the Court indicated that a reviewing court must evaluate the agencies

---

**4.** The Assistant Secretary for Policy and International Affairs is authorized to approve projects on behalf of the Secretary of Transportation, and apparently does so as a matter of course. *See,* Conner deposition, pp. 39–40.

**5.** The Defendants have also argued that socioeconomic impacts are not within the zone of interests protected by NEPA, and that therefore, no plaintiff has standing to assert a claim

based on such impacts. *See,* Federal Defendants' Trial Brief, Doc. # 37, pp. 7–8, 40; State Defendants' Trial Brief, Doc. # 38, p. 23. As was noted in the discussion on standing, the Court has assumed *arguendo* that Plaintiff Mione has standing to assert claims based on the alleged impact of I–675 on the City of Dayton.

compliance with the " 'essentially procedural,' " *id.* at 1072, duties placed upon it by NEPA, and must also conduct a substantive review to determine whether the agency's action was arbitrary or capricious. *Id.* With respect to the latter inquiry, the Court stated:

> This substantive review, although conducted on the basis of the entire administrative record, is quite narrow in scope. The Court should only assure itself that the agency has given good faith consideration to the environmental consequences of its actions and should not pass judgment on the balance struck by the agency among competing concerns.

*Id.,* citing *Stryker's Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) (per curiam).

The procedural requirements of NEPA are contained in 42 U.S.C. § 4332, which provides, in pertinent part, that:

> (2) All agencies of the Federal Government shall
>
> \* \* \* \* \* \*
>
> (C) Include in every recommendation or report on proposals for ... major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
>
> (i) the environmental impact of the proposed action,
>
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> (iii) alternatives to the proposed action,
>
> (iv) the relationship between local short term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

The sole "environmental" effects of I–675 upon the City of Dayton appear to revolve around allegations that construction of I–675 "will encourage further out-migration of businesses, erosion of the tax base, and loss of employment opportunities." *See,* Plaintiffs' Preliminary Memorandum in Support of Preliminary and Permanent Injunction, Doc. # 22, p. 32; Gov. Ex. A, pp. 37–38; Gov. Ex. C. Because these appear to be economic concerns related only to the proposed location of the highway, the first question to be considered is whether economic effects of the type involved herein are within those "environmental impacts" outlined in § 4332(2)(C)(ii).

██ Defendants have argued, citing *Breckinridge v. Rumsfeld,* 537 F.2d 864 (6th Cir. 1976), cert. denied 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977) (*Breckinridge*), that "in the absence of an impact on the physical environment, socio-economic impacts alone are not within the contemplation of NEPA, and do not require the preparation of an EIS." (Doc. # 37, p. 40.) Defendants further have stated that based on this concept, and upon the conceded fact that I–675 will have no significant impacts on the physical environment of the City of Dayton, then "*a fortiori,*" any discussion or no discussion at all of the socio-economic impacts of I–675 upon the City in the FEIS would be adequate. Plaintiffs, of course, have claimed that NEPA requires discussion of urban impacts of the type involved herein. The primary case cited by Plaintiffs, to support their assertion that the economic effects of I–675 upon the City of Dayton should have been addressed, is *McDowell v. Schlesinger,* 404 F.Supp. 221 (W.D.Mo.1975). At the outset, it should be noted that in *Breckinridge,* the Sixth Circuit expressly rejected the reasoning of *McDowell v. Schlesinger. See,* 537 F.2d at 867, n.1. Before specifically discussing *Breckinridge,* however, it is appropriate to consult the legislative history of NEPA, and the regulations promulgated thereunder, to determine whether Defendants violated the procedural requirements of NEPA by failing to evaluate the economic effects of I–675. To begin, the legislative history of NEPA indicates that the overriding Congressional concern in passing the Act was focused upon the apparent inexorable national trend of despoliation of the *physical* environment. In referring to the need for

the legislation, the House of Representatives report accompanying NEPA quoted as follows from a New York Times Editorial:

> By land, sea, and air, the enemies of man's survival relentlessly press their attack. The most dangerous of all these enemies is man's own undirected technology. The radioactive poisons from nuclear tests, the runoff into rivers of nitrogen fertilizers, the smog from automobiles, the pesticides in the food chains, and the destruction of topsoil by strip mining are examples of the failure to foresee and control the untoward consequences of modern technology.

H.R.Rep.No.91–378, 91st Cong., 1st Sess., reprinted in [1969] U.S.Code Cong. & Ad. News 2751, 2753. Further, Senator Jackson made the following statements regarding NEPA when he introduced the bill on the floor of the Senate on July 10, 1969:

> [T]he National Environmental Policy Act of 1969 . . . , is the most significant measure in the area of *national resource policy* ever considered by the Congress.
>
> As reported by the Committee, S.1075 provides a considered Congressional statement of national goals and purposes for the preservation of the quality of America's future environment.
>
> . . . .
>
> What is involved is a congressional declaration that we do not intend, as a government or as a people, to initiate actions which endanger *the continued existence or the health* of mankind. That we will not intentionally initiate actions which do irreparable damage *to the air, land, and water which support life on earth.*
>
> An environmental policy is a policy for people. Its primary concern is with man and his future. The basic principle of the policy is that we must strive, in all that we do, to achieve a standard of excellence *in man's relationships to his physical surroundings.*

115 Cong.Rec. 19009 (1969) (remarks of Sen. Jackson) (emphasis added).

Senator Jackson also requested that excerpts from the Committee on Insular Affairs Report be printed in the Congressional Record. With reference to the term environmental quality, that report stated:

> The expression "environmental quality" symbolizes the complex *and interrelated aspects of man's dependence upon his environment.* Most Americans now understand, for better than our forebears could the nature of man-environment relationships . . . . The Nation has in many areas overdrawn its bank account in *life-sustaining natural elements.* For these elements—*air, water, soil and living space,* technology at present provides no substitutes.

*Id.* at 19012 (emphasis added).

While the above comments place an undisputed emphasis upon purely physical effects, it is apparent that the scope of the NEPA was intended to extend beyond matters such as air and water pollution. *See, Breckinridge, supra,* 537 F.2d 864, 866 (6th Cir. 1976), cert. denied 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977). In fact, the report cited above specifically refers to "haphazard urban and suburban growth; crowding, congestion, and conditions within our central cities which result in civil unrest and detract from man's social and psychological well-being." 115 Cong.Rec. 19010 (1969). The report also mentions "poor architectural design and ugliness in public and private structures," *id.,* and "an increasingly ugly landscape cluttered with billboards, powerlines, and junkyards." *Id.* However, the role of such impacts has been deemed to be limited, and to be significant "only in conjunction with primary environmental impacts." *National Association of Government Employees v. Rumsfeld,* 413 F.Supp. 1224, 1229 (D.D.C.1976), aff'd 556 F.2d 76 (D.C.Cir.1977). *Accord, Metlakatla Indian Community v. Adams,* 427 F.Supp. 871, 875 (D.D.C.1977). Moreover, although the preceding recitation of legislative history is helpful to some degree, one searches in vain through the Congressional discussion of NEPA for any consideration of urban impacts of the type involved herein, i.e., of economic effects allegedly caused by the environmentally unrelated decision to place a highway in a location outside a city. *See*

*generally,* 115 Cong.Rec. 19008–19013; 26569–26590; 29050–29089; 40415–40417 (1969).

With the above analysis in mind, it is now appropriate to consult the pertinent Council on Environmental Quality (CEQ) regulations to determine whether they furnish any guidance for resolution of the present matter. It is also important to bear in mind the Supreme Court's admonition that "CEQ's interpretation of NEPA is entitled to substantial deference." *Andrus v. Sierra Club,* 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979). On April 23, 1971, CEQ published guidelines in the Federal Register, *see,* 36 Fed.Reg. 7724 (1971), which provided with respect to the content of environmental statements, that coverage should include:

> The probable impact of the proposed action including impact on ecological systems such as wildlife, fish, and marine life. Both primary and secondary significant consequences for the environment should be included in the analysis. *For example, the implications, if any, of the action for population distribution or concentration should be estimated and an assessment made of the effect of any possible change in population patterns upon the resource base,* including *land use, water, and public services,* of the area in question.

*Id.* at 7725 (emphasis added). The clear import of this guideline is that population changes, for example, are significant *because* they impact upon, or cause changes in the *physical resource base.*

The 1971 CEQ guidelines further provide that the environmental statement should contain discussion of:

> Any probable adverse environmental effects which cannot be avoided (such as *water or air pollution, undesirable land use patterns, damage to life systems, urban congestion, threats to health* or other consequences adverse to the environmental goals set out in Section 101(b) of the Act).

*Id.* (emphasis added). Again, the emphasis of the guideline is upon those impacts which will impinge upon, or in some way affect, the physical environment.

In 1973, CEQ revised the guidelines, and published them in the Federal Register. *See,* 38 Fed.Reg. 20550–20562 (1973) (to be codified at 40 C.F.R. §§ 1500.1–1500.14). Therein, CEQ did not explain the changes in specific provisions, but merely noted that in response to recent court decisions, the guidelines regarding the responsibilities of federal agencies had been made more detailed. *Id.* at 20550. § 1500.8 of the new guidelines contained a description of the required contents of the EIS, and while that section was expanded to include a discussion of secondary impacts, *see,* 40 C.F.R. § 1500.8(a)(3)(ii) (1974), it did not differ substantially from the 1971 guidelines. § 1500.8 provided, in pertinent part, that:

> (a) The following points are to be covered . . . .
> (3) The probable impact of the proposed action on the environment.
>
> . . . .
>
> (ii) Secondary or indirect, as well as primary or direct consequences for the environment should be included in the analysis. *Many major Federal actions,* in particular those that involve the construction or licensing of infrastructure investments (e.g., highways, airports, sewer systems, water resource projects, etc.) *stimulate or induce secondary effects in the form of associated investments and changed patterns of social and economic activities. Such secondary effects, through their impacts on existing community facilities and activities, through inducing new facilities and activities, or through changes in natural conditions,* may often be even more substantive than the primary effects of the original action itself. For example, the effect of the proposed action on population and growth may be among the most significant secondary effects. Such population and growth impacts should be estimated if expected to be significant . . . and *an assessment made of the effect of any possible change in population patterns or growth upon the resource base,* including

land use, water, and public services of the area in question.

(Emphasis added). Although this section refers to changed patterns of social and economic activities, the example furnished, like that in the 1971 regulations, indicates that the relevant focus, for NEPA purposes, is with impacts that are connected in some way to the physical resource base or environment. Furthermore, the impact regulations of the Federal Highway Administration which were in effect at the time of the filing of the DEIS and FEIS herein, echo substantially the wording of the above CEQ guideline on secondary impacts. *See*, 23 C.F.R. § 771.18(i)(1) (1976). Thus, based on the legislative history surrounding the NEPA, and the regulations promulgated thereunder, it does not appear that economic effects of the type herein are significant considerations, particularly where they are not in some way connected with the primary physical action itself. In this context, the situation herein appears to be indistinguishable from that involved in *Breckinridge, supra*, 537 F.2d 864 (6th Cir. 1976), cert. denied 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977). While *Breckinridge* involved the preliminary determination of whether the quality of the human environment was affected by the closure of a military base so as to require preparation of an EIS, *see, id.* at 865, it is difficult to narrow the scope of the Court's comments on the meaning of human environment under NEPA to merely the facts of that case. It is also difficult to reject the logic of the position of the Defendants herein, that if the economic impacts of I–675 upon the City of Dayton would not have initially been sufficient to trigger the filing of an EIS, then such impacts need not be addressed when an EIS is filed *because of other unrelated reasons.*

In *Breckinridge*, the Sixth Circuit considered whether the district court had erred in enjoining transfers of personnel from an Army depot until a formal environmental statement had been prepared and circulated. *See, id.* at 865. In that case, the Secretary of Defense had concluded that a formal environmental statement would not be prepared because the elimination of over 2,600 jobs in the Lexington, Kentucky area would not constitute a significant impact on the human environment. *Id.* Specifically, a non-governmental study indicated that the area in question would suffer only a "minimal short term unemployment as a result of the partial closure." *Id.* The Court noted that the district court had granted a preliminary injunction, but had not ruled on the dispositive issue, i.e., whether "the scope of the term 'human environment' extend[s] to the closing of a military base and transfer of personnel and functions by the United States Army." *Id.* (parenthetical material supplied.) On appeal, the appellees had contended that the term " 'human environment' means environment which directly affects human beings, including unemployment and loss of revenue." *Id.* The Sixth Circuit clearly rejected this concept in *Breckinridge.* After consideration of the legislative history of NEPA, the Court concluded that it was not "a national employment act," *id.* at 867, and reversed the decision of the district court. While the Court found that "personal and economic interests are not *in and of themselves* sufficient to bring the statute into play," *id.* at 865, it did point out that "[t]he contention that NEPA goes beyond what might be stated to be the 'physical environment' is not in dispute." *Id.* at 865–866. The Court further noted that factors other than the physical environment have been considered only when there has been "*a primary impact on the physical environment.*" *Id.* at 866 (emphasis added).

This Court agrees entirely with the Sixth Circuit's conclusion that NEPA was not intended to be a national employment act, and that socio-economic factors *alone* will not trigger the requirement of filing an environmental impact statement. This view has been adopted by other courts, *see, Image of Greater San Antonio, Texas v. Brown*, 570 F.2d 517, 522 (5th Cir. 1978); *National Association of Government Employees v. Rumsfeld*, 413 F.Supp. 1224, 1229 (D.D.C.1976), aff'd. 556 F.2d 76 (D.C.Cir. 1977); *Metlakatla Indian Community v. Ad-*

*ams,* 427 F.Supp. 871, 875 (D.D.C.1977), and in fact, has been approved by the Council on Environmental Quality, which was created by statute to assist in the implementation of NEPA. *See,* 42 U.S.C. §§ 4341 et seq. The most recent regulation promulgated by the CEQ on this subject provides that:

"Human environment" shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment.... This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement.

40 C.F.R. § 1508.14 (1981). The comments accompanying the publication of the CEQ regulations in the Federal Register furnish additional verification of the Sixth Circuit's position. Therein, the CEQ stated that comments had been received indicating concern that human environment would be interpreted to be "limited to the natural and physical aspects of the environment." 43 Fed.Reg. 55978, 55988 (1978). In response, the CEQ stated:

This is not the Council's intention....

The only line we draw is one drawn by the cases. Section 1508.14 stated that economic or social effects are not intended by themselves to require preparation of an environmental impact statement. A few commentators sought further explanation of this provision reflects the Council's determination, which accords with the case law, the NEPA was not intended to require an environmental impact statement where the closing of a military base, for example, only affects such things as the composition of the population or the level of personal income in a region.

*Id.* at 55988–55989.

 Stripped to its essentials, Plaintiffs' claim herein is that the decision to locate I–675 outside the City of Dayton will cause an economic loss to the City and its residents, in that businesses may decide to locate or relocate in the I–675 corridor as opposed to the City of Dayton. Because these alleged effects are not within the purview of NEPA without a demonstrated relationship with, or impact upon the physical environment, and because the essential grievance herein cannot be distinguished from that involved in *Breckinridge,* the Court concludes that Defendants were not required to include in the FEIS a detailed statement of potential economic impacts upon the City of Dayton.

Plaintiffs have contended, in a supplemental memorandum on standing, that "urban impacts" should be considered under NEPA, and have cited *Como-Falcon Community Coalition, Inc. v. United States Department of Labor,* 465 F.Supp. 850 (D.Minn.1978), modified 609 F.2d 342 (8th Cir. 1979), cert. denied, 446 U.S. 936, 100 S.Ct. 2154, 64 L.Ed.2d 789 (1980), as discussing general categories of urban impacts under NEPA, and as containing a collection of 22 cases in which courts have held that "urban impacts" must be considered. *See,* Doc. # 47, p. 6. In the cited case, the district court had enjoined establishment of a Jobs Center in Minnesota because it appeared from the administrative record that the Department of Labor either had not considered "the environmental impact of the proposed center on the surrounding neighborhood, or had failed to develop a reviewable record of such environmental impacts." *Id.* at 852. Pursuant to the Court order, the Department of Labor made a reassessment of the Center's environmental impact, and determined that an impact statement was not required. *Id.* When this conclusion was challenged in district court, the Court concluded that the Department of Labor had not acted unreasonably in finding that "the impact of the center on the human environment would not be significant." *Id.* at 867. In reaching its decision, the District Court noted that the complaint had alleged specific environmental harms such as:

Vehicular and pedestrial congestion, demand for increased fire and police protection; increased strain on other services such as public transportation, legal services, emergency health care, and utilities; increased criminal activity; a loss in resi-

dential property values; and substantial alteration of the residential character of the neighborhood.

*Id.* at 860. The district court clearly felt that these claims should be considered under NEPA, and did interpret "human environment" under NEPA broadly to include categories of "urban or socio-economic impacts" such as impact on community development policy. *Id.* at 859.

On appeal, the Eighth Circuit affirmed the District Court's ultimate conclusion that the Department of Labor had acted reasonably, but specifically held as follows:

> [W]e vacate that portion of the district court's opinion concerning the evaluation of the Department of Labor's analysis. *We hold the district court erred in requiring the reassessment. The social and economic factors raised by the Coalition's complaint are not encompassed within the provisions of NEPA,* and under the circumstances of this case *need not have been considered by the Department in its determination of whether to file an EIS.*

609 F.2d at 345. It would be difficult to formulate a more explicit rejection of the District Court's conclusions or the contentions of the Plaintiffs herein, than that cited above.

In addition, the Court has read the other cases cited by Plaintiffs, *see,* Doc. # 47, p. 6, and relied upon by the district court in *Como-Falcon Community Coalition, Inc. v. United States Department of Labor, see,* 465 F.Supp. at 859, n.4, and has seen nothing which would alter the conclusions reached herein regarding the non-necessity of including a decision in the FEIS of economic impacts upon the City of Dayton. Without discussing the cases in detail, the Court notes that they were not similar to the present case and did not discuss NEPA's applicability to situations involving economic impacts only. *See, e.g., Businessmen Affected Severely By Yearly Action Plans, Inc. v. D.C. City Council,* 339 F.Supp. 793, 794 (D.D.C.1972) (NEPA held applicable to urban renewal project which involved demolition of existing structures belonging to members of Plaintiff organization); *Mor-*

*gan v. United States Postal Service,* 405 F.Supp. 413 (W.D.Mo.1975) (preparation of an EIS required where construction of mail facility and razing of neighborhood structures would allegedly conflict with local land use plans and historic character of neighborhood in question).

Significantly, in *Maryland-National Capital Park and Planning Commission v. U.S. Postal Service,* 487 F.2d 1029 (D.C.Cir.1973), the Court rejected the type of considerations which are involved herein, as being within the contemplation of NEPA. Specifically, the Court stated:

> Not all deviations from local zoning will necessarily rise to the level of effecting the "quality of human environment" within the fair meaning of that term. The "overriding" issue underlying MNCPC's recommended rejection of this project was *"social and economic" and as we observed, rooted in the prospective loss of real and personal property taxation.* A secondary, and related factor was the prospect of an influx of low-income workers into the County. Concerned persons might fashion a claim, supported by linguistics and etymology, that there is an impact from people pollution on "environment," if the term be stretched to its maximum. We think this type of effect cannot fairly be projected as having been within the contemplation of Congress.

*Id.* at 1037 (emphasis added) (citations omitted). The Court further noted later in the opinion that "[w]e remain troubled, however, by indications that the main concern, 'the over-riding issue' of MNCPC [the plaintiff] is 'social and economic' rather than environmental." *Id.* at 1042. (emphasis and parenthetical material added). *Accord, Nucleus of Chicago Homeowner's Association v. Lynn,* 524 F.2d 225, 231 (7th Cir. 1975), cert. denied sub. nom. *Nucleus of Chicago Homeowner's Association v. Hills,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976).

Based on the fact that it has not been alleged that I–675 would have primary physical impacts upon the City of Dayton,

and based upon the fact that the sole issue involved in the claims of the City relates to economic effects only, the Court concludes, under *Breckinridge* as well as the other authority cited, that the FEIS herein did not need to include a discussion of the economic impacts of I–675 upon the City of Dayton. This conclusion is additionally bolstered by the fact that the comments received from the Department of Housing and Urban Development regarding the negative economic health of the City of Dayton were not submitted until almost two years after the comment period for the DEIS ended in February, 1977. *See*, Finding of Fact 23, and Gov. Ex. A, p. 34. This fact alone indicates that the issue of economic impact itself was not a concern under NEPA, but arose from the urban policy program of President Carter. It should also be noted that these conclusions require a finding that Plaintiff Mione and the Committee do not have standing to raise issues relating to the economic impacts of the proposed highway. Although the Court has assumed these Plaintiffs' standing for the purpose of giving full consideration to the claims herein, it is apparent, under the preceding discussion, that the economic impacts they have asserted are not within the zone of interests protected by NEPA.

■ As a final matter, the Court notes that while NEPA has been construed as protecting the quality of life for city residents, *see, Hanly v. Mitchell*, 460 F.2d 640, 647 (2d Cir.), cert. denied sub nom. *Hanly v. Kleindienst*, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972) (*Hanly*), where it has been so construed, the action in question directly impacted in a physical way upon the area for which the urban effects were calculated. *See, e.g., Hanly* (construction of jail in densely populated urban area required consideration of, *inter alia*, traffic, noise, congestion and crime caused by or associated with the facility). The only exception to this occurred in *City of Rochester v. United States Postal Service*, 541 F.2d 967 (2d Cir. 1976), in which the Court of Appeals for the Second Circuit held that NEPA applied to the decision of the Postal Service to transfer operations from a down-

town site in the City of Rochester to a small town seven or eight miles from the City. *Id.* at 971. The Court found that "the transfer of 1,400 employees could have several substantial environmental effects," *id.* at 973, including an increase in commuter traffic, loss of job opportunities, and perhaps, urban blight through abandonment of a downtown postal facility. Based on the previous discussion of *Breckinridge*, however, it is apparent that the Sixth Circuit would reject the reasoning and result in this decision, since there is no apparent distinction between closing a military base, *Breckinridge, supra*, 537 F.2d 864, 865 (6th Cir. 1976), cert. denied, 429 U.S. 1061 (1971), and closing a post office. Since this Court is bound by the decision in *Breckinridge* it must decline to follow the decision of the Second Circuit.

■ Assuming, *arguendo*, however, that the economic impacts of the highway were relevant for purposes of NEPA, or should have been considered in the FEIS, and, therefore, that Mione has standing to raise this issue, the next question is whether the discussion in the FEIS, such as it was, was sufficient. Defendants have argued that the FEIS did contain information regarding the economic impacts of the highway, and that any further discussion was not necessary because it would have involved a "crystalball analysis." *See*, Doc. # 37, pp. 43–44, citing, *Natural Resources Defense Council Inc. v. Morton*, 458 F.2d 827 (D.C.Cir. 1972). Upon consideration of the record herein, the Court agrees with this assertion and concludes that, even if discussion of economic impacts is required under NEPA, the references to economic impacts in the FEIS were adequate, given the state of the art at the time when the FEIS was prepared. Specifically, the FEIS indicated that an increase in employment and commercial activity was expected in the I–75–I–675 and S.R. 725 interchange, and referred to a 1973 economic analysis performed for that area. *See*, Gov. Ex. F, § 2.8.10, p. 2.8/3; § 3.8.03, p. 3.8/1, and Chapter 10, p. 10/1. In addition, in response to comments regarding the effect of I–675 upon the City of Dayton and

other existing communities, the FEIS referred to a 1974 USDOT document, "Social and Economic Effects of Highways," *see, id.* at Comment 222, § 9.3.07, p. 9.3/84 and Chapter 10, p. 10/2, which indicated that a majority of bypassed towns had experienced a decline in retail sales, or less retail growth than areas not affected by bypass construction. *Id.* at Comment 222, § 9.3.07, p. 9.3/84. Specifically, with respect to the City of Dayton, the FEIS stated:

A review of current development and known plans for development show that there will be little area remaining for development immediately adjacent to the corridor. There is a possibility of some movement from the Dayton CBD [central business district] to outlying areas, however it is recognized such migrations will depend on the vitality of the Dayton CBD & rate of development along the corridor. From a review of census data it is evident that the planned highway will serve development that occurred prior to the location hearing.

*Id.* at § 9.3.07, p. 9.3/66.

From the above comments, it could be concluded that the economic impact associated with the proposed bypass would be a decline in retail sales, particularly within the City of Dayton, since substantial economic growth was predicted for an area located outside the City, i.e., the I–675–I–75–S.R. 725 interchange area. In addition, it could be inferred that impacts on retail sales would be less than usual because little land remained for future commercial development. The Urban Impacts Study performed at the request of Secretary Adams reaches the same conclusions, and is replete with indications that under current methodology, the effect of the completion of the highway could not be assessed. *See,* Finding of Fact 29; *see also,* Gov. Ex. C, pp. 5, 11, 12, 15 and 24. In addition, the testimony of Jack Jensen, the TCC Director indicated that he (Jensen) was unaware of any methodology which could be used to assess urban impacts or to calculate the effect of beltways in cities other than by a comparison of retail sales before and after construction. Moreover, Jensen also stated that the

Department of Housing and Urban Development, which was the agency most involved with urban impact analysis, had indicated in communications to regional planning agencies in 1978 that the department did not know how to apply these techniques to individual projects. HUD further indicated that it was seeking demonstration projects to try to develop technology and methodology in that area. Jensen stated, however, that he had seen no concluding studies regarding these demonstration projects.

Plaintiffs have offered nothing to controvert these facts, or to indicate that adequate methodology was available to assess the urban impacts of the highway. Given the above factors, the Court concludes that the information in the FEIS regarding economic effects was "compiled in objective good faith ... [and] would permit a decision-maker to fully consider and balance the environmental factors." *Sierra Club v. Morton,* 510 F.2d 813, 819 (5th Cir. 1975) (parenthetical material added). This is particularly so because the report cited in the FEIS in conjunction with the economic effect of bypasses, was a study done by the USDOT. Thus, it could hardly be argued that the USDOT was not aware of the economic effect of beltways, at least to the extent that methodology existed to measure such matters. Accordingly, the Court concludes that even if NEPA requires consideration of purely economic factors, the Defendants did not violate the procedural requirements of the act with respect to discussion of such impacts. Based on the above reasoning, the Court also concludes that the Urban Impact Analysis performed by the MVRPC did not contain significant new information, and, therefore, was not required to be circulated as a supplement to the FEIS. Having reached these conclusions, the Court will next address the issues which have been raised in connection with the discussion of alternatives in the FEIS.

VI. REASONABLE ALTERNATIVES TO I–675

In Count I of the Complaint, Plaintiffs have alleged that the Defendants have vio-

lated NEPA because the FEIS did not "evaluate any of the alternative projects proposed by commenters and officials;" did not "consider alternatives to construction of I–675 that function differently than an interstate highway;" and did not "consider substitution projects available under the withdrawal funding provisions of 23 U.S.C. § 103(e)(4)." Complaint, Doc. # 1, ¶ 64(b). In response to Plaintiffs' contentions, Defendants have first argued that Plaintiffs have failed to meet their burden of proving that the EIS is inadequate because they have failed either to cite specific examples which Defendants did not consider, or to offer any evidence to establish the unreasonableness of any alternative contained in the FEIS. As a further matter, Defendants have maintained that the FEIS did consider all reasonable alternatives to I–675, including modal alternatives, location alternatives, and reduced level of service alternatives (Federal Defendants' Trial Brief, Doc. # 37, pp. 25, 26, 28 and 34; State Defendant's Pretrial Memorandum, Doc. # 38, pp. 32, 35, 36, 38).

§ 102 of the National Environmental Policy Act, 42 U.S.C. § 4332 provides that:

[A]ll agencies of the Federal Government shall

* * * * * *

. . . .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

. . . .

(iii) alternatives to the proposed action.

§ 4332 does not define which alternatives to a proposed action should be considered, but the regulations in effect at the time of the submission of the impact statements herein, do furnish some assistance. The CEQ guidelines on environmental impact statements provide that:

A rigorous exploration and objective evaluation of the environmental impacts of *all reasonable alternative actions, particularly those that might enhance or* *avoid some or all of the adverse environmental effects,* is essential. Sufficient analysis of such alternatives and their environmental benefits, costs and risks should accompany the proposed action through the agency review process in order not to foreclose prematurely *options which might enhance environmental quality or have less detrimental effects.*

40 C.F.R. § 1500.8(a)(4) (1976) (emphasis added). It is apparent that the thrust of this regulation is upon *reasonable* alternatives which will either minimize or avoid the adverse environmental effects of the proposed action. This interpretation is further buttressed by the remaining portion of § 1500.8(a)(4), which states, in pertinent part, that:

Examples of such alternatives include: the alternative of taking no action . . . ; alternatives requiring actions of a significantly different nature which would provide similar benefits *with different environmental impacts* (e.g., . . . mass transit alternatives to highway construction); alternatives related to different designs or details of the proposed action *which would present different environmental impacts.*

(Emphasis added.)

Additional assistance may be garnered from the Federal Highway Administration regulations which were in effect during the relevant time, and which provide discussion of alternatives similar to that contained in the CEQ guidelines. For example, 23 C.F.R. § 771.18(j) (1976) states, with respect to alternatives, that:

This section shall include a discussion, with maps and other visual aids, as appropriate, of the reasonable alternatives studied in detail, *including those that might enhance environmental quality or avoid some or all of the adverse environmental effects.* Examples of such alternatives include alternative locations and designs, not implementing the proposed action, postponing the action, providing a lower level of service, providing a reduced facility (lanes/design), and an in-

crease or decrease in public transportation.

(Emphasis added.)

▮ Although the procedural requirements of NEPA are strict, courts have interpreted them on a "basis of reasonableness." *Iowa Citizens for Environmental Quality, Inc. v. Volpe*, 487 F.2d 849, 852 (8th Cir. 1973) (citation omitted). The leading statement on this rule of reason was set forth in *National Resources Defense Council, Inc. v. Morton*, 458 F.2d 827 (D.C.Cir. 1972), as follows:

> [T]he requirement in NEPA of discussion as to reasonable alternatives does not require "crystal ball" inquiry. Mere administrative difficulty does not interpose such flexibility into the requirements of NEPA as to undercut the duty of compliance "to the fullest extent possible." *But if this requirement is not rubber, neither is it iron.* The statute must be construed in the light of reason if it is not to demand what is, fairly speaking, not meaningfully possible, given the obvious, that the resources of energy and research-and-time available to meet the nation's needs are not infinite.

*Id.* at 837 (emphasis added). *See also, Vermont Yankee, supra*, 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978). The Sixth Circuit has applied this rule of reason in its interpretation of NEPA. *See, Natural Resources Defense Council, Inc. v. Tennessee Valley Authority*, 502 F.2d 852, 853 (6th Cir. 1974); and, *Environmental Defense Fund, Inc. v. Tennessee Valley Authority*, 492 F.2d 466, 468, n.1 (6th Cir. 1974) (holding that in assessing the adequacy of an impact statement, "practicality and reasonableness ... are to be taken into account along with the broad purposes of the act to preserve the values and amenities of the natural environment").

▮ Before the present impact statement is evaluated, a few additional observations are in order. First, the purpose of providing sufficient information regarding alternatives is to "permit a reasoned choice of alternatives *so far as environmental aspects are involved.*" *National Resources Defense Council, Inc. v. Morton*, 458 F.2d 827, 836 (D.C.Cir.1972) (emphasis added). Second, while "[a]gency consideration of alternatives in the administrative record cannot replace the NEPA mandated discussion of alternatives in the EIS itself, ... a court may look at the administrative record as a whole to see whether an alternative deserved greater attention in the EIS." *Kentucky ex rel. Beshear v. Alexander*, 655 F.2d 714, 718–719 (6th Cir. 1981) (*Beshear*), citing *Grazing Fields Farms v. Goldschmidt*, 626 F.2d 1068, 1074 (1st Cir. 1980). Third, the sufficiency of the environmental statement "must be examined in light of the particular facts and circumstances surrounding the project." *Iowa Citizens for Environmental Quality, Inc. v. Volpe*, 487 F.2d 849, 852 (8th Cir. 1973). Finally, "an agency is not required, under NEPA, to consider alternatives when such consideration would serve no purpose. Thus, *an agency need not consider in its impact statement alternatives with consequences indistinguishable from the action proposed.*" *National Resources Defense Council, Inc. v. Securities and Exchange Commission*, 606 F.2d 1031, 1054 (D.C.Cir.1979) (citations omitted). *See also, Sierra Club v. Morton*, 510 F.2d 813, 825 (5th Cir. 1975) (holding that alternatives which would result in similar or greater harm than those proposed in the EIS need not be discussed). With the preceding criteria in mind, the Court will now consider the facts and circumstances of the present case, as well as those alternatives discussed in the FEIS, in order to determine whether the preparers of the FEIS complied with the procedural requirements of 42 U.S.C. § 4332(2)(C)(iii).

As was previously noted in the findings of fact, in 1957, the United States Bureau of Roads, the predecessor to the Federal Highway Administration, authorized a belt route for the Dayton area. Based on preliminary studies of physically feasible route corridors, both east and west of Dayton, *see*, Gov. Ex. BB, p. 5, an east corridor was recommended on several grounds, including, *inter alia*, the fact that it would serve an estimated 50% more vehicle miles than the

west corridor, and the fact that, as a Defense Highway, it would provide service to Wright Patterson Air Force Base (Gov. Ex. BB, pp. 10, 11). An alternate "close-in" route through Kettering was also developed but was rejected by the Bureau of Public Roads in 1962 because it did not satisfy the criteria for an interstate belt route. (Gov. Ex. F, § 1.08, p. 1/2; Gov. Ex. CC, App. D, pp. 3D–5D).

In 1962, plans were announced for the development of a new University adjacent to Wright Patterson Air Force Base (Gov. Ex. CC, p. 16). Because of the potential traffic to be generated by this facility as well as by the Air Base, a Wright Patterson Air Force Base and University Needs Study was made in 1963 by Wright Patterson Air Force Base, Ohio State-Miami University, and the Regional Transportation Committee, which was the predecessor of TCC (Gov. Ex. CC, pp. 1, 3). Based on the analysis therein, the study recommended a system which would integrate the construction of I–675 with the needs of the University and the Air Force Base, and would terminate at I–70 northeast of Fairborn. See, Gov. Ex. CC, p. 11, and Figure 1; Gov. Ex. F, § 1.09, p. 1/3. The present location of proposed I–675 is essentially the same as that suggested in 1963, see, Gov. Ex. U and V, and has been approved by the Bureau of Public Roads since January, 1965, subject to certain conditions which related to alternate alignments, and which, therefore, are not particularly relevant herein (Gov. Ex. F, §§ 1.10–1.11, pp. 1/3–1/4). Finally, on July 13, 1965, the Bureau of Public Roads approved the routing for I–675 on the general alignment east of Fairborn, Ohio. See, Finding of Fact 9.

Prior to the time that it was determined that an environmental impact statement would be required for I–675, i.e., in October, 1973, FHWA had authorized the State to begin full right of way acquisition for all of the construction sections for I–675 except for Section 2, a small 3.72 mile portion of the freeway. However, a bridge project in this latter section had already been completed in 1970, at a cost of $214,521. See, Findings of Fact 15 and 16, and Gov. Ex. N.

In addition, by the time it was determined that an EIS should be prepared, 80% of the right of way had been acquired for one of the largest remaining sections of the proposed I–675, and approximately 24% of the right of way on the remaining projects had been acquired. See, Findings of Fact 21 and 22, and Gov. Ex. N. Also, see generally, Gov. Ex. G, pp. 1–116. By 1975, a total expenditure of $24,499,337 had been made on construction projects authorized by the FHWA prior to the time that it had been determined that an EIS would be needed, and even more significantly, prior to the time when the FHWA had entered into the consent agreement with the National Wildlife Federation. (Findings of Fact 19 and 20).

■ The preceding recitation of the background of the within action indicates that the location of the proposed highway was established approximately eight years before NEPA was deemed to be applicable herein, and in fact, considerably before that, if one considers the fact that by 1961, it had been determined that a beltway should be constructed on the east side of the Dayton area. Moreover, a substantial portion of the necessary right of way for construction in the proposed location had been acquired, and a good deal of money had been expended on projects located in the corridor area. Although some of these projects were not completed until 1975, they were authorized prior to the time when it was determined that an environmental reassessment should be made. Given these factors, the Court concludes that consideration of alternate locations for the proposed highway would not have been reasonable, prudent, or, in fact, feasible.

In their post-trial memorandum, Plaintiffs have suggested the following four proposals which they contend were reasonable alternatives to the proposed highway, and should have been considered in the EIS:

(a) I–675 to U.S. 35 (1979 Goldschmidt decision)

(b) I–675 to U.S. 35, improvements to U.S. 35 (id.)

(c) I–675 to U.S. 35, lesser scale improvements in I–675 corridor (*id.*, p. 3)

(d) TCC proposed Alternative Network G (TCC Alternative Analysis and 1980 Goldschmidt decision).

 With regard to the first two proposals, the Court does not find that they were feasible or reasonable alternatives to I–675 as proposed. It must be recalled that approximately sixteen years prior to the 1973 NEPA reassessment, the project in question was authorized as a belt route for the Dayton area, with anticipated northern and southern termini at I–75. *See*, Finding of Fact 1; Gov. Ex. CC, p. 1; Gov. Ex. N and S. Although the northern terminus was modified to connect with I–70 on the north, so that certain traffic needs of Wright Patterson Air Force Base could be better accommodated, the project still had as an essential function the provision of a beltway or bypass around the City of Dayton. *See*, Gov. Ex. F, § 2.1.02, p. 2.1/1; §§ 2.7.01 and 2.7.02, p. 2.7/1. There is no indication, either in the record, or in anything furnished by Plaintiffs, that consideration of these alternatives would have been appropriate in view of that stated purpose. In fact, it is apparent that extending I–675 only to U.S. 35, with or without improvements in Route 35, would have run directly counter to the beltway purpose of I–675, by diverting traffic directly into the city. In light of the fact that the Bureau of Public Roads had previously rejected a proposal which did not satisfy beltway criteria, i.e., the Kettering "close-in route," it would have made little sense to advance another proposal as a substitute which also did not function as a beltway. Thus, under the circumstances of this case, the Court cannot conclude that the alternative of only building I–675 to U.S. 35, with or without improvements to Route 35, was a reasonable alternative which should have been dis-

cussed in the EIS. *See, Farmland Preservation Association v. Goldschmidt*, 611 F.2d 233, 239 (8th Cir. 1979) and *Miller v. United States*, 654 F.2d 513, 514 (8th Cir. 1981) (rejecting necessity for development or consideration of alternatives which would alter the intended purpose or scope of the project in question).

Assuming *arguendo* that the alternative of constructing I–675 only to U.S. 35 was a reasonable alternative to I–675 as proposed, the next question to be addressed is whether the FEIS provided "information sufficient to permit a reasoned choice of alternatives so far as environmental aspects are concerned." *National Resources Defense Council, Inc. v. Morton*, 458 F.2d 827, 836 (D.C.Cir.1972). Clearly, the FEIS herein did contain adequate information regarding the environmental aspects of such an alternative. First, it should be noted that Secretary Goldschmidt's 1979 decision, which specifically approved construction of I–675 to U.S. 35, *see*, Gov. Ex. A, p. 98, was apparently not objected to by any public agency other than ODOT, or by any private individuals, on the ground that the FEIS did not contain adequate information regarding the environmental effects of such an alternative.[6] Second, the FEIS does contain adequate information upon which the environmental aspects of only constructing a portion of the proposed project can be assessed. For example, specific areas of biological impact are noted in the FEIS. *See*, Gov. Ex. F, §§ 2.9.01 and 2.9.02, p. 2.9/1; § 3.9.03, p. 3.9/1; and § 3.9.11, p. 3.9/4. In addition, reference is made to studies which outline particular areas of noise and atmospheric impact. *See*, Gov. Ex. F, § 2.10.10, p. 2.10/7; §§ 2.10.12 and 2.10.13, p. 2.10/8; § 3.10.03, p. 3.10/2; and 3.10.06, p. 3.10/3. Finally, the FEIS outlines the socio-economic conditions existing in specific con-

**6.** Ironically, ODOT did claim, in a letter sent to the United States Environmental Protection Agency on February 8, 1980, that Goldschmidt's decision violated NEPA because "the segmented project . . . provides no analyses of the environmental impacts of a project such as recommended by Secretary Goldschmidt on the region." Gov. Ex. A, p. 115. Apparently, this must be an attack upon the Goldschmidt decision itself, rather than the FEIS. In any event, ODOT is not the only party to advance conflicting positions. Plaintiffs have urged that the 1979 Goldschmidt decision was correct, but have at the same time contended that the FEIS contained insufficient information upon which that decision could be premised.

struction sections of the proposed highway. *See generally,* Gov. Ex. A, §§ 2.8.01–2.8.32, pp. 2.8/1–2.8/12. Thus, it is apparent that the FEIS contained sufficient information upon which the environmental aspects of building the proposed highway only to U.S. 35 could be assessed.

 ▮ As was noted, Plaintiffs have also suggested that construction of I–675 to U.S. 35, with lesser scale improvements in the I–675 corridor, should have been included in the FEIS as a reasonable alternative. Specifically, the 1979 Goldschmidt decision mentioned "small scale, localized transportation improvements," Gov. Ex. A, p. 97, including, *inter alia,* "improved connections between U.S. 35 and Indian Ripple Road," *id.,* and "improvements to existing State Route 725 and S.R. 741." *Id.* Again, these localized improvements cannot be viewed as a reasonable alternative to proposed I–675, because they would not have served the beltway function of that highway project. Therefore, the Court finds that the alternative of small-scale localized improvements was not a reasonable alternative to I–675 as proposed, and accordingly, was not required to be included in the FEIS.

The remaining alternative suggested by Plaintiffs is TCC's proposed Network G. After the 1979 Goldschmidt decision to disapprove the I–675 project south of U.S. 35, a TCC subcommittee was formed to study alternatives to the I–675 project. *See,* Gov. Ex. E, p. I–4. Various jurisdictions were represented on this subcommittee, including, among others, the cities of Centerville, Bellbrook, Dayton, Kettering, and Fairborn, Montgomery and Greene Counties, and the Dayton Area Chamber of Commerce. *Id.* at I–5. In addition, citizen input was received, through review of the alternatives evaluation process by the Council of Citizens, through citizen participation in several TCC subcommittee meetings, and through TCC staff presentations on I–675 alternatives in meetings of local jurisdictions which were open to the public. *See, id.* at pp. I–4 and VII 4–6. In the subcommittee report, Network G was described as follows:

This network uses the I–675 right of way and calls for a four lane divided roadway between I–75 and U.S. 35 . . . .

. . . .

The replacement route in this alternative is an expressway comparable in characteristics to the route in Network A.

*Id.* at pp. IV 63—IV 71. An examination of the characteristics and layout of Network G indicates that of the alternatives suggested by Plaintiffs, it is the only proposal which could even arguably fulfill the beltway function of the original I–675 proposal. While this proposal did not contain all of the interstate design elements of the TCC Network A, (*compare* discussion in Gov. Ex. E, pp. IV 7—IV 13, with that in Gov. Ex. E, pp. IV 63—IV 74), it was considered to be an expressway comparable to Network A, *id.* at IV 71, and did propose certain restrictions on access, i.e., by terminating local roads, or by providing grade separations. *Id.* at IV 73—IV 74. In fact, when these alternatives were evaluated by the USDOT, it was noted that there was little difference between Network A and I–675, and that Network G had "all of the characteristics of Network A, except that two interchanges are deleted." Plaintiffs' Ex. 6, p. 1. *See also,* Gov. Ex. A, pp. 154–155 (September, 1980 Goldschmidt letter rejecting Network A as a redesign of I–675).

 ▮ With the above points in mind, it must now be considered whether Network G, or a similar reduced scale facility, should have been considered in the FEIS. Because Network G would have presented environmental consequences "indistinguishable from the action proposed," *National Resources Defense Council, Inc. v. Securities and Exchange Commission,* 606 F.2d 1031, 1054 (D.C.Cir.1979), the Court has concluded that it did not need to be discussed as an alternative in the FEIS. In the alternatives analysis performed subsequent to the 1979 Goldschmidt decision, a detailed comparison was made of three alternatives, i.e., Network A, which was the I–675 "clone," Network G, and a No Build Sys-

tem.[7] *See*, Gov. Ex. E, Chapter V. The report noted that the evaluation criteria were "somewhat gross," *id.* at V 2, but were the best available measures, given the state of the art. Accordingly, the report noted that only a difference of plus or minus ten percent could be considered to be a significant difference when comparing alternatives. *Id.* An examination of the evaluation criteria for Networks A and G indicates that in nearly every instance, their effects were almost identical. *See*, Gov. Ex. E, pp. V 3—V 11. For example, the two networks show almost precisely the same amount of energy usage, air, noise, and water pollution, impact on aesthetics, maintenance costs, and ability to minimize traffic congestion and displacements.[8] *Id.* Thus, because Network G would result in substantially the same environmental hazards as would the original I–675 proposal, *see, Sierra Club v. Morton*, 510 F.2d 813, 825 (5th Cir. 1975), it need not have been included as an alternative in the FEIS herein.

■ This Court is aware that agency consideration of alternatives in the administrative record cannot substitute for the "NEPA mandated discussion of alternatives in the environmental impact statement itself." *Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068, 1074 (1st Cir. 1980). *See also, Beshear, supra*, 655 F.2d 714, 718–719 (6th Cir. 1981). This Court has merely looked to the administrative record in order to evaluate the degree of discussion, if any, which the particular alternatives advanced herein may have deserved in the FEIS. Specifically, this Court has not concluded that the FEIS contained an insufficient discussion of reasonable alternatives, or that

later analysis of alternatives helped to correct such an inadequacy, but has instead concluded that the information in the administrative record has indicated that certain alternatives were not feasible, or would not have had impacts different than the action proposed, and therefore, did not need to be discussed in the FEIS.

Moreover, because the FEIS herein was resubmitted after the 1980 TCC consideration of alternatives, another way of viewing this situation would be to assess whether the TCC analysis disclosed information regarding Network G which should have been circulated in a supplemental EIS. According to the present CEQ regulations, the 1973 CEQ guidelines are applicable herein, since the DEIS involved in this case was filed prior to July 30, 1979. *See*, 40 C.F.R. § 1506.12 (1981). Those guidelines provide that:

> An agency may at any time supplement or amend a draft or final environmental statement, particularly when substantial changes are made in the proposed action, or significant new information becomes available concerning its environmental impacts.

40 C.F.R. § 1500.11(b) (1974).[9] The FHWA regulations in effect during the relevant time have substantially similar wording. *See*, 23 C.F.R. § 771.15 (1976). Under the preceding analysis, it is apparent that Network G would not have been a substantial change in the proposed action, so as to require its circulation in a supplemental EIS, even at the time of the resubmission of the FEIS in 1981. Moreover, the alternatives analysis does not disclose any signifi-

---

**7.** This No-Build system, like the proposals involving construction of I–675 only to U.S. 35, and implementation of lesser scale improvements, would not in any sense have fulfilled any needs related to a bypass, *see*, discussion of No-Build Network in Gov. Ex. E, pp. IV–51–IV–63, and therefore, cannot be considered to be a reasonable alternative to the I–675 project as proposed.

**8.** The only "significant" comparability distinction between A and G, to use the terms of the alternatives analysis, is that A would consume approximately 22 acres more land. *See*, Gov.

Ex. E, Table 11, p. V–3. Given the overall identity of the effects of these two networks, as well as the magnitude of the project, which involved a total land conversion of over one thousand acres, *see*, Gov. Ex. F, § 3.4.01, p. 3.4/1, the Court does not consider this single disparity to be of particular consequence in the context of this case.

**9.** The present CEQ regulation on supplementation does not differ materially from the guideline cited in the main text. *See*, 40 C.F.R. § 1502.9(c) (1981).

cant new information about the environmental aspects of I–675, since the effects of Network A, G, and I–675, are essentially the same.

Based on the preceding analysis, the Court has concluded that the FEIS discussed all reasonable alternatives to the proposed I–675 project, and that, therefore, the Defendants did not violate the procedural requirements of NEPA by failing to include consideration in the FEIS of certain alternatives such as construction of I–675 to U.S. 35, lesser-scale improvements in the I–675 corridor, or a reduced scale highway.

As was previously noted, Plaintiffs have also alleged in their Complaint that Defendants violated NEPA because the FEIS did not contain a discussion of substitute projects available under the withdrawal funding provisions of 23 U.S.C. § 103(e)(4) (1976). That section empowers the Secretary of Transportation to withdraw approval of routes on the Interstate System upon, *inter alia*, a joint request by the State Governor and the local governments concerned. Thereafter, the funds authorized for the interstate project may be applied to mass transit projects or other highway assistance programs authorized under § 103. Prior to the amendment of § 103(e)(4) in 1976, withdrawn funds would have been available only for public mass transit projects. *See*, notes to 23 U.S.C. § 103 (1976).

The FHWA impact statement regulations in effect at the time of the amendment of § 103(e)(4) do not refer to withdrawal-substitution options, but merely mention such alternatives as "alternate locations and designs, not implementing the proposed action .... providing a reduced facility, and an increase in public transportation." *See*, 23 C.F.R. § 771.18(j) (1977). These regulations remained unchanged in pertinent part from 1974 until 1979. *See*, 23 C.F.R. § 771.18(j) (1979). Likewise, the most recent codification of FHWA impact regulations does not contain a reference to withdrawal-substitution. *See*, 23 C.F.R. §§ 771.103 *et seq.* (1981). Thus, it must be concluded that specific reference to withdrawal-substitu-

tion options is not required in an environment impact statement. In any event, the factors outlined in the regulations, e.g., public transportation, a reduced scale facility, and the like, would appear to cover the same alternatives as those mentioned in § 103(e)(4). Thus, it would appear that withdrawal-substitution merely provides the procedural mechanism for withdrawing interstate funds once it has been determined, for example, that a lesser scale facility is preferred. *See*, H.R.Rep.No.716, 94th Cong., 2d Sess. 2, reprinted in 1976 U.S. Code Cong. & Ad.News 798, 799, (indicating that purpose of 1976 amendment to substitution provisions is to provide increased flexibility in their use). Therefore, once it has been determined whether, for reasons related to NEPA, or some other consideration, that an interstate segment is desired to be withdrawn, § 103(e)(4) merely indicates that the funds withdrawn can be applied to other projects.

Assuming *arguendo* that withdrawal-substitution had some connection with NEPA, it is questionable whether anything more would be required than what actually was done in the present case. In the 1979 Goldschmidt decision, it was suggested that the State consider withdrawing I–675 from the interstate system, and substituting "other priority transportation projects in the region, including reduced scale projects in the I–675 corridor." Gov. Ex. A, p. 98. Pursuant to this recommendation, TCC studied various alternative projects which could be substituted for the rejected portion of I–675. *See*, Gov. Ex. E, pp. xi, I–1, and I–4. On March 18, 1980, Douglas Wright, the Associate Deputy Secretary of Transportation wrote to Nora Lake, the Chairman of the MVRPC, in order to clarify the withdrawal-substitution process. *See*, Gov. Ex. A, pp. 121–123. In that letter, Wright indicated that while ordinarily interstate withdrawal and substitute project selection were distinct steps, TCC had determined that in the present situation, the two elements would be integrated, and that a decision with regard to withdrawal "should be directly related to, *if not contingent upon,*

an understanding ... of the project(s) which will be initiated in the corridor area, subsequent to a withdrawal approval." *Id.* at 121. Wright then stated:

In light of the Secretary's decision, as well as Federal regulations, *the decision making process defined by the TCC is perfectly reasonable.*

. . . .

Allow me, therefore, to set forth my understanding of the general sequential steps which the TCC has chosen to follow—steps which not only comply with Federal regulations but which also reflect the process encouraged by the Secretary.
1. Staff analysis of non-Interstate transportation improvement alternatives in the southeast corridor, or area of the region . . . .
3. With agreement on a corridor alternative, the TCC could formally initiate an Interstate withdrawal request, with an understanding in the region that adequate funds from a withdrawal would be set aside to accomplish the (priority) alternative in the southeast corridor area.

*Id.* at 121–122 (emphasis added).

Subsequently, in September, 1980, the TCC submitted the results of the alternatives analysis, which recommended, in order of preference, reconsideration of the decision on I–675, Network A, and Network G. *See,* Gov. Ex. E, TCC resolution of September 4, 1980. *See also,* Gov. Ex. A, p. 154. While the FHWA regional representative was critical of Networks A and G, since they were "near facsimiles" of I–675, Plaintiffs' Ex. 6, p. 5, Secretary Goldschmidt wrote to TCC on September 26, 1980, indicating that approval of Network G would be likely. *See,* Gov. Ex. A, p. 154–156. The Secretary stated that he appreciated TCC's interest in receiving assurance that it was following a reasonable process, and noted that TCC should understand that it would be *"legally impossible* for FHWA to approve formally any of the alternatives to I–675," since no formal withdrawal request had yet been made. *Id.* at 155 (emphasis in original). Goldschmidt then offered several comments, including, *inter alia*, statements

that disapproval of I–675 would not be reconsidered, and that Network A would be rejected, as merely a redesign of I–675. *Id.* Significantly, for purposes herein, Goldschmidt then said:

The FHWA has indicated the *Alternative G represents a series of transportation improvements which appear to meet the transportation requirements* and are eligible for Interstate withdrawal financing. Although further design refinements (in the EIS and engineering phase) would likely modify this concept, *the FHWA does not foresee any apparent problems with this alternative.*

*Id.* (emphasis added).

Thus, the substitution project for which Secretary Goldschmidt indicated likely approval was Network G, which this Court has already determined did not differ in environmental impact from the original I–675 proposal. As was previously noted, the withdrawal-substitution provisions of 23 U.S.C. § 103(e) cannot be viewed as having increased the procedural requirements for FHWA impact statements, since the FHWA regulations remained unchanged after the amendment of § 103 in 1976. However, even if withdrawal-substitution options should have been included, they would have resulted in nothing more than inclusion in the FEIS of an alternative which has already been determined to be unnecessary. Accordingly, the Court concludes that the FEIS did not violate NEPA or the pertinent FHWA regulations by failing to include withdrawal-substitution options available under 23 U.S.C. § 103(e)(4).

▇ Plaintiffs have also contended that the ODOT was guilty of bad faith in that it misled the City of Dayton about the availability of withdrawal-substitution funding. *See,* Doc. # 1, ¶ 62. The sole evidence which has been submitted in this regard consists of Plaintiffs' Ex. 15, which was admitted into evidence at trial over the objection of Defendants. Although this document is unsigned, it appears to be the report which was submitted to Secretary Lewis in 1981 by Dayton Mayor McGee. *See,* Plaintiffs' Ex. 17 and 22. Although

the Defendants entered into a stipulation with regard to the authenticity of all documents admitted herein, that does not, in the Court's opinion, constitute an admission that statements contained in each document are true. The most which could be said of the statements in Plaintiffs' Ex. 15 is that they represent someone's opinion that the City was misled. It would therefore be appropriate to examine the rest of the record to determine whether there is any support for, or verification of this contention. There is no other evidence which would aid in establishing that the City had been misled. None of the other documents which have been submitted by Plaintiffs refer to any alleged misrepresentations by the ODOT in connection with withdrawal-substitution funding.

It should be noted that in Plaintiffs' Ex. 15 it is indicated that in 1978 Mayor McGee documented with Secretary Adams that the City of Dayton had been misled. However, the correspondence from Secretary Adams to David Weir, the ODOT Director, makes no reference to any misrepresentations. *See,* Gov. Ex. A, pp. 37–38. Likewise, the correspondence of Mayor McGee with Adams in June, 1979 regarding economic impacts of I–675 makes no reference to any ODOT misrepresentations, *see, id.* at pp. 67–85; the USDOT letter in October, 1979 to Governor Rhodes regarding withdrawal-substitution makes no mention of State misconduct, *id.* at pp. 86–90; and the Goldsch-

midt correspondence and decisions do not make any comments to the effect that the State made misrepresentations or that documentation to that effect had been received. *Id.* at pp. 91–99, and 154–156. Moreover, there is nothing in the deposition of the ODOT Director Weir, which would substantiate the allegation that ODOT in any way misled the City of Dayton. *See generally,* Weir deposition, pp. 1–87. In fact, the only inquiry made by Plaintiffs of Weir regarding withdrawal-substitution involved either the process in general, or correspondence between Weir and TCC Director Jack Jenson regarding TCC progress on withdrawal-substitution in 1980. *Id.* at 44–46 and 48–49. *See also,* Ex. 3 attached to Weir deposition, which is also admitted herein as Plaintiffs' Ex. 9.[10]

 The only document herein which even refers to the City being misled was submitted by the intervening Defendants. *See,* TCC Ex. B. This exhibit consists of a letter written in 1979 to Secretary Adams by the USDOT Regional Representative, Doug Kelm. Kelm indicated that he had limited familiarity with the project, and was basing his discussion on comments made by a member of the Kettering Foundation. Based on that discussion, Kelm stated "[t]he city council was misled (deliberately or not is of little consequence) on the matter of use of interstate funds for substitute projects under Title 23." *Id.* at p. 2. These statements are nothing more

10. Plaintiffs have also contended that ODOT acted in bad faith in discouraging withdrawal-substitution consideration by local agencies after the 1979 Goldschmidt decision. The only evidence regarding this matter is contained in Plaintiffs' Ex. 9, which was referred to in the main text. An examination of the documents in Ex. 9 reflects that while Weir was certainly displeased with TCC actions in connection with withdrawal-substitution, the focus of his concern involved his perception that the TCC had not followed the proper procedure for withdrawal-substitution and had circumvented normal channels in corresponding with the US-DOT. *Id.* at pp. 4–5. This view is also reflected in Weir's deposition. *See,* Weir deposition, pp. 49–50. In his letter, Weir informed TCC of the proper sequence of events which should take place for withdrawal-substitution. Plaintiffs' Ex. 9, pp. 4–5. In his response to

Weir's letter, the TCC Director indicated that he was attempting to follow the procedures outlined by the ODOT, and that in his opinion, the USDOT, rather than TCC had been responsible for deviating from the "normal chain of command." *Id.* at pp. 8–9. There is no indication that Weir was attempting to stop withdrawal-substitution. In fact, Jensen's letter to Weir states that "[y]ou and I personally discussed and agreed that our work at TCC would proceed as if the decision to deny I–675 was final." *Id.* at p. 8. While Director Weir was contemplating filing a lawsuit to contest the Goldschmidt decision, *id.,* that fact does not indicate bad faith. It is apparent that Director Weir considered Goldschmidt's decision to be incorrect. *See,* Weir deposition, pp. 34, 85; Gov. Ex. A, pp. 113–116. Based on these facts, the Court does not find evidence of bad faith on the part of the ODOT.

than hearsay, which is not admissible under Fed.R.Evid. 802 or pursuant to any of the hearsay exceptions in Fed.R.Evid. 803. Even if this statement were properly admissible, it is not probative of anything since it does not identify either who misled the city, or even whether the alleged deception was intentional. It would seem obvious that a finding of bad faith could not be premised upon an unintentional act. Given these factors, it is apparent that the Kelm letter falls far short of the "documentation" of bad faith which was alleged in the Complaint.

The preceding discussion has not demonstrated that the ODOT acted in bad faith. It may be true that City officials felt they had been misled regarding withdrawal-substitution, but there is simply no evidence in the record upon which the Court can premise a finding that the ODOT did, in fact, mislead City officials or act in bad faith. *See also*, footnote 13, *infra*. Therefore, the Court must reject the Plaintiffs' contention that the ODOT was guilty of acting in bad faith.

Plaintiffs have further contended that the FEIS evaluation of the No-Build alternative was inadequate because it was premised upon assumptions that growth in the I–675 corridor would remain the same whether or not the highway was constructed (Complaint, Doc. # 1, ¶ 64(c); Plaintiffs' Preliminary Memorandum in Support of Motion for Preliminary and Permanent Injunction, Doc. # 22, pp. 22–25).[11] Defendants have replied to this contention by pointing out that it is premised on the erroneous assumption that traffic volumes would be less for the No-Build alternate than if the project were built. Defendants have further noted that future traffic

trends were forecast by examination of population trends, and socio-economic and demographic data, without reference to any particular transportation system, and that the analysis of the "no-build" alternative was predicated on the "projected traffic volumes resulting from planned growth and development being assigned to the existing road network." (State Defendant's Pretrial Memorandum, Doc. # 38, p. 35).

The No-Build alternative as defined in the FEIS involves "adding additional capacity through installation of traffic controls or construction of more lanes of pavement on existing highways in conjunction with correcting alignment deficiencies . . . without altering the basic characteristics of the highway by limiting access or separating opposing traffic." Gov. Ex. F, § 2.11.09(d), p. 2.11/3. The FEIS indicates that traffic for the No-Build alternate was determined by "reassigning the traffic with I–675 deleted from the system network." Gov. Ex. F, § 2.7.03, p. 2.7/1. In response to a comment from the United States Environmental Protection Agency that it disagreed with the assumption that travel through the corridor would be the same for I–675 and the no-build alternate, TCC noted that "traffic demand has been determined on the basis of the planned growth [for the area]. This is accepted procedure for assigning traffic." Gov. Ex. F, § 9.2.03, comment 6, p. 9.2/3 (parenthetical material added). Phrased in simple terms, what essentially occurred is that based on anticipated area trends and growth, traffic volumes were predicted for the year 2000 and were then assigned to each potential traffic system. Plaintiffs have complained about this procedure because it does not recognize the effect which I–675 would have upon stimu-

---

11. It seems to the Court that there exists an inherent conflict between at least two of the positions which have been advanced in this litigation. On one hand, Plaintiffs have complained that I–675 will induce or stimulate growth, and that the FEIS is inadequate because it assumed that traffic volumes would remain the same whether or not the highway was built. On the other hand, however, Plaintiffs have contended that the Dayton Metropolitan area has not grown in population and that

I–675 will not cause overall growth in this area but will merely draw population from other sources such as the City of Dayton. Plaintiffs have attempted to reconcile this apparent contradiction by stating that, even if I–675 would have no effect on inducing growth, that fact should have been indicated in the FEIS. Plaintiffs' Preliminary Memorandum in Support of Motion for Preliminary and Permanent Injunction, Doc. # 22, p. 25. Frankly, imposing such a futile task appears to have little utility.

lating or inducing growth. This contention, however, is not relevant to a consideration of whether the discussion of the No-Build alternate contained "information sufficient to permit a reasoned choice of alternatives so far as environmental aspects are concerned." *National Resources Defense Council, Inc. v. Morton*, 458 F.2d 827, 836 (D.C.Cir.1972).[12]

In the FEIS, it is noted that the estimated daily traffic for I–675, as well as the No-Build alternate is derived from Volume II of "A Regional Transportation Plan." Gov. Ex. F, § 2.7.03, p. 2.7/1. In addition, charts of the anticipated traffic flow on I–675 for both 1976 and 1993 are provided in the FEIS. *See*, Gov. Ex. F, pp. E76–E80. Further, Volume II of the Regional Transportation Plan provides information regarding: 1975 and 1990 estimated traffic volumes, *see*, Gov. Ex. I, pp. 127–128; a detailed breakdown of 1960, 1975 and 1990 population, employment, and tripends, *id.* at App., pp. 166–170; and, an explanation of those assumptions, i.e., population distribution, motor vehicle registration and use, employment distribution, and future patterns of land use, upon which the regional transportation plan was premised. *Id.* at pp. 3–10. In addition, Volume II contains an analysis of the analytical process used in adopting the regional transportation plan, *id.* at pp. 11–14, of which the proposed beltway was only a part. It is apparent from an analysis of the information contained in this study that the traffic volumes adopted therein were not premised upon development generated by I–675, but were based on other assumptions related to anticipated future trends in Montgomery and Greene Counties. *See, id.* at pp. 3–9, 15. Thus, contrary to Plaintiffs' claims, the No-Build alternate does not assume "vigorous regional growth centered on a six lane interstate highway," Doc. # 22, p. 23, which suddenly disappears. Because trends in the region were expected to develop independently of the highway construction

and because the traffic volumes used to assess the No-Build alternate were not dependent upon the construction of the proposed I–675 highway, the Court does not find that the evaluation of the No-Build alternate in the FEIS was inadequate.

The final matter to be addressed in the consideration of alternatives is whether or not the FEIS adequately discussed the alternative of mass transit. Initially, it should be noted that Plaintiffs have not contended, in their Complaint (Doc. # 1), motion for preliminary injunction (Doc. # 22), or post-trial memorandum (Doc. # 53), that mass transit was a reasonable alternative to the construction of I–675. Therefore, the Court cannot conclude that the FEIS should have included mass transit as a reasonable alternative to the I–675 project. Assuming, *arguendo*, however, that such an alternative had been raised as a reasonable one, it is apparent that it was not a feasible substitute to the proposed project. First, a mass transit alternative must be rejected as a reasonable alternative because, like some of the other options which have been discussed, it did not, and could not have fulfilled the intended bypass function of the proposed highway. Second, the FEIS did evaluate three light rail facilities, including a low-highway/high-transit system. *See*, Gov. Ex. F, §§ 2.7.04–2.7.10, pp. 2.7/2–2.7/5. Even under the most comprehensive high transit system contemplated, ninety percent of the area trips would still depend on a highway system. *Id.* at § 2.7.10, p. 2.7/5. Based on this information, it is apparent that public transit was not a feasible substitute for I–675, and that a decisionmaker would have no difficulty reaching such a conclusion based on the information provided in the FEIS.

The preceding analysis has demonstrated that the FEIS submitted by Defendants did provide a detailed statement of all reasonable alternatives to I–675 as proposed, and

---

12. It is, however, a pertinent consideration in determining the adequacy of the discussion in the FEIS of the proposed I–675 alternate. To the extent relevant in this regard, induced growth will be addressed in the portion of this opinion which deals with traffic and the need for the project.

did contain sufficient information upon which a reasoned choice between alternatives could be made. Therefore, the Court finds that Defendants did not violate the procedural requirements of 42 U.S.C. § 4332(2)(C)(iii) by failing to include an analysis of reasonable alternatives in the FEIS. Having considered this matter fully, the Court will next evaluate the remaining contentions raised regarding the adequacy of the FEIS.

## VII. OTHER ALLEGED INADEQUACIES IN THE FEIS

Plaintiffs have alleged that the FEIS was inadequate in a number of respects other than those previously addressed herein, including the assessment of need for the construction of I–675, consideration of impacts of secondary development, and analyses of impacts on water quality, air pollution, and noise pollution. (Complaint, Doc. # 1, ¶ 64(d), (e), (f), (g), and (i)). In addition, Plaintiffs have claimed that the FEIS did not address and reconcile conflicting views as is required under NEPA. Doc. # 1, ¶ 64(j). Each of these remaining matters will be considered by the Court, to the extent deemed necessary for its resolution.

### A. FEIS Assessment of Need for I–675

In the Complaint, Plaintiffs have made numerous allegations regarding erroneous traffic and growth projections used in the FEIS, the improper methodology of TCC, and the purportedly circular proposition

used to justify the need for I–675, i.e., that population growth in the I–675 corridor, anticipated as a result of construction of I–675, establishes the need for I–675. See, Complaint, Doc. # 1, ¶s 32–39. In response, Defendants have asserted that Plaintiffs are not challenging the adequacy of the FEIS but, rather, the substance of the agency's decision in light of the information contained in the FEIS. See, Federal Defendants' Trial Brief, Doc. # 37, p. 37; State Defendant's Pretrial Memorandum, Doc. # 38, p. 50. After consideration of the evidence submitted, the Court must agree with Defendants.

In *Citizens for Balanced Environment and Transportation, Inc. v. Secretary of Transportation*, 515 F.Supp. 151 (D.Conn.1980), aff'd 650 F.2d 455 (2d Cir. 1981), (*Citizens for Balanced Environment* ), the plaintiffs had filed suit in 1972 attempting to block construction of a proposed highway because the agency had failed to prepare an environmental impact statement for the project. *Id.* at 153. After a final EIS had been prepared and approved, the Defendants requested that an injunction against construction of the highway be lifted. *Id.* at 154. The plaintiffs objected, claiming that the EIS violated the procedural requirements of NEPA. *Id.* Like Plaintiffs herein, the plaintiffs in *Citizens for Balanced Environment* claimed that "construction of a new highway facility was a preconceived conclusion for which the EIS serves as justification." *Id.* at 160.[13] Also,

---

13. The remaining bad faith allegations in the Complaint are premised on the notion that the FEIS served as a justification for the I–675 project, and relate to the ODOT's alleged failure to respond to agency comments, and its failure to seriously consider alternatives to the highway. See, Doc. # 1, ¶s 61 and 63. Specifically, Plaintiffs have contended that the ODOT had a preexisting bias in favor of constructing the highway because it had acquired most of the right of way in the corridor area. As has been indicated in the findings of fact, and elsewhere in the main text of this opinion, a good deal of the right of way was purchased *pursuant to FHWA authorization*, prior to the time when it was determined that an EIS would be required. See, Findings of Fact 12–15. Moreover, there is no indication that the ODOT purchased land after preparation of an EIS be-

came necessary on any other basis than that which was permitted, i.e., for hardship and protective buying reasons. See, Findings of Fact 15, and 21. While the acquisition of certain portions of the right of way and the FHWA approvals received prior to the preparation of the DEIS may have rendered certain alternatives and courses of action infeasible, there is no indication that the ODOT's pre-existing bias, if any, prevented it from complying with NEPA. It must be emphasized that only good faith objectivity, rather than subjective impartiality is required under NEPA. *Environmental Defense Fund, Inc. v. Corps of Engineers of United States Army*, 470 F.2d 289, 296 (8th Cir. 1972), cert. denied 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973) (citations omitted). Specifically, the Court in the cited case stated that the procedural requirements of NEPA were en-

as in the present case, it was contended that the highway department had used invalid data and projections, and improper methodology. *See, id.* at 161 & n.23. Unlike this case, however, the Plaintiffs in the cited case submitted both outside studies and expert testimony to challenge the adequacy of the EIS.[14] After consideration of all of the evidence, the Court found that the plaintiffs had not met the burden necessary to set aside the agency's decision. *Id.* at 162. Specifically, the Court stated:

> This Court is neither required, equipped nor inclined to resolve the fervid disagreements between the parties over technical analyses forming the basis for the Highway Department's recommendation that construction of the proposed expressway is the most viable solution to projected traffic needs in the future.

*Id.* at 161. Therefore, the district court vacated the injunction which had restrained construction of the highway.

On appeal, *see, Citizens for Balanced Environment and Transportation, Inc. v. Volpe,* 650 F.2d 455 (2d Cir. 1981), the Second Circuit Court of Appeals affirmed the decision of the District Court. The Court rejected the plaintiff-appellant's view that reviewing courts were required to " 'take a "hard look" at the agencies' process in compiling the EIS, inquiring into the choice of data, assumptions used, methodologies chosen, and other basic factors which

contribute to the decision-making document.' " *Id.* at 461, quoting from appellants' br. pp. 13–15. The Court stated:

> There is no duty for the district court to embroil itself in the type of detail which CBET urges is necessary to determine if there has been procedural compliance with NEPA. *Clothing its complaint as "procedural" is an inventive way for CBET to invite the Court to enter the very areas forbidden to it.* CBET would have the court act as the decisionmaker in the guise of securing procedural compliance.

*Id.* at 462 (emphasis added). The Court then noted:

> "The district court does not sit as a super-agency empowered to substitute expertise or testimony presented to it *de novo* for the evidence received and considered by the agency which prepared the EIS." *. . . Deciding technical disputes between contesting parties is not the means by which the procedural sufficiency of an FEIS will be measured by the Court.*

*Id.* (emphasis added) (citation omitted).

In the present case, while Plaintiffs have phrased their claim in terms of "failure to meet the standards of NEPA . . . because of reliance on grossly exaggerated and stale population and traffic projections," (Doc. # 1, ¶ 64(d)), it is apparent that in reality,

---

acted because "NEPA assumes as inevitable an institutional bias within an agency proposing a project." *Id.* at 295. Thus, there is no violation inherent in the fact that as here, an agency may have partially completed a project, or may, indeed, wish that the project would be approved.

**14.** While judicial inquiry in administrative cases is normally restricted to the administrative record, courts have in NEPA actions permitted inquiry outside the administrative record to see "what the agency may have ignored." *County of Suffolk v. Secretary of the Interior,* 562 F.2d 1368, 1384 (2d Cir. 1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978) (*County of Suffolk*). In *County of Suffolk,* the Court noted that:

> Generally, however, allegations that an EIS has failed to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise

swept "stubborn problems or serious criticism . . . under the rug," . . . raise issues sufficiently important to permit the introduction of new evidence in the district court, including expert testimony with respect to the technical matters, . . . in challenges to the sufficiency of an environmental impact statement.

*Id.* at 1384–1385, quoting from *Silva v. Lynn,* 482 F.2d 1282, 1285 (1st Cir. 1973). The Court further noted, however, that such new evidence "would be probative only insofar as it tended to show either that the agency's research or analysis was clearly inadequate or that the agency improperly failed to set forth opposing views widely shared in the relevant scientific community. Despite this opportunity, Plaintiffs herein have not furnished the Court with any expert testimony indicating that TCC's method of assigning traffic volumes was not an acceptable procedure.

they are requesting that this Court overturn the agency's substantive decision regarding whether the proposed highway was needed. In this context, *see*, Plaintiffs' Preliminary Memorandum in Support of Motion for Preliminary and Permanent Injunction, pp. 25–27; Gov. Ex. A, pp. 210–216 and 217–218. These latter two documents, i.e., the objections of Plaintiffs to Secretary Lewis' approval of I–675, and Lewis' response, indicate that a primary ground of objection to I–675 centered on the question of the need for the highway. In fact, Lewis' letter to plaintiffs states: "[a]s indicated in your letter, your basis for this request [for reconsideration] appears to center around the following issues: (1) *the need for the proposal* and (2) the consideration of alternatives." *Id.* at p. 217 (emphasis added). It is well established that this Court cannot " 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.' " *Kleppe v. Sierra Club*, 427 U.S. 390, 410, n.21, 96 S.Ct. 2718, 2730, n.21, 49 L.Ed.2d 576 (1976), quoting *National Resources Defense Council, Inc. v. Morton*, 458 F.2d 827, 828 (1972). *See also*, *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227–228, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980). Therefore, this Court must decline Plaintiffs' request to review the merits of FHWA's decision regarding the need for I–675 as proposed.

■ Assuming *arguendo* that this Court is required, or even permitted to immerse itself in the morass of technical data which has been submitted, there is no indication that the FEIS violated the procedural requirements of NEPA. In determining whether the FEIS herein complied with the procedural requirements of § 102(2), 42 U.S.C. § 4332(2), it has repeatedly been held that "the court's task is to determine whether the EIS was compiled with objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors." *Sierra Club v. Morton*, 510 F.2d 813, 819 (5th Cir. 1975) (citations omitted). *See also*, *County of Suffolk, supra*, 562 F.2d 1368, 1383 (2d Cir. 1977), *cert.*

*denied* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978). In addition, as has been previously mentioned, "NEPA, although rigorous in the requirements, does not require perfection nor the impossible. In assessing the adequacy of . . . [an environmental impact] statement, practicality and reasonableness . . . are to be taken into account along with the broad purposes of the Act to preserve the values and amenities of the natural environment." *Environmental Defense Fund v. Tennessee Valley Authority*, 492 F.2d 466, 468, n.1 (6th Cir. 1974). Applying these standards to the facts of the present case, this Court concludes that the environmental impact statement was compiled in objective good faith and did permit the decisionmaker to fully consider and evaluate the environmental factors.

NEPA, of course, does not define the desired contents of an environmental impact statement with specificity. However, the CEQ guidelines in effect at the time of the preparation of the statements herein did provide that:

> In order to ensure accurate descriptions and environmental assessments, site visits should be made where feasible. Agencies should also take care to identify, as appropriate, . . . any population and growth assumptions used to justify the project or program. . . . In discussing these population aspects, agencies should give consideration to using the rates of growth in the region of the project contained in the projection compiled for the Water Resources Council by the Bureau of Economic Analysis of the Department of Commerce and the Economic Research Service of the Department of Agriculture (the "OBERS" projection). In any event it is essential that the sources of data used to identify, quantify or evaluate any and all environmental consequences be expressly noted.

40 C.F.R. § 1500.8(a)(1) (1976).

The FEIS identifies several sources of data and population and growth assumptions used in evaluating the need for the

project, including: the "Wright Patterson Air Force Base University Highway Needs Study—Sept. 1963"; "Alternatives for the Future"—MVRPC—1973; The 1977 TCC Year 2000 Transportation Plan; "The Regional Transportation Plan," Volume II; and population growth factors established by the U. S. Environmental Protection Agency for the Greater Dayton Area 208 Wastewater Management Program. *See*, Gov. Ex. F, § 1.09, p. 1/3; § 1.24, p. 1/7; § 1.25, p. 1/7; §§ 2.701–2.7.03, p. 2.7/1; § 2.7.07, p. 2.7/2; Chapter 10, pp. 10/1– 10/2.

The inclusion of the above sources of data appears to be in direct compliance with the cited CEQ guideline, and as suggested by § 1500.8(a)(1), the "OBERS" projection of growth rate was used in calculating traffic projections for the proposed project.[15] Moreover, the Court has not found any evidence of a lack of good faith objectivity in the compilation of the FEIS. The Regional Transportation Plan, which was published by the predecessor of TCC in 1965, predicted a year 1990 population for Montgomery and Greene Counties of approximately 1,147,995 people. Gov. Ex. I, p. 9. During the time when the DEIS was being prepared, TCC was using an estimated year 2000 population figure of 1,405,329. *See*, Gov. Ex. FF. Pursuant to the recommendation of ODOT, TCC adopted a revised population figure of approximately 973,000 in its year 2000 transportation plan and in compilation of the FEIS. *See*, Gov. Ex. II; Gov. Ex. M, p. 41; Gov. Ex. F, § 2.7.07, p. 2.7/2. As a result of lowered population data, the FEIS indicates a decrease of daily traffic demand. Therein, a comparison is made of the original traffic volumes used for I–675 with the new year 2000 restrained assignment volumes using both a medium highway-medium transit system and a high highway-low transit system. *See*, Gov. Ex. F, § 2.7.03, p. 2.7/1; § 2.7.07, pp. 2.7/2–2.7/3; § 2.7.11, p.

2.75. Even under the lowered traffic volumes, the FEIS concluded that the design for proposed I–675 was valid, but alone could not overcome the projected capacity deficiency. *Id.* at §§ 2.7.11–2.7.12, pp. 2.7/5–2.7/6. The FHWA, in reviewing the FEIS, noted that:

> The traffic assignments have been updated in conjunction with development of the year 2000 long range transportation plan by the MPO [i.e., TCC], as reflected in Section 2.7.... Although the design year traffic assignments resulting from the year 2000 transportation plan study are somewhat lower than the design year traffic assignments used in the DEIS, it has been concluded that I–675 is still warranted from a traffic demand standpoint.

Gov. Ex. A, p. 29 (parenthetical material added).

Based on the preceding recitation of facts, which reveals that the information contained in the environmental impact statement was, in fact, revised on the basis of lowered predictions of population growth, the Court does not find a lack of objective good faith in the compilation of the FEIS. Although Plaintiffs have complained of "phenomenally high" population assumptions, there is no indication that the projections upon which the FEIS was predicated were thought to be too high at the time.

This case differs somewhat from the usual in that, between the time of the original rejection of a portion of the I–675 project by Secretary Goldschmidt, and the resubmission of the FEIS in early 1981, preliminary data from the 1980 census became available, and indicated that between 1970 and 1980, the population of the two county area had declined from approximately 733,-000 to 693,000. *See*, Plaintiffs' Ex. 7, p. 5;

---

**15.** Information submitted by the Defendants, and not disputed by Plaintiffs, indicates that the revised year 2000 population projections used by TCC in estimating traffic volumes corresponded with the "OBERS" series E projections for the Dayton SMSA for the year 2000. *See*, Gov. Ex. FF, Table 2; Gov. Ex. HH, p. 2;

State Defendant's Pretrial Memorandum, Doc. # 38, p. 49 and Ex. DDD. In addition, Jack Jensen, the Executive Director of the TCC during the time relevant herein, testified that population projections made by TCC for the year 2000 were based on the "OBERS" series E projections.

Gov. Ex. E, App. C, pp. 1, 3.[16] Plaintiffs have contended that this was significant new information which required the issuance of a supplemental EIS. Complaint, Doc. # 1, ¶s 65, 66.[17] Directly connected to this theory are several propositions, i.e., that I–675 is the nucleus of, and the precipitating factor in the vigorous regional growth predicted for this area; that when population became stable, growth attributable to I–675 became the sole justification for its construction; and that because the highway was a "self-fulfilling prophecy," it was neither justified nor needed. See, Doc. # 1, ¶s 32, 33, 35 and 39; Doc. # 22, pp. 25–32. As has been previously emphasized, the preceding argument is nothing more than a request that this Court review the merits of the FHWA's determination that the proposed I–675 project is necessary.

■ The CEQ guidelines in effect during the pertinent time herein,[18] indicated, with respect to supplementation, that:

An agency may at any time supplement or amend a draft or final environmental statement, particularly when . . . significant new information becomes available concerning its environmental effects.

40 C.F.R. § 1500.11(b) (1974). Similarly, the relevant FHWA regulations provided that:

A draft EIS or final EIS may be supplemented at any time. Supplements will be necessary when . . . significant new in-

formation becomes available concerning the action's environmental aspects.

23 C.F.R. § 771.15 (1976).

■ Defendants have contended that the census data did not constitute significant new information requiring the preparation of a supplemental EIS, because the TCC evaluation, submitted to FHWA in 1980, indicated that travel variables were following projected patterns, as was growth in the corridor communities, with the exception of the City of Kettering. Federal Defendants' Trial Brief, Doc. # 37, pp. 49–50; State Defendant's Pretrial Memorandum, pp. 67–68. Plaintiffs, however, have maintained that the 1980 census data was substantially below the forecasts made in 1977, and that the projections in the 1980 TCC demographics study were defective. Additionally, Plaintiffs have claimed that FHWA determined that the new data would reduce projections by as much as 40%. See, Plaintiffs' Preliminary Memorandum in Support of Motion for Preliminary and Permanent Injunction, Doc. # 22, pp. 45–46.

In Warm Springs Dam Task Force v. Gribble, 621 F.2d 1017 (9th Cir. 1980), the Court noted that the CEQ regulations on supplementation did not furnish a suitable standard for reviewing a decision on supplementation. However, the Court determined that "the standard applied in reviewing an agency's decision not to file an EIS in the first instance is appropriate here as

---

16. The final combined census count for Montgomery and Greene Counties is approximately 701,466 persons. Plaintiffs' Ex. 27, pp. 12, 21.

17. Count II of the Complaint is based upon Defendants' alleged failure to supplement the FEIS subsequent to its submission in 1978, but does not specify which information mandated supplementation. The 1980 preliminary census data, however, was a primary focus of Plaintiffs' memorandum in support of motion for preliminary and permanent injunction, see, Doc. # 22, pp. 44–46, as well as of the hearing held in this matter. Therefore, the Court has assumed that Plaintiffs are alleging that the preliminary 1980 census data should have been the subject of a supplemental EIS.

18. 40 C.F.R. § 1506.12(a) (1981) provides that the CEQ regulations promulgated in 1978 do not apply to an EIS or supplement if the draft

statement was filed prior to July 30, 1979. Instead, the CEQ guidelines published in 1973 will be applicable. Since the DEIS herein was filed in 1976, the earlier CEQ guidelines, which may be found at 40 C.F.R. § 1500.1 et seq. (1974), are applicable to it. Furthermore, the current FHWA regulations provide that "FEIS's accepted by the Administration prior to July 30, 1981, whose drafts were filed with the Environmental Protection Agency (EPA) prior to July 30, 1979 . . . may be developed in accordance with the regulations in effect at the time the draft document was filed." 40 C.F.R. § 771.109(a)(4) (1981). Since the FEIS in this case was accepted by the administration on July 6, 1981, see, Gov. Ex. A, p. 201, and the draft EIS was filed with the EPA in 1976, Gov. Ex. A, pp. 11–13, the FHWA regulations in effect in December, 1976, will be applied.

well; the decision will be upheld if it was reasonable." *Id.* at 1024 (citation omitted). The Court further noted that:

When new information comes to light, the agency must consider it, evaluate it, and make a reasoned determination whether it is of such significance as to require implementation of formal NEPA filing procedures. Reasonableness depends on such factors as the environmental significance of the new information, the probable accuracy of the information, the degree of care with which the agency considered the information and evaluated its impact, and the degree to which the agency supported its decision not to supplement with a statement of explanation or additional data.

*Id.* (citation omitted).

A review of the facts and circumstances of the present case indicates that the Defendants did not act unreasonably in failing to prepare a supplemental EIS based on the preliminary 1980 census data. At the time when the 1980 preliminary census data became available, TCC was in the process of developing projects which could replace I-675 and be funded through the withdrawal-substitution process suggested by Secretary Goldschmidt. *See,* Gov. Ex. A, pp. 150–151. Thus, in July, 1980, TCC performed an analysis based on the preliminary data, and concluded that use of the data would not result in a significant change in traffic volumes in the I-675 corridor. *Id.* at 151. The study by TCC resulted in the report entitled "Analysis of Transportation Alternatives in the I-675 Corridor (U.S. 35 to I-75)." *Id.* at 151–152; *see also,* Gov. Ex. E, pp. II–1–II–3. In September, 1980, the ODOT approved this report as well as the methodology used in its completion, and forwarded it to the FHWA. Gov. Ex. A, pp. 151–152.

The FHWA Division Administrator reviewed the report, and concluded that while there were "differences between population forecasts for the region and the preliminary 1980 census data, . . . all planning for the region, including transportation has been based on consistent socio-economic forecasts." Gov. Ex. A, p. 152. The Administrator further noted that:

The analysis included in the report of the year 2000 demographic forecasts shows that the 1980 population within the I-675 corridor has been growing and is reasonably close to the 1980 forecasts for that area. In addition, other factors affecting trip generation, such as vehicle registration, dwelling units and employment after 1975 have been increasing as has travel.

*Id.* at 152–153. Based on these factors, the Administrator concluded that traffic forecasts were within an acceptable range and that "further analysis at this time would not be productive." *Id.*

The alternatives analysis was also reviewed by the Regional Representative for the Department of Transportation, who did not comment specifically on the traffic forecasts beyond noting that the population in the two-county area had declined. *See,* Plaintiffs' Ex. 6, p. 1. Another reviewer in the Department of Transportation noted that the TCC projected population for the year 2000 of 875,000 seemed optimistic, and that a more reasonable figure, based on the national projected annual growth rate, would be approximately 829,000. *See,* Plaintiffs' Ex. 7, p. 4. On June 8, 1981, after the I-675 proposal had been resubmitted and was under consideration by FHWA, the FHWA Associate Administrator for Planning and Policy Development requested that the Director of the Office of Highway Planning address certain questions regarding I-675. Plaintiffs' Ex. 20, p. 1.[19] Specifically, the memo noted that "much attention has been given to the population forecasts in the Dayton Metropolitan area, the traffic assignment on I-675, and by implication whether I-675 is justified on the basis of traffic demand." *Id.* The Administrator asked what population assumptions might be reasonable, and what levels of

19. Plaintiffs' Exhibit 20 corresponds to Gov. Ex. P. Likewise, Plaintiffs' Exhibit 21 is identical to Gov. Ex. Q.

service might be justified on the basis of those assumptions. *Id.* at pp. 1–2. In response, the Director of the Office of Highway Planning indicated that a reasonable assumption for the Dayton area for the year 2000 would be in the 780,000–900,000 range. *See,* Plaintiffs' Ex. 21, p. 1. The report provided projections based on national low, median and high annual growth rates, and noted that the 973,264 TCC estimate exceeded these rates by between 8.5% and 24.6%.[20] Based on the new population projections, the director reduced the anticipated traffic volumes for the highway, and concluded that even under the lowest national population growth rate of 0.6%, i.e., the "worst case of population difference of 24.6 percent," *id.* at 2, a four lane facility would operate predominantly at a C–D level. The report thus concluded that a freeway could be supported by the traffic "even at reduced volumes." *Id.*

The Court has previously observed that Network G, the four lane alternative to I–675, did not differ in terms of environmental effects, from the highway as originally proposed. It is also apparent that the preliminary population data was relevant primarily, if not solely, to the question of whether the highway should be built with four lanes as opposed to six. *See,* Plaintiffs' Ex. 20, pp. 1–2. Given these factors, this Court would be hard pressed to conclude that the census information was of "*environmental significance.*" *Warm Springs Dam Task Force v. Gribble,* 621 F.2d 1017, 1024 (9th Cir. 1980) (emphasis

added). It is clear that the FHWA did not consider the information to be of either environmental, or any other significance, since even under reduced traffic volumes, the highway was deemed to be justified. *See,* Plaintiffs' Ex. 21, p. 2; Gov. Ex. A, pp. 200, 217. The preceding discussion has additionally indicated that the census information was carefully considered and evaluated by the FHWA on many occasions, but was not felt to have an impact on the project as proposed. Under these circumstances, the Court must conclude that the FHWA did not act unreasonably in failing to file a supplemental EIS based on the information obtained from the 1980 preliminary census.[21]

■ In tandem with the above argument, Plaintiffs have suggested that a supplemental EIS should have been filed, or additional study should have been made, based on the fact that the growth in the I–675 corridor became the sole justification for the project. This contention is also related to Plaintiffs' claim that the FEIS was inadequate because it did not consider the effect of I–675 in inducing growth in the region. As has been previously emphasized, these contentions, in reality, appear to request that the Court interject itself into a forbidden area, i.e., the selection by the agency of the action to be taken. *Strycker's Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 227–228, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980). *See also,*

---

20. It should be noted that the TCC estimate of 973,264 referred to in the FHWA director's report *is the estimate used in compiling the FEIS, and is not the estimate used by TCC in 1980 in preparing the year 2000 demographic report which is attached as part of the 1980 TCC Alternatives Analysis. The 1980 TCC estimate for the year 2000 was 875,000, and is within the range found appropriate by FHWA,* although somewhat higher than the median FHWA projection of 829,064. *Compare* Plaintiffs' Ex. 21, p. 1, with Gov. Ex. E, App. C, p. 5. As has been previously noted in the main text, there is no indication in the record that the FEIS estimate of approximately 973,264 was *not appropriate when made.* The only question is whether the data which became available subsequently was significant.

21. The Court has not considered the issue of the probable accuracy of the preliminary 1980 census figures, which placed the two-county population at approximately 693,050. As has been previously noted, *see,* footnote 9, *supra,* the final 1980 census figures for the two-county area place the population at approximately 701,466 persons. While this latter figure represents a loss from the 1970 population, it is not as great as that upon which the "worst case" FHWA traffic volumes were predicated. *See,* Plaintiffs' Ex. 21, pp. 2–3. Thus, the 1980 preliminary data was accurate insofar as it reflected a general decline, but the final figures reveal that the FHWA population assumptions for the year 2000 were, if anything, slightly conservative.

*Citizens for Balanced Environment and Transportation, Inc. v. Volpe,* 650 F.2d 455, 460 (2d Cir. 1981). This, the Court declines to do. Moreover, even if this Court were permitted to substitute its judgment for that of the agencies involved, this would not be a proper case in which to do so, since the historical development and planning process herein do not indicate that growth in the two-county area was predicated on the construction of an interstate highway, that significant new growth was expected to be induced in the area of the highway, or that growth in the corridor became the primary justification for the highway project when the area population evidenced a decline.

In the Regional Transportation Plan, Volume I, prepared in 1963 by the Regional Transportation Committee, TCC's predecessor, it was noted that the area had experienced substantial growth in the decades between 1930 and 1960. Gov. Ex. I, Volume I, p. 7. In addition to this growth, the report stated that one outstanding characteristic of the Greene-Montgomery County area was its extreme low-density development, caused by "the availability of land for residential expansion, together with high income of the study area's residents." *Id.* The report further stated that the "low density development prevalent in the upper Miami Valley produces a relatively high overall transportation demand." *Id.* at 8. It was also observed that between 1952 and 1960, suburban areas had shown substantial growth, and that this, "taken together with the centralized employment opportunities of the study area indicates a high percentage of long-distance commuting to the central work area." *Id.* The report predicted that the area population would increase to approximately 1,045,144 persons by 1980, and that the largest numerical increases in population would occur in the northwest and southeast sections of the area, with "intense growth" in Madison, Washington, and Beavercreek townships, due to their "acces-

sible location and abundant vacant land." *Id.* at 9. Vehicle registrations for 1970 and 1980 were predicted to be 380,000, and over 500,000, respectively. *Id.* at p. 11. Significantly, the 1959 employment of 211,830 persons in the two-county area was expected to increase to between 291,715–380,000 persons by 1980.[22] The study outlined certain locations expected to be traffic generators, *see,* pp. 17–18 and Figure 12, and noted that "there will be a greater work trip demand for radial movement from the suburbs to the central areas." *Id.* at 23. The report then stated:

> While the magnitude is significantly larger for the central area, radial trips into Xenia and Vandalia, for example, will increase at a more intense rate than will trips in the region. *Since the radial arteries in the region are working near to, or above practical traffic capacity it is a foregone conclusion that these facilities cannot accommodate the 100,000 additional wage earners in their journey to work from suburban residential locations.*

*Id.* (emphasis added).

The transportation plan also stated that a 1960 highway needs study had been performed in conjunction with the Ohio Department of Highways, and together with subsequent investigation, indicated that "major improvements were required to reduce inadequacies in present-day traffic flow and to accommodate anticipated increases in traffic demand." *Id.* at 50. The report identified certain elements of the transportation plan which were committed or completed, or deemed to be necessary to serve the needs of a particular corridor. *Id.* at 57, and Figure 41, at 58. In addition, the report noted the existence of eleven high-volume corridors. *Id.* at 57. For purposes pertinent herein, the report discussed a "North Beavercreek Corridor," *id.* at 58, which was expected to accommodate 50,000 trips daily, and a "Washington Township Corridor," *id.,* expected to total approxi-

22. A footnote on page 15 of Volume I of Government's Exhibit I indicated that the predicated employment figure of 291,715 "refers to that employment which can be reliably predi-

cated on the basis of past trends." The footnote further stated that "[a]ctually, 1980 employment is expected to total 380,000.

mately 20,000 trips daily. To meet these needs, it was suggested that construction of limited access facilities, or improvement of existing roads, or a combination of both, could be made. *Id.* It was also indicated that travel on the "Mad River Corridor," *id.*, was expected to exceed the capacity of existing highways by 20,000–50,000 vehicles each day, and that either S.R. 4–69 could be made an expressway, or traffic from the Air Force Base and the new university could be "channeled to the south and thence west, or to the northwest and thence east." *Id.* The study further noted that with regard to the "Dayton-Xenia Corridor," *id.*, that:

> Although there are clear indications that forecast traffic in this area are overestimated, there are reasons to expect that overloaded conditions may occur on U.S. 35 expressway. In addition, the movement from Xenia, Yellow Springs and eastern sections of Greene County to Kettering and points south is not well accommodated by existing routes.

*Id.* at 58.

Based on all the information which had been compiled, the Regional Transportation Committee then studied five different thoroughfare plans, and adopted a sixth plan, which was felt to incorporate the best features of the alternatives studied. *See, id.* at 59–62. This plan was felt to be adequate, but it was noted that several overload problems, including those associated with Wright Patterson Air Force Base and the new University, had not yet been resolved. *Id.* at 61 & footnote to column three.

In 1965, the Regional Transportation Committee published Volume II of the Regional Transportation Plan, which was described as "a summary of five years' study." Gov. Ex. I, Volume II, p. ii. In addition, a listing of the RTC publications and studies was provided, together with publication dates. *Id.* In the summary portion of the report, it was noted that:

If it were forecast that there would be no population or employment increases within the Greene-Montgomery County region in the near future, nor increases in motor vehicle ownership and use, there would still be a wide-spread belief that something "needs to be done about the traffic problem" . . . .

The facts are that substantial growth is forecast for all activities in the region, and it is forecast that by 1980 the existing communities in the Miami Valley will have become assimilated into a metropolitan region of over one million inhabitants. With each passing week, about 300 additional automobiles are added to the region's highway network, and it has been observed (in the past few years) that the completion of substantial freeway and arterial improvements has not eased travel frictions appreciably. Indeed, . . . we are still "catching up" with a backlog of needed facilities which date back to 1945 or beyond.

*Id.* at vii.

The report further indicated that the transportation plan did not present any radical solutions to existing foreseeable problems, and that additional major facilities were "largely those same facilities that had long been recognized to be needed, although the precise location and design characteristics may vary from previous studies." *Id.* at 1. *See also*, footnote 3, at 2. It was also noted that:

> If there is any danger of criticism concerning the plan, it may be that the proposals are considerably more conservative and more readily obtainable than might be desirable for a *long term* view into the future.

*Id.* at 2 (emphasis in the original).

The report then outlined certain assumptions upon which the plan was premised, i.e., increased population in the two-county area, together with relocation of population within the region;[23] increased motor vehi-

---

23. In particular, it was predicted that the northwest and southeast areas of the Dayton Urbanized Area would gain 35,000, and 60,000 persons, respectively, by 1975. *See*, Gov. Ex. I, Vol. II, p. 3.

cle registration and use;[24] an increase in employment by 1980 of approximately 150,-000 over 1960 levels; reverse commuting to outer portions of the center urban area; and future patterns of land use. *See, id.* at 3–10. After setting forth these assumptions, the study outlined the process analysis which resulted in the presently recommended transportation plan. *See, id.* at 11–14. Specifically, the report noted that the 1962 thoroughfare plan was preliminary, and that certain "aspects of the study program required more intensive work, including the long-range needs of the region; the unresolved Interstate Belt Route facility, and the fiscal aspects of the transportation process." *Id.* at 14. Based on previous analysis,[25] and further study, including use of a 1990 O&D table[26] and the publication of the Wright Patterson Air Force Base-University Highway Needs Study, *id.*, the report recommended a "backbone system" for the area,[27] which included the proposed I–675. *See,* Figure 8 on p. 17. The report further noted that while the total mileage of the backbone system would amount to only 3% of the total highway facility mileage in the region, it would have the capacity to accommodate approximately 45–50% of the region's 1975 and 1990 travel demand. *Id.* at 16.

It must be emphasized that the preceding analysis of the studies and research conducted prior to the preparation of the FEIS has not indicated that any anticipated regional growth was predicted on the existence of I–675.[28] Instead, the facts have demonstrated that I–675 was merely one of a variety of transportation projects designed to accommodate the present and future traffic needs of the region. It is additionally apparent from the foregoing discussion that neither I–675 nor other proposed regional projects were justified solely on the basis of population growth. Rather, the need for a suggested improvement was also premised upon expected trends in employment, motor vehicle registration, land use, and population distribution. Thus, merely because a decline in regional population occurred, it does not automatically follow that the reason for the proposed highway evaporated, or that the anticipated growth in the corridor area became the sole rationale for the project. In fact, a comparison of predictions with actual data indicates that with the exception of population growth, other travel variables did not differ substantially from expectations. For example, in Volume I of the Regional Transportation Plan, it was predicted that motor vehicle registration in the two-county area would increase to 380,000 by 1970, and to over 500,000 by 1980. Gov. Ex. I, Volume I,

---

**24.** Based on 300,000 additional vehicles in the area by 1980, it was predicted that 10.5 million additional vehicle miles per day would be traveled. *See,* Gov. Ex. I, Vol. II, p. 4.

**25.** It is interesting to note that the first test of alternate systems in 1961 began with the loading of anticipated 1980 traffic loadings in a system which was composed of the arterial network presently in existence, plus seven major facilities which were either completed or scheduled for completion. *See,* Gov. Ex. I, Vol. II, p. 11. Based on this study, it was anticipated that traffic demand would increase by approximately 140%, and that significant additions to the existing and planned network would be required. *Id.*

**26.** O&D refers to origin and destination. *See,* Gov. Ex. I, Vol. II, p. 47.

**27.** In assessing the need for the regional backbone system, the report loaded anticipated 1975 traffic onto a less extensive transportation system. *See,* Gov. Ex. I, Vol. II, p. 130. Inter-

estingly, the report concluded that under this system, which presumed expressways in operation on S.R. 4–69, I–675, I–75 and U.S. 35, the traffic demand would still cause "an intolerable situation of nearly twice today's traffic on all or most of the presently used major arterials." *Id.*

**28.** Based on this conclusion, the Court also rejects Plaintiffs' contention that the FEIS was inadequate because it assigned the same traffic volumes to both the build and no build systems in the FEIS. The method used in analyzing the FEIS build and no build alternatives, i.e., by loading anticipated traffic demand onto the proposed systems, was the method used consistently in the regional transportation process to evaluate all types of highway systems. *See,* Gov. Ex. I, Volume I, pp. 47, 51; Gov. Ex. I, Volume II, pp. 11, 130. *See also,* footnotes 25 and 27, *supra,* and discussion at pp. 99–106 herein.

p. 11. By 1970, passenger car registration had increased to 366,115, and by 1978, had risen to 443,304. Gov. Ex. E, App. C, An Analysis of the Year 2000 Demographic Forecasts, p. 5. With regard to employment, in 1960, the total employment for the two-county area was 211,901. Gov. Ex. I, Volume II, p. 9. It was predicted that employment in 1975 would be 310,404, and that by 1980, approximately 150,000 employment opportunities would have been gained over 1960 levels, primarily in services, trade, and government. *Id.* at 5, 9. By 1975, employment was above the predicted level, at 313,433, and by 1979, had risen to 347,000 slightly below the expected 1980 level of 361,901. *See,* Gov. Ex. E, App. C, An Analysis of Year 2000 Demographic Forecasts, p. 5. In addition, two other factors affecting travel, i.e., number of dwelling units, and number of persons per unit, had altered since 1970 in a way which would increase travel. *See, id.* at 1. There were no predictions in the regional transportation plan regarding dwelling units and their occupancy, but between 1970 and 1980, the two-county area had gained 38,702 dwelling units, and household size had declined from 3.14 persons to 2.55 persons. *Id.*

With regard to land use and population distribution, trends continued as expected. As was previously noted, the regional transportation plan predicted that growth would occur in the southeast and northwest quadrants of the area, and that the greatest population growth would occur in Beavercreek, Washington, and Madison Townships. The final 1980 census data indicates that substantial population growth did occur in both the southeast and northwest areas of the region. For example, Madison, Randolph, and Butler Townships, located in the northwest section of the area, gained between 3% and 39.2% population between 1970 and 1980. *See,* Plaintiffs' Ex. 27, p. 21, and Gov. Ex. E, App. C, An Analysis of Year 2000 Demographic Forecasts, p. 2.[29] Washington, Beavercreek, and Spring Valley Townships in the southeast portion of the area gained between 16.7% and 62% during the time period from 1970 to 1980. Plaintiffs' Ex. 27, pp. 12–13, 21–22.[30] While Madison Township did not grow as much as had been expected, Washington Township in the south, and Randolph Township in the north, were among the most rapidly growing areas in the region.[31] In addition, the increase in dwelling units outside the City of Dayton, coupled with the decrease in dwelling units inside that City, *see* Gov. Ex. E, App. C, An Analysis of Year 2000 Demographic Forecasts, p. 1, indicates that as predicted, the area continued to show low-density residential development. Thus, with the exception of population growth, all other travel variables for the two-county area showed growth similar to what had been expected during the time when I–675 was initially proposed. Given these factors, it is apparent that growth in the I–675 corridor, while certainly relevant, and appropriate for consideration, was not the only factor justifying construction of the highway. Therefore, the Court does not find that it was necessary to file a supplemental EIS because of the alleged change of focus of the justification for the highway.

**29.** The reason for any discrepancy between the figures referred to in the main text and those which appear in the TCC Year 2000 Demographic Forecasts is that the Court has before it the final 1980 census figures, *see,* Plaintiffs' Ex. 27, while the TCC analysis was based on the 1980 preliminary count. *See,* Gov. Ex. E, App. C, An Analysis of Year 2000 Demographic Forecasts, p. 1. As was previously indicated, the 1980 final census count indicated a higher population for the two county area than had been predicted in the preliminary figures.

**30.** These percentages are somewhat misleading. For example, the 16.7% increase in the population of Spring Valley Township reflects a growth of only approximately 366 persons. *See,* Plaintiffs' Ex. 27, p. 13. However, while the population of Madison Township increased only by 5.5%, the actual growth in population was approximately 1,605 persons, i.e., over four times the number of new inhabitants in Spring Valley Township. *Id.* at p. 21.

**31.** From 1970–1980, Randolph Township gained approximately 8,225 persons, while the population of Washington Township increased by approximately 14,254 persons. Plaintiffs' Ex. 27, pp. 21–22.

The final matter which needs to be addressed in this context pertains to Plaintiffs' contention that the FEIS is inadequate because it does not discuss the effect which I–675 will have in inducing growth in the region. Related to this argument is the claim that the FEIS is inadequate because the same traffic volumes were loaded onto both the build and no-build systems. These contentions to some extent appear to have had their primary genesis in Secretary Goldschmidt's observation that:

> Although the EIS forecasts moderate traffic volumes during the 1993–2000 era, these projections appear to be based to a significant extent on anticipated population growth in the corridor which, in turn, is predicated in part upon the construction of I–675. Thus, construction of the Interstate south of U.S. 35 would represent a self-fulfilling prophecy.

Gov. Ex. A, p. 97.

The CEQ regulations in effect at the time of the filing of the DEIS provide that:

> [T]he effects of the proposed action on population and growth may be among the more significant secondary impacts. *Such population and growth impacts should be estimated if expected to be significant* . . . and an assessment made of the effect of any possible change in population patterns or growth upon the resource base, including land use, water and public services, of the area in question.

40 C.F.R. § 1500.8(a)(3)(i) (1974) (emphasis added). The applicable FHWA regulations are similar, but more cursory, and provide that "the effect on population and area growth associated with the construction of new highways may be among the more significant impacts. Such impacts associated with anticipated secondary actions

should be assessed and discussed in this section of the EIS." 23 C.F.R. § 771.-18(i)(1) (1976).

With regard to secondary impacts, courts have ruled that "[t]he central focus should not be on a primary/secondary impact analysis but upon those impacts which have a 'significant impact' upon the environment." *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283, n.9 (9th Cir. 1974). *Accord, Environmental Defense Fund, Inc. v. Hoffman*, 566 F.2d 1060, 1067 (8th Cir. 1977).[32] Defendants have maintained that I–675 was not expected to induce significant new growth, but was designed to accommodate transportation demands and growth which would have occurred even without construction of the highway. *See*, State Defendant's Pretrial Memorandum, Doc. # 38, pp. 46–47. Plaintiffs have not responded to this contention, but did indicate in a previous pleading, that by making such an assertion, "ODOT has stood reality on its head." Plaintiffs' Preliminary Memorandum in Support of Motion for Preliminary and Permanent Injunction, Doc. # 22, pp. 31–32, citing *City of Davis v. Coleman*, 521 F.2d 661 (9th Cir. 1975) (*City of Davis*). The present case, however, differs substantially from *City of Davis*. In that case, no environmental impact statement had been filed; instead, the state filed a negative declaration which concluded that the action in question did not have a significant environmental impact, *see, id.* at 669 & n.8, because the purpose of the project was merely to provide a limited amount of freeway access. *Id.* The Court of Appeals rejected this "avowed purpose," *id.* at 667, i.e., that an interchange project of over one half million dollars was intended only to provide "slightly more convenient freeway access to a *handful* of local motorists." *Id.* (emphasis

---

**32.** The Ninth Circuit has adopted a liberal ruling regarding secondary impacts, by holding that "treatment of secondary impacts is not a specific requirement of an impact statement." *Coalition for Canyon Preservation v. Bowers*, 632 F.2d 774, 783 (9th Cir. 1980), citing *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283, n.9 (9th Cir. 1974), and *City of Davis v. Coleman*, 521 F.2d 661, 680–681 (9th Cir. 1975). It is questionable whether this would be true under

the current CEQ regulations, which are not applicable herein, but which provide that the EIS shall include a discussion of "[i]ndirect effects and their consequences." 40 C.F.R. § 1502.16 (1981). It is true, however, that even the present CEQ regulations place emphasis upon impacts, secondary or otherwise, which are significant. *See*, 40 C.F.R. § 1502.2(b) (1981).

added). In fact, the Court noted that there were so few people who would be served, that "Solano County has not yet seen fit to build the road called Kidwell Road, which the interchange is supposed to connect to I–80." *Id.* The Court found a simple explanation for what it termed a "curious state of affairs," *id.*, in that the proposed interchange was "not being built to meet the existing demand for freeway access but to stimulate and service future industrial development in the Kidwell area which Solano County and the City of Dixon are now planning." *Id.* Those plans included, *inter alia*, an almost five mile general industrial tract, and another limited industrial tract over half the size of the general industrial tract. *Id.* The Court also found that the "growth-inducing effects of the Kidwell Interchange project are its raison d'etre," *id.* at 675, and that due to water problems in the area, industrial demand could either threaten or contaminate the city's water supply. *Id.* In addition, the Court was concerned about the effect of rapid increases in population brought on by commercial development, and the resulting demand upon city services. *Id.* Under these circumstances, the Court found that it was unreasonable for the state to conclude, "without further study, that the environmental impact of the proposed exchange will be insignificant," *id.*, and that, therefore, no impact statement would be required.

The circumstances of the present case, however, are unlike those in *City of Davis.* As has been previously noted, it has not been demonstrated that the growth-inducing effects of I–675 were its reason for being. Without reiterating the preceding discussion, the Court would merely note that I–675 was neither conceived nor planned as a tool for industrial development, but rather, was developed as a means of providing for interstate and local traffic needs. To this end, the proposed project was modified in some respects to better serve the needs of Wright Patterson Air Force Base and Wright State University, and was included in the regional transportation plans for 1965. It would, of course, be nonsense to maintain that I–675 would have no potential effect upon growth. In fact, the I–675 preliminary engineering report published in 1965 recognized that the location of the bypass "would stimulate suburban growth in the area of the corridor." Gov. Ex. BB, p. 11. However, whether anticipated growth was *significant* is another question entirely. It should be noted that the portion of the 1961 recommended route lying below U.S. 35 is in essentially the same location as is I–675 as presently proposed. Compare, Gov. Ex. V, T and W. *See also,* Gov. Ex. BB, Figure 1 and Figure 4. The engineering report noted that acreage in the vicinity of the recommended route was presently zoned for commercial and industrial development, and then stated:

> A relatively low amount of land would be brought into urban development as a primary result of the Recommended Route, *since it was located to optimize benefits to existing traffic needs and the needs of existing development. Since the land affected is in the path of urban development and would have tended to become urbanized in any event, the Recommended Route would not have a markedly strong effect on urban development.*

Gov. Ex. BB, p. 19 (emphasis added).

In the Wright Patterson Air Force Base-University Highway Needs Study, various alternative locations for I–675 were studied, including, *inter alia*, Alignments 8D and 10. That portion of Alignment 10 which is located north of U.S. 35, follows essentially the same route as the part of I–675 which was approved by Secretary Goldschmidt in 1979. *See,* Gov. Ex. U, Gov. Ex. CC, Figure 1, and Gov. Ex. F, p. E6. Those portions of Alignments 8D and 10 located south of U.S. 35, in essence follow the portion of I–675 presently under consideration. *Id.* With respect to new development, the study noted that 8D "encourages little development that would not occur anyway." Gov. Ex. CC, Figure 35. With regard to effect on population density and distribution, it was observed that "8D will cause a continuation of present developmental trends and will

not adversely affect the developing patterns of the community." *Id.* Finally, with regard to effect on community service needs such as sewer, water, etc., the study found that: "[i]t is believed that *the community service needs are not appreciably affected one way or the other by Alignments 9 or 8D* although Alignment 9 may be somewhat superior in this respect." *Id.* at Figure 36 (emphasis added). The comments concerning Alignment 10 are generally similar to those made about Alignment 8D, *see,* Figures 35 and 36, except that it was noted that "[b]y promoting industrial development south of Airway Road, Alignment 10 would tend to accentuate population growth in the area *north of U.S. Route 35 and South of Airway Road as far east as Beaver Valley Road. Id.* at Figure 35 (emphasis added).[33]

The FEIS reflects this view that I–675 was not anticipated to have significant secondary impacts primarily because "the facility has been a part of the regional and community planning for years and was conceived in an effort to control the development of an expanding urban area." Gov. Ex. F, § 3.4.06, p. 3.4/2. In addition, the FEIS refers at various points to the fact that certain impacts and growth have occurred even without the construction of the highway. *See,* Gov. Ex. F, § 3.4.04, pp. 3.4/1–3.4/2; § 3.9.13, p. 3.9/5; § 6.4, p. 6/1. *See also,* Responses to: USDOI Comment 6, § 9.2.03, p. 9.2/11; RAPCA Comment 30, § 9.2.03, p. 9.2/20; RAPCA Comment 33, § 9.2.03, p. 9.2/21; General Public Comment 16, § 9.3.07, p. 9.3/37;[34] General Public Comment 21, p. 9.3/39; General Public Comments 31 and 33, p. 9/3.42; General Public Comment 46, p. 9.3/44; General Public Comments 79 and 80, p. 9.3/51; General

Public Comment 139, p. 9.3/66; Comment 161, p. 9.3/70; Comments 166 and 167, p. 9.3/71; Comment 176, p. 9.3/73; Comments 180 and 181, § 9.3/75; Comment 186, p. 9.3/76; Comment 190, p. 9.3/77; and Comment 220, p. 9.3/83.

Additional insight may be gained through reference to the 1980 TCC "Analysis of Projected and Observed Growth in the I–675 Corridor." *See,* Gov. Ex. A, pp. 124–130. Like the TCC Alternatives Analysis, this document is not being consulted in order to bolster an EIS which has been found to be inadequate. Rather, it provides some means of assessing the validity of decisions to restrict discussion of certain points in the EIS. According to the TCC analysis, which was prepared during a period when the decision to deny I–675 was considered to be final, at least by TCC, Secretary Goldschmidt's concern about higher growth rates in the I–675 corridor was unwarranted. *See,* Plaintiffs' Ex. 9, October 24, 1980 Jensen letter, pp. 2–3. *See also,* Gov. Ex. A, p. 124. Because the pertinent areas had grown at the pace projected, *id.* at 124 and 126, TCC determined that a redistribution of forecasted growth was not necessary for the evaluation of substitute programs to replace I–675. *Id.* at 124. *See also,* Gov. Ex. E, p. II–1. TCC asked that FHWA approve its decision to use previously adopted socio-economic land use variables, *id.* at 124–125, and after a review of the TCC analysis, the FHWA Division Administrator approved the use of that data. *Id.* at 131.

As has been noted previously, in September, 1980, TCC submitted an analysis of withdrawal-substitution projects for I–675 to the ODOT, and requested that the study be forwarded to the Department of Trans-

---

**33.** Interestingly, the only portion of the proposed highway which was felt to possibly accentuate population growth in a manner sufficient to invoke comment, was the part of the I–675 project which was approved by Secretary Goldschmidt and is not before this Court. It is equally interesting that Secretary Goldschmidt made no reference either to this fact, or to any apparent inadequacy of the FEIS in this respect in his 1979 decision memorandum and letter to ODOT director David Weir. *See,* Gov. Ex. A,

pp. 91–99. It is also notable that none of the comments received by the ODOT after distribution of the FEIS in 1979 raised the issue of the FEIS's alleged failure to adequately discuss the growth induced by the highway. *See,* Gov. Ex. A, pp. 136–149.

**34.** All of the General Public Comments are contained in § 9.3.07 of the FEIS. Therefore, only page numbers will be cited in the remaining references to public comments.

portation. Gov. Ex. E, September 4, 1980 letter to Brayshaw from Jensen, pp. 1–2. In that analysis, TCC again discussed the potential effect of I–675 upon population growth, based on a comparison between the preliminary 1980 census data and the 1970 census figures. Gov. Ex. E, pp. VI–2–VI–4. The Study noted that three of the five corridor jurisdictions had shown growth during the relevant period, with 59% population growth experienced by Washington Township. *Id.* The report noted, however, that:

> This pattern of growth in suburban areas was not peculiar to the I–675 corridor. Randolph Township in northwest Montgomery County grew from 20,971 to 29,097, a 38.7 percent rise. Similarly, Wayne Township, in the northeast, grew from 27,975 to 35,095, a jump of 25.5 percent.[35]

*Id.* at VI–4. Significantly, two of the corridor jurisdictions for I–675 south of U.S. 35, i.e., the City of Kettering and Sugarcreek Township, suffered population losses of 15.5% and 8%, respectively, from 1970–1980.[36] In this context, the report stated:

[F]or the first time, suburbs adjacent to Dayton which constitute an inner-ring began to lose population. These include Kettering, Harrison Township, Jefferson Township, and Oakwood. While it is difficult to be conclusive, *it appears that these changes are the result of the normal cycle of growth, maturity and decline to which communities in a metropolitan area are subject, rather than to any set of public decisions or investments which directly induce growth.*

*Id.* at VI–4 (emphasis added).

■ It is also interesting that another corridor jurisdiction, Beavercreek Township, was experiencing substantially less population gain, both in terms of percentage and numerical increase, than was Randolph Township, a jurisdiction in the northwest, for which no significant highway improvements were scheduled.[37] Given the above factors, which indicate that the population growth trends in the I–675 corridor south of U.S. 35 merely reflected what was occurring generally in the area, it is apparent that the alleged growth-inducing secondary effects of I–675 were not significant, and therefore, need not have been included in the FEIS.[38] Another way of

35. The final 1980 census count indicated a gain of 39.2% in Randolph Township, a gain in Wayne Township of 26.5%, and a gain in Washington Township of 62.3%. Plaintiffs' Ex. 27, pp. 21–22.

36. The final count indicates losses for Kettering and Sugarcreek to be 14.9% and 7.3%, respectively. Plaintiffs' Ex. 27, pp. 13, 21.

37. The final 1980 figures reveal that Beavercreek Township gained approximately 6,809 persons, for a percentage increase of 25.6%. Plaintiffs' Ex. 27, p. 12. During the same time span, however, Randolph Township gained approximately 8,125 persons for a percentage increase of 39.2%. Plaintiffs' Ex. 27, p. 21. Other non-corridor jurisdictions in which population increases occurred between 1970 and 1980 included, *inter alia*: the City of Vandalia, and the City of West Carrollton, with gains of 2,365 persons, or 21.9%, and 2,400 persons, or 22.3%, respectively. Plaintiffs' Ex. 27, pp. 21–22.

38. Another method of assessing the existence of significant secondary impacts of I–675 south of U. S. 35 could be an analysis of the growth of the I-675 corridor north of U. S. 35. By the time the FEIS was submitted, I-675 had been

constructed from North Fairfield Road to I–70, and was open for traffic. *See,* Gov. Ex. F, § 1.19, p. 1/6. The areas immediately adjacent to the completed construction were the City of Fairborn, Bath Township, and part of Beaver-creek Township. *See* Gov. Ex. X. The remaining portion of I–675 north of U. S. 35, which was approved by Secretary Goldschmidt in 1979, was located entirely in Beavercreek Township. *Id.* Despite the completion of portions of I–675 during the 1980's, Bath Township, which includes the City of Fairborn, declined in population by 14.7%. *See,* Plaintiffs' Ex. 27, p. 12. Moreover, as was already indicated, *see,* footnote 30, *supra,* Beavercreek Township evidenced gains in population which were less than those experienced in an area where no major highway construction was scheduled. (The current regional transportation plan does include new roads for the northwest area in 1991–1995, and beyond the year 2000, *see,* Gov. Ex. M, Maps 13 and 17, but one would have to say that those plans, even now, are in their infancy.) Given these facts, it could hardly be concluded that I–675 has, in fact, had an impact upon growth other than that which would have occurred anyway, without the construction of the highway.

viewing this matter, of course, is whether this information would have been required to be circulated in a supplemental EIS at the time of the resubmission of the FEIS in 1981. *See,* discussion of supplementation in the portion of this opinion dealing with alternatives to I–675. Obviously, since the data did not disclose significant secondary growth impacts of the proposed project, a supplemental EIS, based on such information, would not have been required in 1981, when the FEIS was resubmitted. Based on the preceding discussion, which has indicated that I–675 was not expected to, and did not, in fact, induce significant growth, the Court concludes that the FEIS was not inadequate because it did not address the effect of the highway upon inducing development. Moreover, the Court concludes that a supplement to the FEIS, addressing growth and development, need not have been submitted in 1981. Finally, based on the discussion in this section, and that contained in the portion of this opinion dealing with the need for the project, *see* part VII and footnote 28, the Court also concludes that the FEIS was not inadequate because the same traffic volumes were used to assess the Build and No Build Systems in the FEIS. Because I–675 was not expected to induce significant growth, there was no need to add traffic to the predicted I–675 volumes.

▪ In addition to the preceding comments, there exists an additional reason for rejection of the claim that the FEIS should have contained a discussion of growth and development induced by the construction of the highway. As was previously noted, *see,* footnote 33, *supra,* neither Plaintiffs nor any other party responded to the 1979 publication of the FEIS by commenting on its failure to address developments induced by the highway, and resulting impacts on the resource base. Even more significantly, the comments received after the republication of the FEIS in 1981, also do not alert the agency to the FEIS's alleged failure to calculate the effect of induced growth upon

the environment. For example, while Plaintiffs Mione and Lovelace commented that construction of the highway would induce population growth, that assertion was made only in the context of whether or not the highway was needed, and not with regard to the alleged failure of the FEIS to address the effect of induced growth on the resource base. *See,* Gov. Ex. A, pp. 211–212. In fact, a careful reading of the August 31, 1981 letter to the Secretary of Transportation reveals no comment regarding the FEIS's failure to address the secondary effects of allegedly induced development. *See generally,* 211–216.[39] It is apparent that Secretary Lewis perceived the Plaintiffs' objections to be thus limited, for his September, 1981 response to them states: "[a]s indicated in your letter, your basis for this request appears to center around the following issues: (1) the need for proposal and (2) the consideration of alternatives." Gov. Ex. A, p. 217. The Environmental Protection Agency also commented on the FEIS, but did not raise the point now under consideration. *See,* Gov. Ex. A, pp. 220–221.

In *Beshear, supra,* 655 F.2d 714 (6th Cir. 1981), the Sixth Circuit considered a situation similar to that herein. In *Beshear,* the State of Kentucky had challenged an EIS prepared by the Army Corps of Engineers by alleging, *inter alia,* that the EIS had failed to consider three specific alternative sites for the proposed project. *See, id.* at 717. The Court of Appeals rejected this claim, and noted:

*Vermont Yankee* counsels that a significant factor in whether the specificity of an agency's examination of alternatives is an abuse of discretion is how meaningful was the participation in agency proceedings by intervenors . . . . In contrast to the negative response to the Corps' treatment of Tell City, Aurora, and Madison in the Draft EIS, the Corps did not receive a single comment after publication of the final EIS, either during the comment period or a reasonable time thereafter, to

**39.** The only "secondary effect" raised in the 1981 Mione comment relates to adverse im-

pacts on the City of Dayton. *See,* Gov. Ex. A, p. 211.

indicate that its discussion of the three sites was inadequate. *Thus, Kentucky clearly did not meet its obligation of meaningful participation by informing the Corps of the state's position at time when the Corps could have taken any necessary corrective action without undue delay, nor has that action been satisfied by others.*

*Id.* at 718 (citations omitted) (emphasis added).

Although the above comments in *Beshear* were made in connection with consideration of alternatives, this Court believes they are also applicable to other matters such as secondary development, which could have been raised before the agency, but were not. Because there were no comments, either at the time of the publication of the FEIS, or at the time of its republication in 1981, which contested the alleged failure of the FEIS to address the environmental effects of development to be induced by the highway, it was not unreasonable for the FHWA and the ODOT to proceed as they did. Therefore, in addition to the conclusion previously reached, i.e., that discussion of induced growth and its impacts was not required under the circumstances of the present case, the Court also finds that as in *Beshear*, Plaintiffs herein did not meet their obligation of "meaningful participation." *Id.*

## B. *Adequacy of Discussion of Noise Impacts*

The remaining inadequacy of the FEIS which has been raised by Plaintiffs relates to its discussion of the noise impacts of the

project.[40] In Paragraph 64(i) of the complaint, Plaintiffs have alleged that the FEIS fails to adequately discuss the burdens of the noise pollution caused by I–675 and what noise mitigation measures would be needed. In addition, Plaintiffs have alleged that the FEIS applies incorrect standards and that the drafters of the FEIS neglected to consult with local noise receptors who would be impacted by the noise of the highway.

The DEIS refers to a noise report prepared for I–675, and indicates that there were approximately twenty-nine areas along the route where noise levels would exceed acceptable levels outlined in the FHWA "Criteria Guidelines." Gov. Ex. B, § 3.10.03, p. 84. The DEIS then described the land use categories contained in the FHWA guidelines, and outlined the noise impacts upon the twenty-nine sites. *Id.* at §§ 3.10.04–3.-10.06, pp. 84–84. After this review, it was concluded that the plans would not be modified to include noise barriers because the impact of highway-generated noise would not be significantly reduced. *Id.* at § 3.10.-07, p. 89. In addition, §§ 3.10.08–3.10.09 of the DEIS discuss short term noise caused by the construction of the highway. *Id.* at 90. *See also,* Gov. Ex. B, pp. 276–280, which contain an analysis of each impacted site, including, *inter alia,* a description of predicted noise levels, number and type of sensitive receptors, and comments on the impact of constructing a noise barrier.

After circulation of the DEIS, the United States Environmental Protection Agency submitted comments regarding the noise

**40.** It should be noted that Paragraphs 64(f) and (g) of the Complaint allege that the FEIS inadequately treats the issues of air quality and water pollution. These matters were not raised by Plaintiffs in the 1981 letter to Secretary Lewis. *See,* Gov. Ex. A, pp. 210–216. However, even more important is the fact that the Environmental Protection Agency indicated, after a review of the FEIS in 1981, that its air pollution and water quality concerns had been resolved. *Id.* at 220–221. Also, Plaintiffs herein have not referred to alleged inadequacies in these areas either in their Preliminary Memorandum in Support of the Motion for Preliminary and Permanent Injunction, or in other

memoranda filed with the Court. Based upon these factors, the Court concludes that not only have Plaintiffs failed to establish the claims in Paragraphs 64(f) and (g) by the required preponderance of the evidence, *see, Sierra Club v. Callaway,* 499 F.2d 982, 992 (5th Cir. 1974); *Sierra Club v. Froehlke,* 534 F.2d 1289, 1300 (8th Cir. 1976); *Monroe County Conservation Council, Inc. v. Adams,* 566 F.2d 419, 422 (2d Cir. 1977), cert. denied, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978), they have failed to point to *any* evidence supporting the allegations of inadequate discussion of air pollution and water quality.

impacts of the highway. *See*, Gov. Ex. F, § 9.2.03, USEPA comments 11–18, pp. 9.2/4–9.2/5, and pp. 9.2/32–9.2/33. Specifically, the USEPA stated that "[t]he noise analysis appears to be quite thorough in its evaluation of noise impacts upon receptors along the right of way." *Id.* at 9.2/32. The USEPA also stated, however, that it did not feel the DEIS had given sufficient consideration to various noise abatement measures, and that while the analysis of noise barriers appeared to be thorough, additional consideration should be given to measures such as soundproofing, vegetative buffers, and the like. *Id.*

While the FEIS preparers appeared to disagree with the USEPA's opinion of potential harm which might be caused by highway noise in excess of design levels, *see, id.* at § 9.2.03, pp. 9.2/5–9.2/6, they did indicate that subsequent to the DEIS, it had been determined that noise barriers would be provided at certain locations. *Id.* at 9.2/6. The FEIS also stated that the other noise mitigation measures suggested by the USEPA were not considered practical for the project. *Id.* In addition, the FEIS noted that a reevaluation of predicted noise conditions had been made since the circulation of the DEIS, and had indicated 22 potential areas of noise impact. *Id.* at § 3.10.03, p. 3.10/1. The FEIS also outlined the standards for evaluating noise impacts, *id.* at § 3.10.05, p. 3.10/3, applied the appropriate criteria to the sites involved, *id.* at § 3.10.06, p. 3.10/3 and pp. E176–E183, and listed those areas for which noise barriers would be provided. *See*, § 3.10.7, p. 3.10/4; pp. E21, E22, E25, E31–33, E34–35, E42–45, E56–57, and Ex. XIII.

It is interesting to note that during the comment period for the FEIS in 1979, the only USEPA comment regarding noise was that "[i]f construction of noise barriers is not feasible, the use of landscaping as a visual and psychological barrier appears warranted." *Id.* at Gov. Ex. A, pp. 143 and 147. Finally, after the second publication of the FEIS in 1981, the USEPA submitted more comments regarding noise impacts. *See*, Gov. Ex. A, pp. 220–221. In these comments, the USEPA stated that "degree of noise impact is a relative concept," *id.*, and that where ambient noise levels are low, impact could be significant even though it did not exceed design levels. *Id.* at 220. The USEPA indicated that it felt mitigation should be reconsidered for those areas where the noise increases were classified as moderate, but where the increase in noise annoyance level could be considered significant. *Id.* at 220–221. The USEPA comments were apparently received after the expiration of the comment period, and further correspondence on the issue of noise impacts was rejected because the USEPA's disagreement was felt to be on a "philosophical basis," and because the FHWA had accepted the FEIS presentation as being in compliance with FHWA regulations and with NEPA. Gov. Ex. A, p. 219.

As has been previously noted, in assessing the adequacy of an impact statement, "[t]he court's task is to determine whether the EIS was compiled in objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors." *Sierra Club v. Morton*, 510 F.2d 813, 819 (5th Cir. 1975). Given the extensive consideration of potential noise impacts, as well as the agency's retreat in the FEIS from its former position that no noise barriers would be erected, the Court cannot conclude either that there was a lack of objective good faith in the compilation of the FEIS, or that the FEIS did not contain sufficient information to allow a balancing of the noise factors involved in the construction of the highway. While there may have been a difference of opinion between the USEPA and the preparers of the FEIS regarding the relative importance of increases in noise levels, it is clear that "[m]ere disagreement among experts will not serve to invalidate an EIS." *Beshear, supra*, 655 F.2d 714, 720 (6th Cir. 1981), citing *Life of the Land v. Brinegar*, 485 F.2d 460, 472 (9th Cir.), cert. denied, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1973).

There is also no indication that the discussion of noise impacts in the FEIS was not in full compliance with the FHWA regulations then in effect. 23 C.F.R. § 771.-18(i)(2)(v) (1976) indicates that:

If highway-generated noise is a significant factor, this section will include a discussion of the possible noise problems and a summary of the noise analysis information. The summary should include: (A) Information on the numbers and types of activities which may be affected. (B) Extent of the impact (in decibels). (C) Likelihood that noise abatement measures can reduce the noise impacts. (D) Noise abatement measures which will likely be incorporated in the project. (E) Noise problems for which no apparent solution is available.

The FEIS herein does contain a discussion of the above items. For example, § 3.10.03, p. 3.10/1, §§ 3.10.05–3.10.06, p. 3.10/3, and pp. E176–E183 contain a discussion of possible noise problems. Further, Ex. XIII in the FEIS also contains: information on activities at the various impacted sites; specific reference in decibels to the noise to be generated by the highway and its potential impact; an indication of noise levels with barriers; and, a discussion of barriers which will be provided, and noise problems for which no solutions appeared feasible. Given these factors, as well as the fact that the USEPA characterized the analysis of noise impacts as thorough, the Court concludes that the FEIS did not violate the procedural requirements of NEPA by failing to adequately assess noise impacts of I–675.

In their Preliminary Memorandum in Support of Motion for Preliminary and Permanent Injunction, Plaintiffs have devoted slightly over two pages to a discussion of inadequacies in the FEIS discussion of noise impacts. See, Doc. # 22, pp. 33–35. The primary points which are apparently being set forth in this section are that the Federal Aid Highway Act of 1970, and FHWA regulations promulgated thereunder, provide certain standards for noise levels compatible with different land uses, and that the ODOT did not consider some of these factors in calculating the noise impacts of I–675. In the first place, it should be noted that the Complaint herein does not allege any violation of either 23 U.S.C. § 109 or of 23 C.F.R. part 772, and, therefore, those matters are not appropriate for consideration herein. Secondly, part 772 does not promulgate requirements for environmental impact statements, but outlines policies and procedures for noise studies, noise abatement measures, and design noise levels. See, 23 C.F.R. § 772.1(a) and (b) (1976). Part 772 makes it clear that noise studies are to be performed during the development of a particular highway project but need not be completed prior to the preparation or submission of an EIS. For example, 23 C.F.R. § 772.11(c)(2) (1976) provides that:

The noise study report may be in preparation throughout the project development process but shall be concluded prior to approval of the plans and specifications. *Preliminary versions of the report shall be prepared as necessary for environmental statements and for imput to decisions on selecting a highway location.* Depending on the scope and timeliness of a complete noise report, various sections of the report such as noise inpact evaluation, proposed noise abatement measures, noise exception requests, etc., may be processed separately and included in the final report.

(Emphasis added).

This section clearly contemplates that the mandated studies will be the result of an ongoing process which may not be completed until after the submission of the EIS. In the present case, it is apparent that the Noise Study performed by the ODOT was, in fact, being updated as planning on the project progressed. See, Gov. Ex. F, § 3.10.06, p. 3.10/3. Thus, even if the applicability of 23 U.S.C. § 109(i) and 23 C.F.R. part 772 were properly before this Court, it would be difficult to conclude that violations had occurred, since there is no indication that anything other than the normal planning process was being followed.

Plaintiffs have claimed that the ODOT used an "oversimplified test," *see*, Doc. # 22, p. 35, to determine the noise impacts of the proposed highway. Specifically, Plaintiffs have contended that the FEIS is inadequate because it evaluated noise impacts and the need for noise barriers on the basis of whether a construction project followed the start of the preparation of the EIS. Defendants have responded by pointing out that the FEIS does set forth and utilize the noise methodology contained in 23 C.F.R. § 772.13(b) (1981), and by noting that Plaintiffs have provided no proof that any planned developments were ignored in the selection and analysis of I–675 study sites. After a thorough examination of the noise impact information in the FEIS, the Court must agree with the position which has been adopted by the Defendants.

For the purpose of evaluating the noise impact of the highway, 52 areas of noise reception were selected, and predictions were made of the potential noise which would be generated by the highway. *See*, Gov. Ex. F, §§ 2.10.12–2.10.13, p. 2.10/8, and pp. E176–E183. These sites, which are listed in Ex. XIII of the FEIS, *see*, pp. E176–E183, are located along the entire length of the I–675 corridor. *Compare*, pp. E–176–E183 with pp. E7–E65. An examination of the data in the FEIS indicates that the construction date of certain projects was not used to measure the noise impacts of the highway. Rather, the potential noise impacts at a particular location were determined by comparing present ambient noise levels with future noise levels which would be generated by the highway. Based on the ODOT "Manual on Highway Noise," the resulting impacts were placed in categories ranging from no impact to severe. *Id.* at § 3.10.05, p. 3.10/3, and pp. E176–E183. Thus, noise impacts of the proposed highway were not evaluated by reference to post-EIS construction.[41]

Plaintiffs have also criticized the application of the design noise levels in the FEIS, because that document allegedly did not take into account development which was not planned on the date of public knowledge of the project, but which, under 23 C.F.R. § 772.19(b) (1981) was required to be treated as developed land. *See*, Doc. # 22, p. 35. Again, this contention does not relate to the discussion in the FEIS, but is an attack on the methodology in the Noise Study.

§ 772.19(a) indicates that noise abatement measures (and thus, application of design noise levels, which are used to calculate the necessity for noise abatement measures), are not required for lands which are undeveloped on the date of public knowledge of the project. Thus, in the present case, the FEIS could have rejected the need for application of the design noise levels to certain areas along the corridor, and for consideration of noise abatement measures with respect to those areas, based on the fact that the land in question was not developed at the time of public knowledge of the project. If such an approach had been taken, § 772.19(b) would have placed a further restriction on the classification of lands as undeveloped for purposes of noise abatement measures and application of design noise levels. For example, even though lands are undeveloped on the date of public knowledge of the project, they are to be treated as developed lands, i.e., the design noise levels listed in § 772.13 should be applied, and noise abatement measures may be required, if the development was planned during the highway project planning and design, if there is a very high probability that the development will be built, and if the developer has given reasonable consideration to noise impacts. § 772.19(b)(2). Rather than exercising this option to omit consideration of noise abatement measures and application of design

---

41. In fact, it is questionable whether planned development is even relevant to an assessment of noise impacts, since, as is noted in the text, such impacts are calculated by determining the difference between present noise levels and those generated by the highway. In any event, there is no indication either in the FEIS, or in any materials furnished to the Court, which would dictate that such a factor is pertinent.

noise levels for areas along the corridor which were deemed to be undeveloped under the criteria in § 772.19, the FEIS treated *all* lands along the corridor as *developed* lands for purposes of applying noise design levels, and did not reject abatement measures because certain lands were considered to be undeveloped. Specifically, § 3.10.04 indicates that land usage along the corridor was considered to fall within categories B and C, *id.* at Gov. Ex. F, § 3.10.04, p. 3.10/2, which, under 23 C.F.R. § 772.13(b) are described as categories for developed lands.[42] Thus, by assuming that all lands were developed and applying the FHWA design noise levels equally, there was no need for a distinction to be made between lands developed prior to public knowledge of the project, and those developed or planned thereafter.

The same conclusions may be drawn with regard to the discussion of noise abatement measures in the FEIS. After determining the potential impact of the increased noise generated by the highway, the Noise Study Summary discusses whether use of noise barriers would be appropriate, and if so, whether they are feasible. *See generally,*

Gov. Ex. F, pp. E176–E183. Again, the summary does not classify certain land as undeveloped and conclude on that basis that barriers need not be considered. Although such an approach would be permissible under 23 C.F.R. § 772.19(a), the FEIS discusses noise abatement measures for all sites, whether the development therein occurred prior to public knowledge of the project, during the highway planning process, or was not even specifically contemplated. Thus, contrary to Plaintiffs' contentions, it does not appear that the fact of post-EIS construction was used, either to evaluate the noise impacts of the proposed highway, or as a basis for concluding that noise abatement measures were not required. In fact, in the majority of cases in which mention was made of post-EIS construction, noise barriers were recommended. *See,* Gov. Ex. F, Locations 22, 26, 35, 36, and 44, pp. E178–E180, and E182.[43] Given these factors, the Court cannot conclude that the ODOT failed to consider the circumstances outlined in 23 C.F.R. part 772 when the noise impacts of the proposed highway were evaluated.[44]

---

**42.** Another example of the liberal use of the design noise levels in the Noise Study may be seen in the treatment of several of the study locations. For example, the FHWA design noise criteria were applied in evaluating locations 2, 4, 20 and 51, even though such an application was not required because the areas in question consisted of parking lots and storage, or did not have human occupancy. *See,* Gov. Ex. F, pp. E176, E178, and E183.

**43.** With regard to locations 13, 21 and 40, the FEIS noted that some construction had begun after the start of the EIS, but did not recommend noise barriers. *See,* Gov. Ex. F, pp. E177, E178, and E181. At location 13, a barrier was not recommended because of the high cost and because the noise levels were within the design criteria. *Id.* at 177. Barriers were deemed unnecessary at location 21 because impacts were minor, *id.* at 178, and at location 40 because noise levels were within design criteria, and impacts ranged from minor to severe. Thus, even where barriers were not recommended, the fact of post-EIS construction does not appear to have been the reason. In fact, it appears that the reference to post-EIS construction is for purposes of description only, as other references are phrased in the same manner. For example, the remarks regarding location 1 state "10 Exist. apt. bldgs. constructed

after I–75 to traffic." *Id.* at E176. Likewise, the location 3 remarks state "Bldg. to be removed under another project," *id.,* the location 6 remarks state "Commercial-Industrial area under Construction," *id.,* and the location 26 remarks indicate "2 apt. bldgs. under construction," *id.* at E179.

Moreover, even if the fact of post-EIS construction had been a reason for rejection of a particular noise barrier, there is no indication that specific discussion of this point need be made in the EIS. As was noted previously in the text, the noise study proceeds independently of the preparation of the EIS, and need not be approved prior to the preparation of the EIS. *See,* 23 C.F.R. § 772.11(c)(2) (1981). While preliminary versions of the report should be prepared for use in the EIS, *id.,* as was done herein, approval of proposed noise abatement measures and requests for exceptions to design noise levels need only be obtained prior to approval of the plans and specifications for the project. *Id.*

**44.** The conclusion which has been reached regarding the discussion of noise impacts does not rest upon the fact that Plaintiffs have not offered any evidence of development which was planned and highly probable but which was ignored in assessing the noise impacts of

## C. *Response to Agency Comments*

As was previously noted, Plaintiffs have contended that the FEIS was inadequate because it did not address and reconcile conflicting views of the other agencies. *See,* Doc. # 1, ¶ 64(j). Specifically, Plaintiffs have indicated that the objections of the United States Environmental Protection Agency (USEPA), the U.S. Department of the Interior (USDOI), and the Regional Air Pollution Agency (RAPCA) were not addressed and reconciled. The comments of the USEPA have been previously discussed, *see,* discussion of noise impacts and footnote 40, and need not be further considered. Plaintiffs have not referred in detail at any point to the comments of RAPCA or the USDOI beyond pointing to comments which support their positions or perceived inadequacies of the FEIS, i.e., that it did not adequately discuss traffic and development to be induced by the highway, or impacts upon the City of Dayton. *See,* Doc. # 22, pp. 24, 28, and 33.

With regard to comments, the pertinent CEQ guidelines provide that the agency "should make a meaningful reference in the final statement to the existence of any responsible opposing view not adequately discussed in the draft statement, indicating the agency's response to the issues raised." 40 C.F.R. § 1500.10 (1974). Likewise, the FHWA regulations in effect at the pertinent time herein indicated that "[t]he final EIS shall include a copy of all substantive comments received (or summaries ...), along with a discussion of each substantive comment or suggestion." 23 C.F.R. § 771.-18(*o*)(2) (1976).

In interpreting the responsibility of an agency with respect to comments, the Court in *Committee for Nuclear Responsibility v. Seaborg,* 463 F.2d 783 (D.C.Cir.1971) (*Seaborg*) indicated that:

> When, as here, the issue of procedure relates to the sufficiency of the presentation in the statement, the court is not to rule on the relative merits of competing

scientific opinion. Its function is only to assure that the agency sets forth the opposing scientific views, and does not take the arbitrary and impermissible approach of completely omitting from the statement, and hence, from the focus that the statement was intended to provide for deciding officials, any reference whatever to the existence of responsible scientific opinions concerning possible adverse environmental effects.

*Id.* at 787. In the present case, the Comment Section of the FEIS is extensive, *see generally,* Gov. Ex. F, Chapter 9, § 9.1.01, p. 9.1/1–§ 9.3.07, p. 9.3/89, and as there has been no suggestion that the FEIS omitted references to any comments which were made, the Court cannot conclude that any violation of the FHWA regulations or of NEPA has occurred.

As a further matter, it should be noted that contrary to Plaintiffs' contention, the FEIS need not reconcile opposing comments. According to the Court in *Seaborg*:

> The agency need not set forth at full length views with which it disagrees, all that is required is a meaningful reference that identifies the problem at hand for the responsible official. *The agency, of course, is not foreclosed from noting in the statement that it accepts certain contentions or rejects others.*

463 F.2d at 787 (citation omitted) (emphasis added). In the present case, it is apparent that the preparers of the FEIS disagreed with the viewpoint of certain agencies and persons regarding traffic assumptions and development, etc. *See,* e.g., Gov. Ex. F, § 9.2.03, RAPCA Comment 30, p. 9.2/20 (commenting that more land will be consumed than that indicated in § 4.1 of the EIS, i.e., the acreage in the right-of-way). The response in the FEIS indicates that the comment is correct, but that development is expected with or without construction of the highway. *Id.* As is apparent from the discussion elsewhere in this opinion, the

I-675. While plaintiffs have not offered any such evidence, the Court chooses not to premise its decision on what would appear to

be a failure to meet the required burden of proof.

conclusions outlined in the FEIS are supported by ample evidence. Thus, while an agency might disagree with the conclusions reached by the preparers of the FEIS, there is no indication herein that Defendants failed to comply with either the requirements of NEPA, or the regulations promulgated thereunder.

Having found against Plaintiffs on all grounds which have been raised regarding the alleged inadequacy of the FEIS, and the Defendants' alleged failure to comply with the procedural requirements of NEPA, the Court will next consider whether Secretary Lewis' decision to approve the remaining portion of I–675 constituted an abuse of discretion.

## VIII. THE 1981 LEWIS DECISION

In ¶ 60 of the Complaint, Plaintiffs have alleged that in 1979, Secretary Goldschmidt disapproved the FEIS because of certain inadequacies, including, *inter alia*, its failure to consider alternatives, and that the FEIS which was approved two years later contained no additional analyses of the matters commented upon by Goldschmidt. In addition, it is noted in ¶ 29 of the Complaint that in July, 1981, the resubmitted FEIS was approved by the Department of Transportation and, in ¶ 31, that on September 18, 1981, Defendant Lewis refused to reconsider that decision. Counts I and II of the Complaint contain the alleged violations of NEPA, but there is no mention in either of these counts of any violation of NEPA by Secretary Lewis or the Department of Transportation. However, in Plaintiffs' Preliminary Memorandum in Support of Motion for Preliminary and Permanent Injunction, Plaintiffs have contended that approval of the FEIS in 1981 violated NEPA because the 1979 Goldschmidt decision constituted a finding that the FEIS was legally insufficient to satisfy NEPA. *See*, Doc. 22, pp. 48–50. In addition to this argument, Plaintiffs have claimed, apparently under Count IV of the Complaint, which refers to Defendants' alleged abuse of discretion in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), *see*, Doc. # 1, ¶ 70, that the 1981 Lewis

Decision was arbitrary and capricious because it was based on political concerns and political prejudices. *See*, Doc. # 22, pp. 51–66.

Defendants have responded to the above arguments by contending that Secretary Goldschmidt did not find the FEIS inadequate in 1979 but merely determined to approve one portion of the highway project, and to disapprove another segment, for reasons unrelated to the adequacy of the FEIS. *See*, Doc. # 37, p. 51; Doc. # 38, p. 69. Defendants have further contended that nothing in NEPA prevents an agency from reaching a different substantive decision on the basis of the same impact statement, *see*, Doc. # 37, p. 52, and alternatively have claimed that even if Goldschmidt did find the FEIS inadequate in some regard, Secretary Lewis would not be bound by that determination in the manner suggested by Plaintiffs. *See*, Doc. # 38, p. 70. Finally, Defendants have claimed that the agency decision was not arbitrary because it did take environmental consequences into consideration, and was not based on irrelevant factors. *See*, Doc. # 37, pp. 56–60; Doc. # 38, pp. 70–74.

Both NEPA and the regulations promulgated thereunder are silent regarding whether a decisionmaker may reconsider a prior decision, and also make no comment with respect to the effect of an agency determination on any of the matters discussed in an EIS. At the very least, the absence of any relevant standards indicates that reconsideration is not prohibited. Plaintiffs have contended that determination of the adequacy of an FEIS is not an exercise of discretion, but is a binding decision on whether a given factual record satisfies the legal requirements of NEPA. *See*, Doc. # 22, p. 48. The Court does not agree with this statement, since it is apparent from the discussion in this opinion that an application of the legal requirements of NEPA to the FEIS herein could result in conclusions which differ from those reached by Secretary Goldschmidt. The only case cited by Plaintiffs to support the above proposition is *Environmental Defense Fund,*

*Inc. v. Tennessee Valley Authority*, 468 F.2d 1164 (6th Cir. 1972). That case, however, makes no comment regarding the effect of agency determinations about the adequacy of an FEIS, and is further not on point, in that it dealt, not with reconsideration of a prior decision, but with whether construction of a project begun before the effective date of NEPA would mandate application of the Act's procedural requirements. *See, id.* at 1172.

In the cited case, the Sixth Circuit did discuss generally the substantive and procedural portions of NEPA, and did state, with regard to § 102 of the Act, that:

> The procedural requirements of section 102 were designed to assure federal agency consideration of the policies and goals enunciated in section 101 .... It contains procedural provisions that are not discretionary; "[i]ndeed, they establish a strict standard of compliance."

*Id.* at 1174, quoting *Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission*, 449 F.2d 1109, 1112 (D.C.Cir.1971) (other citations omitted).

Obviously, an agency does not have the discretion, for example, of failing to include in the EIS any discussion of alternatives. However, as was noted in *Beshear, supra*, 655 F.2d 714 (6th Cir. 1981), "[t]he agency charged with drafting an EIS must make the initial determination which alternatives are feasible and merit consideration. Clearly then, '[t]he specificity of EIS treatment of alternatives is a matter of agency discretion.' ... Accordingly, this Court may only inquire whether the ... consideration of ... [alternatives] was so inadequate as to be an abuse of this discretion." *Id.* at 718, quoting *North Slope Borough v. Andrus*, 642 F.2d 589, 601 (D.C.Cir.1980) (parenthetical material supplied).

In the present case, one example may be illustrative of the preceding point. In his 1979 decision memorandum, Goldschmidt indicated that, in his opinion, I–675 was "an integral part of a regional plan based on continued low density development patterns," *id.* at Gov. Ex. A, p. 096, which would "lead to a continuation of low occupancy automobile travel as the predominant mode of transportation in the region." *Id.* Goldschmidt noted that the EIS did not reflect an effort to device measures "which might be undertaken in conjunction with I–675 or in lieu of the highway to promote national energy conservation goals." *Id.*

The accuracy of these observations might well be questioned in view of the fact that even under the most extensive mass transit alternative studied, it was determined that only 10% of the transportation needs would be served, *see*, Gov. Ex. F, § 2.7.10, p. 2.7/5, and in light of the fact that I–675 was viewed in the regional planning as a means of controlling urban development. *See*, Gov. Ex. F, § 3.4.05, p. 3.4/2. In addition, as has been extensively discussed and noted herein, the developmental trend of this area has historically been in a low density fashion, and has continued in all areas of the two-county area without the construction of the highway. Goldschmidt's decision, however, refers to none of these factors, and the conclusions reached therein are certainly subject to question on this basis.

Contrary to Goldschmidt's finding, the July 6, 1981 Decision Statement concluded, after a review of developmental patterns in the area, that "development and land use patterns have been responsive to a well-established regional development and transportation plan which has recognized I–675 since the early 1960's. *Planned development responsive to local needs and desires is not considered urban sprawl.*" *Id.* at Gov. Ex. A, p. 199. As has been noted, there is ample support in the record for this view. Thus, because another decision-maker could reach conclusions different than those made by Goldschmidt, and frankly, because Goldschmidt's interpretation of the facts may well have been plainly incorrect, it would make little sense to accord the binding weight to his findings and conclusions which has been suggested by Plaintiffs. Therefore, the Court must reject Plaintiffs' contention that the Goldschmidt decision constituted an insurmountable barrier over which no subsequent decision-maker could leap. Moreover, it is apparent that

Goldschmidt was overruled in part on the basis that he incorrectly identified the alleged inadequacies in the FEIS. It is implicit in the example cited above, that the current Secretary disagreed with both the factual conclusions and the reasoning of Secretary Goldschmidt.

The final matter to be addressed in connection with the 1981 reversal of the Goldschmidt decision was whether it was "arbitrary, capricious," or "an abuse of discretion." 5 U.S.C. § 706(2)(A) (1977). Plaintiffs have contended that the 1981 reversal was "without explanation, and motivated by political concerns and personal prejudices." Doc. # 22, p. 52.

The rule applied to agency reconsideration of decisions or departure from past precedent is that "an agency may alter or reverse its position if the change is supported by a reasoned explanation." *Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 289 (D.C.Cir.1981). *See also, Ohio Fast Freight, Inc. v. United States*, 574 F.2d 316, 319 (6th Cir. 1978) (holding that "an administrative agency either must conform with its own precedents or explain its departure from them"). In addition it has been noted that "an agency is not required to adhere to a prior policy with iron rigidity; all that the law requires is that it explain the reasons for its modification." *Environmental Defense Fund, Inc. v. Environmental Protection Agency*, 510 F.2d 1292, 1299 (D.C.Cir.1975) (citations omitted). Moreover, in *Greater Boston Television Corp. v. Federal Communications Commission*, 444 F.2d 841 (D.C.Cir.), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971), the Court stated that:

> An agency's view of what is in the public interest may change, *either with or without a change in circumstances.* But an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from tolerably terse to the intolerably mute.

*Id.* at 852 (citations omitted) (emphasis added). Finally, in order to determine whether a particular agency choice constituted an abuse of discretion, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park, supra*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

After applying the above standards to the present case, the Court has concluded that the 1981 reversal of the Goldschmidt decision was not arbitrary or capricious, and was not an abuse of discretion. An examination of the 1981 decision indicates that it did consider all issues raised by the Goldschmidt decision, and did explain any departure from former policy in a reasoned fashion.

In the 1981 Decision Memorandum, it is noted that Goldschmidt's "primary reason for rejecting the project was that he found it inconsistent with former President Carter's urban policy, which was designed to protect cities from loss of economic growth." *Id.* at Gov. Ex. A, p. 198. This is also the conclusion of the Thwing memo, *see,* Plaintiffs' Ex. 14, p. 1, which has been referred to in Plaintiffs' Memorandum in Support of Preliminary and Permanent Injunction. *See,* Doc. # 22, p. 54. An examination of the 1979 Goldschmidt decision, as well as Goldschmidt's accompanying letter indicates that, in fact, Carter's urban policy was the overriding reason for Goldschmidt's rejection of the project. Specifically, in his 1979 letter to ODOT Director David Weir, Goldschmidt indicated that "I strongly support the President's urban policies and intend to adhere to them in all relevant transportation decisions." *Id.* at Gov. Ex. A, p. 91. Goldschmidt further stated that I–675 north of U.S. 35 was being approved because it served legitimate transportation needs and was not "inconsistent with the Urban Policy." *Id.* Further, the Goldschmidt Decision memorandum stated that the EIS for the project had been under review within the Department of Transportation for nearly a year, and noted that:

The major issue involved is the potential impact of I-675 on the City of Dayton and the development likely to result if I-675 were to be built, as proposed. The City has repeatedly expressed its concerns on this matter and is on record opposing completion of the full I-675 project.

*Id.* at Gov. Ex. A, 95. Given these factors, it is apparent that the 1981 Decision Statement did not make a clear error of judgment in concluding that Goldschmidt's main objection to I-675 was its apparent conflict with the urban policies of President Carter. It is also apparent from the 1981 Decision Statement that the Department of Transportation intended to accord less value to urban impacts than did President Carter, and to place more emphasis upon local planning processes and demonstrated transportation needs. Specifically, the Decision Statement said:

> Available information does not indicate that the adverse economic impact on the City of Dayton is significant enough to deny the approval of the EIS for the portion of I-675 south of U.S. 35. It would not be appropriate at this time to break faith with the transportation planning process that has existed for over 20 years, which resulted in the endorsement of I-675 by all of the governing bodies on the Metropolitan Planning Organization (MPO) until the late 1970's when Dayton reversed its position. *This process has clearly identified a transportation need in the corridor, and I-675 has been selected*

*by the established process as the appropriate transportation facility.*

*Id.* at Gov. Ex. A, p. 199.

The deposition of Judith Conner, who signed the 1981 Decision Statement, further reflects the change in policy which occurred in the Department of Transportation. Conner indicated that in assessing the project, she considered whether "reviewing the same facts the Reagan administration would have adopted the same policy approach." Conner deposition, p. 22. Conner concluded that "with respect to transportation installations, the Reagan administration was going to be paying more attention to the actual transportation benefits than they were to be making decisions based on premises as to how an urban area would develop around transportation." *Id.* at 23. *See also,* pp. 24–26 and 30–31.[45] As was noted by the Court of Appeals for the District of Columbia in *Environmental Defense Fund, Inc. v. Higginson,* 655 F.2d 1244 (D.C. Cir.1981), nothing in NEPA or in the judicial decisions interpreting that act would prevent alteration of an agency's position regarding an environmental impact statement "in order to reflect *a new departmental policy,* a new evaluation of facts, or changed circumstances." *Id.* at 1247 (emphasis added).[46] Because the Department of Transportation adopted a new policy regarding the relative importance of urban impacts vis-a-vis transportation needs, and provided a reasoned explanation of its reversal of the 1979 Goldschmidt decision, the Court cannot conclude that the 1981 decision was arbitrary or capricious in its treatment of the Goldschmidt opinion.[47]

---

**45.** These statements are not considered by the Court to be "*post-hoc* rationalizations," *Overton Park, supra,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971), since they merely repeat what is already clearly expressed in the 1981 Decision Statement.

**46.** The case cited in the main text dealt with a change in the position of the Department of the Interior regarding the necessity of preparing a region-wide environmental impact statement. *See,* 655 F.2d at 1247. There is no reason, however to read the Court's decision as narrowly applicable to the fact situation of that case, since the Court did not limit its opinion in such a manner. Because the agency's position occurred during the pendency of the appeal,

the Court did remand the case to allow the plaintiffs to attack the new agency position. *See, id.* at 1246–1247.

**47.** Plaintiffs have submitted several past decisions of the Department of Transportation, *see,* Plaintiffs' Ex. 26, and have argued that the previous practice of the Department has been to accord great deference to prior decisions, and to depart therefrom only after a thorough analysis. In particular, Plaintiffs have stressed that Secretary Adams, in refusing "to reverse a decision of a previous administration, maintained a position of rationality free from even the appearance of prejudice or personal influence." Doc. # 22, p. 56. The decision of Sec-

Plaintiffs have also questioned the 1981 reversal on the basis that it did not attempt to deal rationally with the four issues which had been raised by Goldschmidt. *See*, Doc. # 22, pp. 59–63. As has been previously noted, there was a reasoned explanation of the bases for departing from Goldschmidt's conclusions about urban impacts and urban sprawl/energy conservation. In addition to these matters, Goldschmidt had expressed concern about traffic volumes in the corridor, and about whether, in light of President Carter's urban policy, lesser scale alternatives should be considered more fully. *See*, Gov. Ex. A, pp. 97–98. The 1981 Decision Statement indicated opinions contrary to those of Goldschmidt, concluding that: even under reduced population growth, traffic volumes existed to warrant construction of the highway; that alternative studies performed indicated that I–675 as recommended would be the first preference, and that "[t]he 8400 daily through trips, when associated with other regional transportation needs, provide clear project justification." Gov. Ex. A, pp. 200–201. To the extent that Plaintiffs' position would require binding weight to be accorded to Goldschmidt's observations, *regardless of their validity*, it must be rejected, for the reasons noted earlier. Because the 1981 Decision Statement did indicate an explanation of its departures from Goldschmidt's conclusions, and because there is evidence in

the record to support the later USDOT conclusions, the Court cannot conclude that the reversal of the Goldschmidt decision was arbitrary or capricious, or an abuse of discretion.

The remaining matter which must be addressed in connection with the 1981 Decision Statement is whether the decision of the USDOT to approve the final portion of I–675 constituted an abuse of discretion. Although this discussion may seem somewhat repetitive, Plaintiffs have separated the 1981 decision into two facets, i.e., reversal of the Goldschmidt decision, and approval of the remaining portion of the I–675 project, and, therefore, the Court has utilized a similar approach. Plaintiffs have contended that the 1981 approval of I–675 was an abuse of discretion, because it was based on irrelevant factors, i.e., political considerations. *See*, Doc. # 22, pp. 64–66. Defendants have responded by arguing that no improper political threats or pressures have been either alleged or proven. *See*, Doc. # 37, p. 59; Doc. # 38, p. 73.

Plaintiffs have cited *D. C. Federation of Civic Associations v. Volpe*, 459 F.2d 1231 (D.C.Cir.), cert. denied 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972) (*Federation of Civic Associations*) for the proposition that "consideration of political factors is irrelevant and reversible error." Doc. # 22, p. 64. While certain legal principles

retary Adams which has been referred to by Plaintiffs, however, is not particularly helpful or relevant, since it indicates that although the project in question was approved by a prior secretary, it was apparently entirely consistent with the policies of the new administration. In fact, Adams specifically noted that the project had been developed to enhance "the urban development, . . . of the City of New York." Plaintiffs' Ex. 26, *Statement by Secretary of Transportation Brock Adams concerning Interstate Highway 478*, p. 2.

In addition, an examination of the 1977 Adams decision submitted by Plaintiffs, and discussed at Doc. 57b 22, pp. 55–56, indicates that contrary to Plaintiffs' contention, Adams did not disapprove further funding because the conditions specified by former Secretary Coleman had not been met; instead, Adams determined that funding would be premature because *it was not clear that a new airport was needed. See*, Plaintiffs' Ex. 26, *Decision of*

*Brock Adams, . . . on federal funding of land acquisition of a new airport*, pp. 4–5. Also, in reaching his decision, Adams placed *heavy reliance* on the fact that the majority of the local populace had voiced a preference for retention of the present airport situation, i.e., for not constructing the new airport. *Id.* at 10–11. Thus, the funding was not rejected because the limitations imposed by Coleman had not been met. In fact, beyond outlining those limitations, which had nothing to do with the need for the airport, *id.* at pp. 2–3, Adams' decision makes little reference to Coleman's former decision. Consequently, it cannot be concluded that the treatment of the prior Secretarial decision herein differed in any way from past USDOT practice. Moreover, as will be discussed further in the text, there is no indication that either Conner or Secretary Lewis did not maintain an appearance of rationality, untainted by political influence.

may be extracted from that case, the decision provides little guidance for the application of its principles in a particular factual context because of the unusual way in which the plurality reached its holding. In order to better understand this point, reference to the lower court decision must first be made.

In *D. C. Federation of Civic Associations v. Volpe*, 316 F.Supp. 754 (D.D.C.1970), rev'd in part, 459 F.2d 1231 (D.C.Cir.), cert. denied, 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972), several plaintiffs challenged, *inter alia*, certain procedures followed by the Department of Transportation in the approval of a controversial bridge project in the District of Columbia. *Id.* at 758. The bridge was first designated as a part of the Interstate System in 1960, but in 1968, the D.C. Circuit Court of Appeals enjoined the construction of the bridge because the District had not complied with certain procedural requirements of the D.C. Code. *Id.* at 758–759. After that decision, Congress enacted legislation directing that the bridge be built, and that regardless of other contrary provisions of law, court decisions, or administrative actions, construction would be carried out in accordance with the requirements of Title 23 of the United States Code. *Id.* at 759. President Johnson signed the bill but indicated he had been assured that the procedural requirements of the D.C.Code would be complied with prior to construction. *Id.* Approximately four months later, the District of Columbia City Council approved a transportation plan which did not include the bridge, and requested that the bridge be deleted from the Interstate Highway system. *Id.* This was done shortly before Secretary Volpe took office, and Congress then threatened to withhold appropriations for the District of Columbia's rapid transit program unless the bridge project was constructed. *Id.* Specifically, in July, 1969, the House of Representatives approved a supplemental appropriations bill for the District which did not include the transit funds. *Id.* at 762. Even more significantly, threats were made to the effect that other District funds would be withheld, and to

this end, on August 8, 1969, the revenue bill for the District was reported to the House with an amendment to the effect that any part of the Federal payment would be withheld until Congress received word from the President that "the city had committed itself 'irrevocably' to the construction of the freeway system." *Id.* at 763.

Not surprisingly, on the next day the City Council voted to go forward with the bridge project, and three days later Secretary Volpe indicated that the FHWA would be directed to rescind the deletion of the bridge project from the Interstate system. *Id.* at 759–760. In the action brought in the District Court, the issues with respect to the Department of Transportation were whether it had made the determinations required by Title 23, and if so, whether they were made on the basis of the merits of the project. *Id.* at 762. The district judge found the allegations of political pressure to be relevant only insofar as they may have caused public officials to disregard their obligation under Title 23 of considering the bridge project on its merits. *Id.* at 763. In this context, the Court received testimony from Secretary Volpe, and made several comments regarding Volpe's role. The Court stated, "[t]here is no question that the Secretary was aware of the nature of the impasse between the Congress and the City Council. He testified that soon after taking office he undertook to try to resolve the problem." *Id.* at 764. The Court further noted:

> Mr. Volpe also recalled that he was aware of the threat to withhold the entire federal payment for the District unless affirmative action was taken on the freeway program.... The statement issued by the Secretary at the time he directed the Federal Highway Administration to restore the bridge to the Interstate System indicates that the pressure on the rapid transit funds was a consideration at that time.

*Id.* at 764–765.

The Court then concluded:

> The mere fact that the Secretary was aware of the Congressional pressure to

build the Three Sisters Bridge is not sufficient to invalidate his action.... The Court believes the Secretary's testimony that his decision was based on the merits of the project and not solely on extraneous political pressures.

*Id.* at 765–766. As a further matter, the Court also stated that "[f]rom the evidence of the contemporaneous statements of Secretary Volpe and his testimony in this case, there is no question that the pressure regarding the rapid transit appropriations was given some consideration at the time of the approval of the project in August, 1969." *Id.* at 766. Although the district court did not invalidate the Secretary's decision, it did find that the Department of Transportation would be required to comply with certain procedures, including those requiring a design hearing, *id.* at 784–785, and those mandating that the structural feasibility of the facility be determined prior to approval of plans and specifications. *Id.* at 793.

On appeal, the D.C. Circuit Court of Appeals affirmed that part of the District Court judgment which found noncompliance by the Department, but concluded that statutory requirements were not satisfied with respect to those provisions with which the District Court had found compliance. *Federation of Civic Associations, supra,* 459 F.2d 1231, 1235 (D.C.Cir.), cert. denied, 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972). The Court considered two contentions, i.e., that the Secretary's determination was "tainted by his consideration of extraneous factors unrelated to the merits of the questions presented," *id.* at 1236, and that "apart from the allegations of pressure, the record and applicable legal principles do not support a finding of compliance." *Id.* The first point which should be made is that the opinion in *D.C. Federation of Civic Associations* represented the view of only a majority of the Court, and even then, only on certain issues. Judge Bazelon, writing for the plurality, considered first the issue of whether the Secretary's decision could stand irrespective of the issue of political pressures, and concluded that it could not. *See generally, id.* at 1237–1245.

The second member of the plurality, Judge Fahy, agreed with Judge Bazelon regarding this issue, and found it unnecessary to decide the case on the second, and independent ground of political pressures. *Id.* at 1246. The third member of the panel disagreed with the majority's finding that the Secretary did not comply with Title 23 and would have affirmed the District Court's findings on this point. *See generally, id.* at 1249–1256.

Judge Bazelon then went on to discuss the issue of political pressure even though it was not required for disposition of the case. Judge Bazelon concluded that in *his opinion,* the impact of the Congressional pressure, i.e., the threats associated with blockage of the transit funds, would be sufficient, "standing alone, to invalidate the Secretary's action," *id.* at 1245, and that even if the Secretary had taken "every formal step required by every applicable statutory provision, reversal would be required." *Id.* at 1245–1246. This statement, which forms the basis of the assertion of the plaintiffs herein, that consideration of political factors is reversible error, is clearly the opinion of Judge Bazelon alone, as is noted in Bazelon's opinion. Thus, immediately following Bazelon's observation regarding reversal, he stated, "Judge Fahy, on the other hand, has concluded that since critical determinations cannot stand irrespective of the allegations of pressure, he finds it unnecessary to decide the case on this independent ground." *Id.* at 1246.

Bazelon then discussed what he characterized as the District Court's "finding of law that since the Secretary was not acting in a judicial or quasi-judicial capacity, his decision would be invalid only if based *solely* on these extraneous considerations." *Id.* (emphasis in the original). Bazelon rejected this principle of law, and noted that:

While Judge Fahy is not entirely convinced that the District Court found as a fact that the extraneous pressure had influenced the Secretary's decision—... he has authorized me to note his concurrence in my discussion of the controlling principle of law: namely, that the deci-

sion would be invalid if based in whole or in part on the pressures emanating from [the Congressional] [r]epresentative.

*Id.* (parenthetical material added).

Judge MacKinnon, in dissent, disagreed vehemently with Bazelon's characterization of the trial judge's findings, and instead contended that the district court had found, as required, that Volpe's decision was based on the merits of the project. *Id.* at 1257–1258. Specifically, MacKinnon stated:

It ... seems clear to me that the trial court ... found that the Secretary had based his decision upon the merits of the project. I specifically concur in this conclusion ... and disagree with Judge Bazelon's solitary conclusion with respect to this phase of the case. Judge Fahy also does not agree with Judge Bazelon that the trial court found that extraneous pressure had influenced the Secretary's decision. It is thus clear that as presently articulated in these opinions a majority of the judges in this panel do not require that new determinations "on the merits" be made because of the interjection, of any, for want of a better name, political pressure.

*Id.* at 1258.

There is force to Judge MacKinnon's conclusion, since as been previously noted, Judge Fahy found it unnecessary to reach the second issue which was before the Court. What one is left with, then, is a principle of law without a specific context within which it can be said to operate.

In *Sierra Club v. Costle*, 657 F.2d 298 (D.C.Cir.1981) (*Costle*), the District of Columbia Court of Appeals attempted to clarify the application of its previous decision in *D.C. Federation of Civic Associations*, by noting that:

**48.** Although the Court in *Costle* referred to "administrative rulemaking," that is not a basis for rejecting application of the standards therein to the present case. In *Costle*, the Court noted that there would be a problem with *ex parte* communications where the administrative function involved " 'conflicting private claims to a valuable private privilege,' " 657 F.2d at 400 (citation omitted). Cases involving this type of situation were distinguished from

*D.C. Federation* thus requires that two conditions be met before an administrative rulemaking may be overturned simply on the grounds of Congressional pressure. First, the content of the pressure upon the Secretary is designed to force him to decide upon factors not made relevant by Congress in the applicable statute.... Second, the Secretary's determination must be affected by those extraneous considerations.

*Id.* at 409.[48]

In the present case, like *Costle*, there is simply no evidence that either of the above requirements have been satisfied. Although the record indicates that Secretary Lewis met with a number of suburban Congressmen who asked him to reconsider the previous administration's decision not to approve the entire bypass project, *see*, Plaintiffs' Ex. 17, there is no indication at any point in the record that the meeting involved any extraneous pressures, that the discussion was focused on factors irrelevant to NEPA, or that Secretary Lewis made any commitments to any party regarding the I–675 proposal. Subsequent to the meeting, a letter was sent to the ODOT by the FHWA, indicating that re-examination of the I–675 project would be appropriate in view of "the time elapsed since the 1979 decision, the additional studies made, and recent discussions with State, local and Congressional officials." Gov. Ex. A, p. 165. *See also*, Plaintiffs' Ex. 17. There is no indication at *any* point in the record, that Lewis had made a commitment to approve the highway; in fact, the evidence indicates that he was carefully considering the urban policy arguments which had been made by the City of Dayton representatives in an April 16, 1981 meeting. *See*, Plaintiffs' Ex. 17, 18, and 22, p. 1.

*Costle*, and only *D.C. Federation of Civil Associations* was deemed to be legally relevant. *See, id.* at 408 & n.533. Because the present case involves precisely the type of administrative proceedings which were involved in *D.C. Federation of Civil Associations*, i.e., approval of a proposed transportation project, it is apparent that the ruling in *Costle* should apply herein.

In a similar situation in *Costle*, the Court rejected a claim of improper influence where a senator had met with the administrative agency in question "in order to express 'strongly' his already well-known views." 657 F.2d at 409. The Court stated:

Americans rightly expect their elected representatives to voice their grievances and preferences concerning the administration of our laws. We believe it entirely proper for Congressional representatives vigorously to represent the interests of their constituents before administrative agencies involved in formal general policy rulemaking, so long as individual Congressmen do not frustrate the intent of Congress as a whole as expressed in statute, nor undermine applicable rules of procedure.

*Id.* The Court thus found that, despite the Senator's meetings with the agency, there was no evidence that he "attempted actively to use 'extraneous' pressures to further his position." *Id.* Again, there is simply no evidence of any such attempts in the present case.

■ Plaintiffs have appeared to base their "political pressures" argument in part upon the fact that, after the 1980 elections, TCC voted to proceed with attempts to win approval of I–675 because of "comments in the press by the new vice-president (that the new administration would consider I–675 in its original form)." Gov. Ex. A, p. 174. In *Costle*, the Court rejected a similar claim of extraneous "'threats.'" *See*, 657 F.2d at 409, n.539. Therein, the Washington Post had stated that the EPA decision in question came after "two weeks of ... 'hard-ball arm-twisting.'" *Id.* The article further noted that "Byrd [who had also met with the EPA to strongly express his views] summoned Costle [the EPA administrator], and White House advisor Stuart Eizenstat *strongly hinted* that the Administration needs his [Byrd's] support on [other unrelated political issues]." *Id.* (emphasis in original) (parenthetical material added). After noting these facts, the Court stated: "[w]e do not believe that a single newspaper account of strong 'hint[s]' represents substantial evidence of extrane-

ous pressure significant enough to warrant a finding of unlawful congressional interference." *Id.* In the case at hand, there is far less present than even the strong hint involved in *Costle*. First, TCC's speculation about future events is irrelevant to a consideration of actual influence upon Secretary Lewis. Second, there has been no evidence adduced herein of any "arm-twisting" of the Secretary. Thus, the Court concludes that there is no basis upon which it may be said that there was evidence of extraneous pressure on the Secretary. Moreover, even if the comments in the press which had been linked to the new Vice-President could be considered extraneous pressure, they would be nothing more than what was involved in *Costle*, and, therefore, would not be significant enough to merit a finding of unlawful pressure. Simply put, there is no evidence that any pressure existed, let alone that the content of the pressure was designed to make Lewis focus on concerns which were irrelevant under NEPA.

Assuming *arguendo* that Plaintiffs had prevailed on the first branch of the *Costle* test, which requires a finding that the content of the pressure was designed to make the decision-maker focus on factors not made relevant by Congress in the applicable statute, there is no evidence herein that the Secretary's decision was, in fact, influenced by any extraneous pressures. As was previously noted, on March 13, 1981, R. H. Barnhart of the FHWA sent a letter to David Weir, the ODOT Director, and observed therein that Goldschmidt had indicated on September 26, 1980 that the Department of Transportation was not in a position to make a decision regarding the recommendations in the TCC alternatives analysis "since no formal project submission had been proposed." Gov. Ex. A, p. 165. Barnhart then stated that "[i]n light of the time elapsed since the 1979 decision, the additional studies made, and recent discussions with State, local and Congressional officials, I believe that it would now be appropriate to reexamine the overall I–675 proposal." *Id.* Barnhart then suggested that the final EIS

be resubmitted, together with a response to the issues in the 1979 Goldschmidt decision, and as appropriate, to the comments in the 1980 Goldschmidt letter. *Id.* On April 16, 1981, the ODOT did resubmit the FEIS to the FHWA, together with a recommendation by the ODOT that the project be approved. *Id.* at Gov. Ex. A, p. 168.

During the course of the within litigation, the deposition of Leon Larson was taken, and was filed with the Court on March 11, 1982. Therein, Larson indicated that he had been chief of the FHWA environmental programs division from some point in 1979 to August, 1980, and from that time, had been Director of the Office of Environmental Policy. Larson deposition, p. 4. In this latter capacity, he had as his responsibility "the advancement of projects through the environmental impact stage." *Id.* at 15. With respect to projects in the pending stage, Larson noted that "[i]t is our goal to get them finalized either with withdrawal/substitution or with a final environmental impact statement." *Id.* at 15–16. According to Larson, the March 13, 1981 I–675 letter was written by someone on his staff, reviewed by Larson and then signed by Barnhart. *Id.* at 7, 16, and 19. Larson indicated that the letter was written partially on his own initiative, and partially because the FHWA executive director, Les Lamm, had requested that he resolve the pending issues on many of the interstate projects, including I–675. *Id.* at 16–17. According to Larson, his objective was to have the State make a formal submission regarding I–675 because there was no current proposal before the FHWA, and even the September, 1980 submission to Goldschmidt had come from the TCC rather than from the State. *Id.* at 18, 24.

There is no indication that Larson was influenced by any extraneous political pressure, as he had not talked to, or corresponded with any political officials between September 26, 1980, and March 13, 1981. *Id.* at 18–19. Lawson did indicate that the reason for the reference in the letter to discussions with Congressional officials was due to his knowledge that there had been Congressional inquiries about the highway, but he

didn't know when they were made, to whom, or even where he had heard that there had been Congressional interest expressed in the project. *Id.* at 20.

After traveling to Ohio in June, 1981, to review the project, Larson dictated the first draft of the decision statement which was ultimately signed by Judith Conner, the Assistant to Secretary Lewis. *Id.* at 11. After the decision was reviewed by Larson's staff, Larson prepared second and third drafts which were also reviewed by staff members. *Id.* at 12–13. There is no indication in Larson's deposition that the decision statement was based on anything other than the FEIS, his observations of the project and corridor area, a review of the State's resubmission in 1981, including the additional studies made by the TCC, and a review of the existing FHWA files concerning I–675. *See, id.* at 27–28, 30, and 33–36.

Likewise, the deposition of Judith Conner, who signed the 1981 Decision Statement does not indicate that extraneous political "threats" entered into her decision regarding the highway. At the time of the decision on I–675, Conner served as the primary policy advisor to the Secretary of Transportation. Conner deposition at p. 6. Conner had held this position since February, 1981, but had previously held various positions in the Department of Transportation, including jobs in the urban mass transportation administration, and in environment safety and consumer affairs. *Id.* at 5–6.

Conner was not aware of any discussions held with Congressional officials, and did not discuss any such meetings with Secretary Lewis. *Id.* at 12, 40–41. Conner was aware that the project was controversial, because there had been controversy through previous administrations, and that she might have to confer with Secretary Lewis about it. *Id.* at 8, and 14–15. Conner was informed by the staff of the office of Environmental Policy, which had participated in the Goldschmidt decision, that there was no basis for overrunning the previous decision. *Id.* at 20–21, and 38. *See also,* Gov. Ex. R.

Conner indicated that at the time she received this memorandum from her staff, she had not made her decision regarding I–675. Conner deposition, at p. 28. Conner also indicated that since her staff had helped to make the Goldschmidt decision, she would have been "very surprised if they had reversed themselves." *Id.* at 38.

After reviewing the materials provided by her staff, Conner determined that it was necessary to explore "whether or not reviewing the same facts the Reagan Administration would have adopted the *same basic policy approach.*" *Id.* at 22. Conner indicated that her approach was not to determine whether or not the Department *could* reach a different conclusion, but was "whether we *should.*" *Id.* (emphasis added). Conner was aware that the Reagan Administration had not endorsed the Carter policy directives, *id.*, and concluded that the policy emphasis in the new Administration would be upon "actual transportation benefits," *id.* at 23, and upon the local interests and planning process. *Id.* at 24–25.

Conner received another staff memo prior to her discussion of I–675 with Secretary Lewis, *see,* Plaintiffs' Ex. 23, but had previously made a decision regarding her position on the highway. Conner deposition, pp. 29–30. Conner had determined that the two basic issues were urban policy, i.e., using the highway as a tool for urban change, and traditional approaches used by the Department for highway installations, i.e., traffic needs. *Id.* at 30–31. Because these issues were "sensitive to policy," Conner wanted to obtain the guidance of the Secretary. *Id.* Conner met with Secretary Lewis on Monday, July 6, 1981, and repeated pro and con arguments for the highway to him. *Id.* at 33–34. Conner indicated that Lewis was "fully familiar with the background and the controversy." *Id.* at 33. Conner indicated to Lewis that she felt the highway should be approved, and Lewis stated that he agreed. *Id.* at 36, 39. After discussing the project with the Secretary, Conner signed the statement. Such a procedure apparently was the usual method, and Conner indicated that it would have been highly unusual for Lewis to have signed the decision. *Id.* at 39–40.

While Conner's decision to approve the highway project indicated a shift in policy from urban policy to highway justification policies, there is no indication that extraneous political threats played any part in her decision. Therefore, even if Plaintiffs had prevailed on the first portion of the *Costle* test, the Court must conclude that they would have failed to show, as required by the second prong of the test, that the alleged unlawful interference affected the decision to approve the highway.

As a final matter, the Court notes that it has not found, by applying the pertinent standards of review, that the USDOT decision to approve the highway constituted an abuse of discretion. As was noted by the Supreme Court in *Strycker's Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980), "once an agency has made a decision subject to NEPA's procedural requirements, the only role for a Court is to insure that the agency has considered the environmental consequences; it cannot ' "interject itself within the area of discretion of the executive as to the choice of the action to be taken." ' " *Id.* at 227–228, 100 S.Ct. at 499–500, quoting *Kleppe v. Sierra Club,* 427 U.S. 390, 410, n.21, 96 S.Ct. 2718, 2730, n.21, 49 L.Ed.2d 576 (1976). In this context, it should be noted that, assuming *arguendo* that economic impacts of the type involved herein are relevant under NEPA, they were given sufficient consideration in the 1981 decision. Therein, the potential for adverse economic impact on the City of Dayton was recognized, but the traffic needs and benefits for the region were deemed to outweigh economic considerations. Gov. Ex. A, pp. 199–200. As was noted by the Supreme Court NEPA does not require that an agency "elevate environmental concerns over other appropriate considerations," 444 U.S. at 227, 100 S.Ct. at 499, but only mandates that environmental consequences be considered. *Id.* Because the Court's analysis, as evidenced in this opinion, has indicated that there was procedural compliance with the requirements of NEPA and that the envi-

ronmental consequences of the project were considered, there is no basis upon which this Court may permissibly conclude that the Department of Transportation abused its discretion, or acted in an arbitrary or capricious manner when it approved the construction of the remaining portion of I-675.

## IX. BAD FAITH—Count IV

■ In Count IV of the Complaint, the Plaintiffs have alleged that the actions of the Defendants in ¶s 1–63 of the Complaint constituted bad faith in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). The Federal Defendants have filed a Motion to Dismiss Count IV, with respect to the Federal Defendants, based on the fact that the Complaint contains no allegations of bad faith on the part of these Defendants. *See*, Doc. # 41, ¶ 2. An examination of the Complaint does indicate that there are no specific allegations of bad faith on the part of the Federal Defendants. However, to the extent that NEPA has been interpreted as requiring good faith objectivity in complying with the Act's requirements, *see*, *Life of the Land v. Brinegar*, 485 F.2d 460, 467 (9th Cir. 1973), cert. denied, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974), it could be argued that a lack of good faith, i.e., bad faith, may be raised through the allegations that the Federal Defendants did not base their decision-making upon relevant factors but instead upon irrelevant political considerations. Therefore, the Court will not grant the Motion to Dismiss on this basis, but does conclude, for the reasons outlined in the preceding discussion, as well as elsewhere in this opinion, that Plaintiffs have failed to establish bad faith on the part of the Federal Defendants, or that any alleged bad faith on the part of any other Defendant affected the decision of the Department of Transportation. In addition, because Count IV refers only to violations of the Administrative Procedure Act, it is deemed by the Court to be inapplicable to the State Defendant, since that agency is not within the purview of the Administrative Procedure Act. *See*, 5 U.S.C. § 551(1). Even if Count IV had raised a claim against the State

Defendant, the Court has concluded elsewhere in this opinion that the State Defendant did not act in bad faith.

## X. ALLEGED VIOLATION OF 23 U.S.C. § 134—Count III

■ In Count III of the Complaint, Plaintiffs have alleged that the Department of Transportation violated the requirements of 23 U.S.C. § 134, and abused its discretion under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) by certifying the local planning process in 1980 and 1981 despite the failure of the local planners to engage in a meaningful analysis of alternate projects available under withdrawal/substitution. *See*, Doc. # 1, ¶s 67–69. In their Preliminary Memorandum in Support of Motion for Preliminary and Permanent Injunction, Plaintiffs have contended that the TCC did not start to consider withdrawal/substitution until after Goldschmidt's September 26, 1980 letter, that ODOT was antagonistic to TCC withdrawal/substitution efforts, and that TCC did not proceed with withdrawal/substitution after the 1980 presidential election. Based on these facts, Plaintiffs have claimed that USDOT certification of local planning constituted an abuse of discretion. *See*, Doc. # 22, pp. 66–67.

Defendants have moved to dismiss Count III of the Complaint for failure to state a claim upon which relief may be granted, because they claim that Count III contains no factual allegations which are material to a determination of whether certification of the planning process was arbitrary, capricious, or an abuse of discretion. Doc. # 41, ¶ 1. Specifically, the Federal Defendants have contended that consideration of alternatives to a particular project is irrelevant to the question of certification of the planning process itself; that decisions regarding withdrawal/substitution are under the control of the State Governor and the local governments; and that neither TCC nor the ODOT had a duty under 23 U.S.C. § 134 to comply with Secretary Goldschmidt's request that consideration be given to withdrawal/substitution. *See*, Doc. # 38, pp.

15–18. In addition, the ODOT has maintained that it is not even a relevant agency for purposes of withdrawal/substitution. *See*, Doc. # 38, p. 26. Plaintiffs have not responded to these contentions. Finally, Defendants have contended that alternatives were in fact given consideration.

23 U.S.C. § 134(a), as amended in 1978, requires that the Secretary of Transportation cooperate with State and local officials in the development of transportation plans, and further indicates that "[a]fter July 1, 1965, the Secretary shall not approve ... any program for projects ... unless he finds that such projects are based on a continuing comprehensive transportation planning process carried on cooperatively by States and local communities in conformance with the objectives stated in this section." Pursuant to, *inter alia*, § 134, the FHWA has promulgated regulations which indicate that review of the planning process shall be made annually by the Federal Highway and Urban Mass Transportation Administrators, and that certification shall be a "prerequisite for program approvals in urbanized areas." 23 C.F.R. §§ 450.102 and 450.122 (1979).[49] The regulations further indicate that the urban transportation planning process shall include certain technical activities such as, *inter alia*, "[a]nalysis of alternative transportation investments to meet area-wide needs for new transportation facilities and the development of the long-range element of the transportation plan." 23 C.F.R. § 450.120(a)(8)(iv) (1979). Because these regulations, if read in their broadest sense, could be interpreted as extending to the analysis of alternatives conducted herein, which was certainly an element of the planning for the area, the

Court will not dismiss Count III of the Complaint for failure to state a claim upon which relief may be granted, *see*, Fed.R. Civ.P. 12(b)(6), but will consider the merits of the claims advanced therein by Plaintiffs.

On the merits, however, the Court must disagree with Plaintiffs' conclusion that no meaningful alternative investment strategies were considered. Without repeating in detail those points which have already been made in this opinion, the Court notes that subsequent to the 1979 Goldschmidt decision, the TCC did consider alternatives which might be suitable for withdrawal/substitution. As was previously mentioned, the Associate Deputy Secretary for the Department of Transportation indicated in March, 1980, that in his opinion, the TCC was acting in a "perfectly reasonable" manner by combining a decision on interstate withdrawal with an understanding of what projects would be initiated in the corridor area. Gov. Ex. A, p. 121–123. The September 26, 1980 letter of Secretary Goldschmidt also reflects the same understanding of the process which would be followed with regard to withdrawal/substitution. *Id.* at 155.[50] Thus, it cannot be concluded that no meaningful analysis was undertaken because no withdrawal request was submitted prior to Goldschmidt's September 26, 1980 letter. Moreover, as has been previously indicated, the dispute between the ODOT Director Weir and TCC Director Jensen involved the proper procedures to be followed in initiating withdrawal/substitution rather than with regard to whether such a course of action should be taken. Again, the Court notes that Jensen's reply to Weir stated that the parties had agreed to proceed as if

---

**49.** The regulations cited in the main text remained the same from 1975 until April 1, 1981. *See*, 23 C.F.R. part 450, note, and §§ 450.102 and 450.122 (1981). However, the new regulations, which became effective on June 30, 1981, are similar to the previous provisions. *See*, 23 C.F.R. Appendix-Postponed Regulations, §§ 450.102 and 450.124 (1981).

**50.** It is apparent that the FHWA regional representative, Doug Kelm, was of the opinion that local officials had not given consideration to "'project substitution'" rather than "'I–675

Replacement." *Id.* at Plaintiffs' Ex. 6, p. 5. Kelm recommended that only projects in the TCC No-Build Alternate be funded. *Id.* It is questionable whether Goldschmidt shared this opinion, since he did not follow Kelm's recommendation, but instead informed the TCC on September 28, 1980, that "[a]lternative G represents a series of transportation improvements which appear to meet the transportation requirements and are eligible for Interstate withdrawal funding." Gov. Ex. A, p. 155.

Goldschmidt's decision was final. Finally, the Court does not find that TCC's decision to attempt to secure approval of the original project rather than to proceed with withdrawal/substitution is relevant to the issue at hand. 23 U.S.C. § 103(e)(4) does not mandate a certain result; it merely provides a procedure through which the Secretary may approve withdrawal of a segment from the Interstate System once the local jurisdictions and the State Governor have determined that they wish withdrawal to occur. Because the withdrawal/substitution analysis performed by the TCC indicated that the first priority was construction of the highway as originally proposed, it is hardly surprising that the local agency would exercise its discretion in favor of trying to obtain permission for its first preference.

The FHWA correspondence regarding the TCC certification indicates an awareness of the process which was being followed, and in fact, does indicate in May, 1980, December, 1980, and April, 1981, that advancement of projects connected with the I–675 corridor would be permitted only on a case by case basis until studies of alternatives were completed, and a resolution of the appropriate corridor facility had been made. *See*, Gov. Ex. H, pp. 54–58; 66–67; and 70–71. Thus, the FHWA did monitor the planning process, particularly as it related to I–675. Given the facts outlined elsewhere in this opinion, the Court concludes that the FHWA did not abuse its discretion, i.e., commit a clear error of judgment, *see, Movement Against Destruction v. Trainor*, 400 F.Supp. 533, 573–574 (D.Md., 1975), by certifying the local planning process in 1980 and 1981.

*Conclusion*

Based on the foregoing analysis of the facts and law, the Court finds in favor of Defendants and against Plaintiffs on all four Counts in the Complaint. Accordingly, the Plaintiffs' request for a declaratory judgment, a permanent injunction, and other relief, including attorneys' fees, is hereby denied.